**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | | |
|---|---|---|
| **JERRY JOSEPH HIGDON,** | ) | |
| | ) | |
| **Defendant/Movant,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:07cv310-MEF** |
| | ) | **(CR NO. 99-00043-N-1)** |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**UNITED STATES' RESPONSE TO § 2255 MOTION**

COMES NOW the United States of America, by and through its attorney, Leura G. Canary, United States Attorney, and, in compliance with this Court's order, responds to Defendant/Movant Jerry Joseph Higdon's Motion Under § 2255 to Vacate, Set Aside, Or Correct Sentence By a Person In Federal Custody, as follows:

## I. PROCEDURAL HISTORY

On February 27, 2003, a grand jury for the Middle District of Alabama returned a ten-count indictment against Defendant/Appellant Jerry Joseph Higdon, Jr., and his co-defendants, John Gabriel Medley and Tammy Kincaid Porter.  (R:1:39) (**See Attachment 1 - Indictment**). Specifically, the indictment charged that, commencing on or about May 17, 2002, and continuing thereafter until January 28, 2003, the exact dates being unknown to the grand jury, in Montgomery County, within the Middle District of Alabama, and elsewhere, the defendants did knowingly and intentionally conspire, combine and agree together and with other persons known and unknown to the grand jury to distribute and possess with intent to distribute "Ice" methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), all in violation of 21 U.S.C. § 846.

Count two of the indictment charged that, on or about November 12, 2002, in Montgomery County, within the Middle District of Alabama, Higdon knowingly and intentionally distributed approximately 7.0 grams of "Ice" methamphetamine, a Schedule II controlled substance, in violation of 18 U.S.C. § 2, and 21 U.S.C. § 841(a)(1). Count three charged that, on or about December 10, 2002, in Montgomery County, within the Middle District of Alabama, Higdon knowingly and intentionally distributed approximately 7.0 grams of "Ice" methamphetamine, a Schedule II controlled substance, in violation of 18 U.S.C. § 2, and 21 U.S.C. § 841(a)(1). Count four charged that, on or about December 12, 2002, in Montgomery County, within the Middle District of Alabama, Higdon knowingly and intentionally possessed with the intent to distribute approximately 6.9 grams of "Ice" methamphetamine, a Schedule II controlled substance, in violation of 18 U.S.C. § 2, and 21 U.S.C. § 841(a)(1).

Count five of the indictment charged that, on or about December 12, 2002, in Montgomery County, within the Middle District of Alabama, Higdon knowingly and intentionally possessed with the intent to distribute approximately .76 grams of "Ice" methamphetamine, a Schedule II controlled substance, in violation of 18 U.S.C. § 2, and 21 U.S.C. § 841(a)(1). Count six charged that, on or about January 21, 2003, in Montgomery County, within the Middle District of Alabama, the defendants knowingly and intentionally distributed approximately two grams of "Ice" methamphetamine, a Schedule II controlled substance, in violation of 18 U.S.C. § 2, and 21 U.S.C. § 841(a)(1).

Count seven of the indictment charged that, on or about December 12, 2002, in Montgomery County, within the Middle District of Alabama, Higdon knowingly used, carried and brandished a firearm, to wit: a Mossberg, 12 gauge, pistol grip, pump shotgun, during and in

2

relation to a drug trafficking offense, to wit: possession with intent to distribute

methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. § 841(a)(1), a

drug trafficking crime prosecutable in a court of the United States, all in violation of 18 U.S.C. §

924 (c)(1)(A)(ii).  Count eight charged that, on or about December 5, 2002, in Montgomery

County, within the Middle District of Alabama, Higdon and co-defendant John Medley

knowingly, and during and in relation to a drug trafficking offense, to wit: distribution and

possession with the intent to distribute methamphetamine and marijuana, Schedule I and II

controlled substances, in violation of 21 U.S.C. § 841(a)(1), drug trafficking crimes prosecutable

in a court of the United States, use and carry a firearm which was discharged, to wit:  an AK-47

assault rifle, 7.62x39 millimeter, and an SKS assault rifle, 7.62x39 millimeter, all in violation of

18 U.S.C.  § 924 (c)(1)(A)(ii).  Count nine charged that, on or about December 5, 2002, and

January 28, 2003, in Montgomery County, within the Middle District of Alabama, Higdon and

Medley knowingly, during and in relation to a drug trafficking offense, to wit:  distribution and

possession with the intent to distribute methamphetamine and marijuana, Schedule I and II

controlled substances, in violation of 21 U.S.C. § 841(a)(1), drug trafficking crimes prosecutable

in a court of the United States, use and carry a firearm which was a semi-automatic assault

weapon, to wit:  an AK-47 assault rifle, 7.62x39 millimeter, and an SKS assault rifle, 7.62x39

millimeter, all in violation of 18 U.S.C.  § 924 (c)(1)(B)(I).

Finally, count ten of the indictment charged that, on or about December 5, 2002, in

Montgomery County, within the Middle District of Alabama, Higdon and co-defendant John

Gabriel Medley knowingly, and in furtherance of a major drug trafficking offense, to wit:

conspiracy to distribute marijuana and methamphetamine, Schedule I and II controlled

substances, in violation of 21 U.S.C. § 841(a)(1), a drug trafficking crime prosecutable in a Court of the United States, with the intent to intimidate, harass, injure, or maim, fire a weapon, to wit: an AK-47, 7.62 x 39 millimeter, and a SKS assault rifle, 7.62 x 39 millimeter, into a group of two or more persons, and thereby cause grave risk to a human life, all in violation of 18 U.S.C. § 36(b). Higdon entered a plea of not guilty on March 12, 2003.

Higdon was tried before a jury on May 6, 2003. At the close of the United States's evidence, the defense moved for judgment of acquittal as to each count in the indictment. (R:8:434) The court denied the motion, stating that the United States had presented evidence sufficient to sustain convictions against Higdon. (R:8:442) The defense renewed its motion at the close of all evidence, and the court again denied the motion. (R:10:524-25) Higdon was found guilty of counts two, three, four, and ten on May 9, 2003. (R:11:650-52) His defense again renewed its motion for a judgment of acquittal, and filed a motion for a new trial. (R:1:106; 107) Both motions were denied by the Court. (R:1:113) Again, on July 21, 2003, Higdon filed for leave to file out of time renewed motions for new trial and judgment of acquittal. (R:1:117; 118). The district court granted permission for the new trial motion, but denied the request to file an additional motion for judgment of acquittal. It denied the motion on July 28, 2003. (R:1:127)

A sentencing hearing was held on August 8, 2003. After hearing testimony in support of the findings made by the United States Probation Office during the preparation of the presentence investigation report, the district court determined that Higdon's offense level was 44 and his criminal history category was I, resulting in a relevant guideline range of life. (R:12:87) The court then sentenced Higdon to 480 months as to counts two, three and four, and 300 months as to count ten, with each term consecutive to the other. (R:12:88-89) (**See Attachment 2 -**

4

**Sentencing Transcript**)  It also ordered that Higdon pay a $400 special assessment to the United

States; and, ordered him placed on supervised release for five years if he was released from

prison, subject to general and special conditions (R:12:89-90)

Sentence was pronounced in this case on August 8, 2003.  A final judgment of conviction

and sentence was entered on August 20, 2003 (R:1:137).  An amended judgment was filed on

September 2, 2003.  (R:1:145)  Higdon  filed a timely notice of appeal to this Court on August

23, 2003 (R1-143).  His appeal was filed on August 28, 2003.  He filed another new trial motion

on October 29, 2003.  (R:1:150) The district court denied the motion on November 6, 2003.

(R:1:151).  Higdon filed his appeal with the Eleventh Circuit Court of Appeals on January 28,

2004.  He raised five issues on appeal. (**See Attachment 3 - Higdon's Appeal Brief**)

Higdon's first issue on appeal alleged that he was entrapped as to Count Two and Three,

because his testimony at trial showed that he was not predisposed to sell drugs.  The Court held

that "A valid entrapment defense requires two elements: (1) government inducement of the

crime, and (2) defendant's lack of predisposition to commit the crime prior to the inducement.

Once the defendant has produced evidence of inducement, the government must prove beyond a

reasonable doubt that the defendant was predisposed to commit the crime absent the

government's role in assisting such commission."  United States v. Francis, 131 F.3d 1455-56

(11th Cir. 1997).  The Court held that the record was replete with evidence that Higdon was

predisposed to sell drugs before the government agent approached him about purchasing drugs

and rejected Higdon's argument. (**See Attachment 4 - Decision of the 11th Circuit**)

Higdon's second issue on appeal alleged that the district court erred by not ordering an

evidentiary hearing prior to denying Higdon's renewed motion for new trial based upon newly

discovered evidence.  Higdon contended that the district court was required to conduct an evidentiary hearing to determine whether to grant a motion for new trial after Higdon proffered an affidavit from Christopher Lee Stevens, the cellmate of Higdon's co-defendant, John Gabriel Medley, stating that Medley had admitted to him that he had perjured himself at Higdon's trial. Applying United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998), the Court reviewed the district court's denial of the evidentiary hearing and denial of a motion for new trial for abuse of discretion.  Relying on it's decision in United States v. Bascaro, 742 F.2d 1335, 1344 (11th Cir. 1984), the Court denied Higdon's appeal on this issue holding that Higdon was not entitled to either an evidentiary hearing or a new trial because the "new evidence" was merely impeaching and Higdon had not shown that it would change the outcome of the trial.  The Court noted in it's opinion the taped statement of Higdon admitting that he was responsible for the drive by shooting which was the subject of the alleged impeaching statement attributed to Medley by his cellmate Stevens.

Higdon's third issue on appeal alleged the district court erred in denying his motion for judgment of acquittal as to his conviction for possession with intent to distribute methamphetamine because there was insufficient evidence at trial that he intended to distribute, as opposed to merely possess, the 6.9 grams of "ice" seized on December 11, 2002.  To sustain a conviction under 21 U.S.C. Section 841, the government must prove, either by direct or circumstantial evidence, three elements: (1) knowledge, (2) possession, and (3) intent to distribute.  See United States v. Poole, 878 F.2d 1389, 1391-92 (11th Cir. 1989).  Reviewing the evidence in a light most favorable to the government to see if a reasonable trier of fact could conclude that the evidence established Higdon's guilt beyond a reasonable doubt the Court

6

denied Higdon's appeal on this ground finding that a reasonable jury could have concluded from the evidence that Higdon intended to distribute the methamphetamine seized from his home and charged in Count Four.  See, United States v. Rodriguez, 218 F.3d 1243, 1244 (11th Cir. 2000); United States v. Martinez, 83 F.3d 371, 373-74 (11th Cir. 1996).

Higdon's fourth issue on appeal alleged that the district court erred when it denied his motion for a new trial for an alleged Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97 (1963), violation on the basis that Higdon's appeal was pending, pursuant to Fed.R.Crim.P. 33(b)(1).  Higdon argued that a DEA-6, obtained in a separate investigation by DEA, in which a source stated Medley was a major supplier of Methamphetamine in the Montgomery area should have been turned over to him because it was favorable to him and could have changed the outcome of the proceedings.   In it's opinion denying Higdon's appeal on this issue the Court found Higdon was correct in his assertion that the district court should have either clearly rejected Higdon's motion on the merits or certified to the Eleventh Circuit its intention to grant the motion. United States v. Chronic, 466 U.S. 648, 667 n.42, 104 S.Ct. 2039, 2051 (1984). Nevertheless, the court declined to grant Higdon relief on this issue finding that there was not a reasonable probability that the evidence would have changed the outcome of the trial.  United States v. Hansen, 262 F.3d 1217, 1234 (11th Cir. 2001), cert. denied, 122 S.Ct. 2326 (2002).  The Court explained that it's decision was based on the fact that the evidence Higdon claimed was withheld was favorable to the government as it bolstered the governments evidence at trial that Medley was selling large amounts of methamphetamine during the time Medley testified he was selling large amounts of methamphetamine he had obtained from Higdon.

Higdon's fifth, and final, issue on appeal alleged that the district court erred in accepting

the base offense level calculations in the PSI over his objection because the computation was based on a proffer by his co-defendant, John Gabriel Medley.  The Court held that the government has the burden to prove drug quantity by a preponderance of the evidence.  United States v. Lee, 68 F.3d 1267, 1274 (11th Cir. 1995).  The Court found that, considering all the evidence produced at trial and sentencing, the government sufficiently proved a drug quantity that would trigger a base offense level of 36.  The Court then concluded that the district court did not commit reversible error when if found the government had met its burden of providing reliable and specific evidence.

On June 24, 2004, after all pleadings had been filed in Higdon's appeal and the parties were awaiting action by the Eleventh Circuit Court of Appeals the United States Supreme Court issued its decision in Blakely v. Washington, ___ U.S. ___, 124 S.Ct. 2531, 159 L. Ed. 2d 403 (2004).  The Supreme Court held that the Washington State Sentencing Guidelines violated the Sixth Amendment right to a trial by jury and clarified the rule it had announced in Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S. Ct. 2348, 2362-63, 147 L. ED. 2d 435 (2000), that other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.  In United States v. Booker, ___ U.S. ___, 125 S. Ct. 738, 755-56, 160 L. Ed. 2d 621 (2005), the Supreme Court extended Blakely to the Federal Sentencing Guidelines.  To remedy the Guidelines' constitutional defect, the Court excised the statutory provision that made the guidelines mandatory and made them "effectively advisory".   Higdon's motion for leave to file supplemental argument and brief in support asserting his sentence was unconstitutional under Blakely was denied by the Eleventh Circuit because it was not timely raised in his initial brief.

8

The Court cited <u>United States v. Curtis</u>, 380 F.3d 1308 (11th Cir. 2004), and <u>United States v. Levy</u>, 379 F.3d 1241, reh'g en banc denied, 391 F.3d 1327 (11th Cir. 2004)

The Eleventh Circuit affirmed the conviction and sentence in this case.  See <u>United States v. Higdon</u>, 122 Fed. Appx. 985 (11th Cir. 2004).  Later, the Court denied rehearing en banc.  See <u>United States v. Higdon</u>, 418 F.3d 1136 (11th Cir. 2005).  On October 25, 2005, the United States Supreme Court vacated the judgement of the Eleventh Circuit and remanded the case to it for consideration in light of <u>Booker v. United States</u>, 543 U.S. __, 125 S.Ct. 738 (2005).  The Eleventh Circuit reconsidered its decision as instructed by the Supreme Court and re-instated its judgment affirming the conviction and sentence on December 13, 2005.  The Eleventh Circuit denied Higdon's Petition for Rehearing and Petition for Rehearing en banc on April 7, 2006. The mandate of the Court was entered on April 17, 2006. (**<u>See Attachment 5 - Decision of 11th Circuit Rejecting Higdon's Booker Argument As Procedurally Barred</u>**)

Higdon filed a Motion to Vacate, Set Aside or Correct Sentence on April 6, 2007.  On April 13, 2007, this Court entered an order directing the United States to respond within thirty days.

## II.  RELEVANT FACTS

**<u>The Transcript of the Trial is Complete and Available to the Court.  It has not been attached as the United States believes the Court can resolve this petition from the foregoing facts together with record citations provide the relevant facts</u>.  <u>Should the Court determine that it needs the record and a copy is not a part of the Court's record of these proceedings the United States will be happy to provide same to the Court</u>.**  At the trial Shane Carlton testified that he knew the defendant Jerry Joseph Higdon, Jr. by virtue of their mutual

employment at the State of Alabama's Department of Transportation in Montgomery, Alabama. During their acquaintance, Carlton became aware that Higdon sold marijuana, and stated that he purchased some from Higdon approximately two years prior to trial. (R:6:44) Carlton later became a confidential source to local and federal law enforcement, and, in that capacity, approached Higdon about purchasing drugs. Around August of 2002, Carlton asked Higdon if he could obtain a controlled substance known as "ice," a very pure form of methamphetamine, and Higdon responded that he could. (R:6:44) Carlton asked Higdon how long it would take to get the "ice," and Higdon's response that some was probably at his house led Carlton to believe that the substance was readily obtainable for him. (R:6:45-46)

On November 12, 2002, Carlton met with law enforcement for the purpose of making a controlled buy of "ice" from Higdon. Officers searched Carlton's person and automobile to insure that he did not have any "ice" in his possession. He was given $800 to purchase a quarter of an ounce (approximately 7.5 grams) of "ice," and a tape recorder with which to record the transaction. (R:6:48-50) Carlton testified that he entered Higdon's home, where he watched Higdon use digital scales to weigh a bag which contained the substance, and then gave him the $800 in exchange for the "ice." He stated that he did not see much of the interior of the home, but that the transaction took place in a room that had a couch and table, and that there was a surveillance monitor that showed the driveway and road outside the residence. (R:6:52-53) Carlton then returned to a designated location to meet law enforcement officers where he surrendered the controlled substance and tape recorder to Thomas Halasz, a federal agent. Carlton then explained the proceedings during playback of the recording in open court. (R:6:59) During the transaction, Higdon could be heard to indicate the stone of methamphetamine from

10

which the purchased portion had been taken, and stating that the stone had weighed one full

ounce.  (R:6:62) Carlton then testified that he received payment for his work as a confidential

source to law enforcement.  (R:6:66)

Carlton arranged for another controlled buy of approximately 7 grams of "ice" from

Higdon, to take place on December 10, 2002.  Again, he met with law enforcement officers prior

to his appointment with Higdon and was given a tape recorder to operate during the transaction.

(R:6:66-68) Carlton testified that when he arrived at Higdon's home the agreed upon amount of

"ice" was already weighed, bagged, and waiting for him.  He picked up the bag, gave Higdon

$800 in buy money provided by the officers, and proceeded to the rendezvous point to meet the

officers.  (R:6:70-71) A tape of this transaction was also played in open court, and again Carlton

explained the events recorded on tape.  He testified that the "ice" purchased on December 10th

was placed on the globe of a lamp located on the table in Higdon's home.  (R:6:74-75) The tape

also recorded Carlton's request for another transaction, and Higdon's response that he could

purchase the same amount on the next day, December 11, 2002.  (R:6:76) Carlton commented to

Higdon that he was "fast," and Higdon replied that there were three ounces (of "ice") that were

available for him in Atlanta.  (R:6:77)

Higdon could be heard on the tape referring to someone named Gabe as "his boy."

Carlton stated that he did not know who "Gabe" was, but that he had heard the name used in

several conversations.  (R:6:78) Higdon stated that he liked Gabe because he didn't discuss his

(Higdon's) business, and that he didn't want to meet people in his own house when he was

dealing drugs.  (R:6:79)  Higdon was also heard to imply that he was responsible for a recent

shooting on North Pass, and that the cause of the shooting was the theft of a half pound of

11

marijuana by persons in the North Pass neighborhood which caused a financial loss to Higdon of $8500.  (R:6:80) Additional statements Higdon made on the tape discuss shooting three automobiles with 30 round clips.  (R:6:81) Carlton stated that he never directly asked Higdon how long he had sold drugs, but that Higdon mentioned in passing that he had done so for twenty years.  (R:6:82)

During Carlton's cross-examination, he acknowledged that he had approached Higdon to purchase drugs, but that Higdon was already involved in the distribution of drugs when he did so. (R:6:93)

Randy Pollard, an investigator with the Montgomery County Sheriff's Office, explained to the jury that a "controlled buy" was a law enforcement technique wherein an officer or confidential informant was searched, given funds to make a purchase of a controlled substance, followed to the purchase location, and observed as much as possible during the transaction. (R:6:119) Pollard stated that actual observation of an informant during a controlled buy operation was sometimes difficult.  (R:6:120) Pollard described being informed that Shane Carlton had information on the narcotics trade in Montgomery, and then developing Carlton as a confidential source.  (R:6:123) Pollard then described providing surveillance during Carlton's controlled buys of "ice" from Higdon on November 12 and December 10, 2002.  (R:6:125-31)  Pollard also testified that he participated in a search of Higdon's house on December 11, 2002.  He stated that Higdon was located on the couch in the room where surveillance monitors were located (R:6:136), and that a shotgun was within his reach, approximately two and one-half feet away (R:6:137).

Tammy Porter testified that she was a friend of a man named John Gabriel Medley, and

12

that she had regularly used methamphetamine with Medley during December, 2002.  (R:6:164-66) Porter stated that she became acquainted with Higdon when taking Medley to Higdon's home, but that she had never been inside the house, per the request of Higdon.  (R:6:166-67) Porter testified that on January 21, 2003, she was asked to procure methamphetamine for an acquaintance.  Porter, accompanied by Gabriel Medley, met the acquaintance at a local Chevron station, where she found him in the company of a man that she later learned was an undercover police officer.  (R:6:171-72) Porter was given $260, which she then turned over to Medley.   The pair then went to a car wash because, according to Medley, "Higdon wasn't home yet." (R:6:172-73) She then dropped Medley off at Higdon's house and returned to the car wash. Porter received a call from Medley, returned to Higdon's house to pick him up, and they proceeded to meet Porter's friend and the undercover officer at a local Winn-Dixie supermarket. (R:6:173-74) Medley showed her approximately one to two grams of methamphetamine that would be turned over to the acquaintance and undercover officer.  When they arrived at the Winn-Dixie, Medley got out of the car and delivered the methamphetamine.  (R:6:174)

On cross-examination, Porter testified that Medley was periodically living at Higdon's house during this time period.  While she had testified to driving Medley to Higdon's to purchase drugs two or three times, she admitted that she never actually saw Medley obtain drugs from Higdon.  (R:6:176)

Tommy Conway, a corporal in the Montgomery Police Department, testified that on January 21, 2003, he participated in an undercover operation wherein an informant assisted him in purchasing two grams of methamphetamine from Tammy Porter and Gabriel Medley.  Conway testified that prior to the transaction, Medley stated that he would meet them after 4:00 p.m.,

because the "person he is getting it from works for the DOT." (R:8:185) Rather than simply wait for Medley's instructions for delivery, the informant took Conway to Higdon's house, noting that it was "probably the house they are going to get it from" because he had seen Medley go there before. When Medley called with instructions to meet at a Winn-Dixie, Conway and the informant did so, and there received the methamphetamine from Medley. (R:8:186)

John Gabriel Medley testified that he first met Higdon in July or August of 2002 when he went to Higdon's house to purchase "ice" methamphetamine. On that occasion, he purchased an "eight-ball" of the drug, did so again approximately one week later, and thereafter "about every other day." (R:8:201-03) Medley stated that he sold some of the methamphetamine purchased from Higdon to other users of the drug in order to support his own habit, and that Higdon would usually "front" the drug to him, with the understanding that Medley would secure the value of the drug fronted by, in turn, selling to third parties. (R:8:203-04) Medley stated that Higdon was aware of his redistribution of methamphetamine in this manner. (R:8:204)

Medley testified that, between August, 2002 and January, 2003, Higdon "fronted" him a quarter ounce of "ice" methamphetamine at least twice on weekends, and that an ounce was "fronted" to him "at least a dozen times." (R:8:204) Medley stated that he sometimes purchased ounces and quarter ounces of "ice" from Higdon with cash during this period. (R:8:205) In addition to the purchases of "ice," Medley testified that he purchased marijuana from Higdon "at least 30 or 40 times" in quantities that ranged from less than an ounce to a full pound. Medley explained that Higdon supplied "kind bud," which is a high grade, hydroponic type of marijuana. (R:8:207) When questioned further, Medley estimated that between August, 2002 and January, 2003, he bought at least a quarter pound of marijuana from Higdon "at least a

14

dozen times," and a pound or half pound at least five or six times during the same time period.
(R:8:208) He also stated that his purchases of marijuana were sometimes made by the "fronting"
procedure he had described earlier.

Medley witnessed Higdon sell "ice" methamphetamine every time he was at Higdon's
house, which he estimated to be at least every other day between August, 2002, and January,
2003. (R:8:210) He stated that for a while, he was actually living with Higdon, and during those
times, saw him sell marijuana "just about every day." The lowest number of persons that could
testify to Medley's first-hand observations of Higdon's drug dealing was estimated to be about
twenty to thirty. (R:8:210) Medley testified that, in August, 2002, Higdon rented a car from
Thrifty Rental Car at the Montgomery airport so that the two could drive to Atlanta, Georgia,
where Higdon purchased two ounces of methamphetamine from his dealer, Landon Birch.
(R:8:211-12) Upon returning to Montgomery, Higdon split the "ice" between himself and
Medley for each to sell. (R:8:213) Medley stated that this practice demonstrated his agreement
with Higdon to distribute drugs, and that Higdon had the money and the connections to
accomplish this goal. (R:8:213) Finally, Medley described traveling to Atlanta with Higdon to
purchase two pounds of marijuana in July, 2002. (R:8:214)

Medley was next questioned about the events of December 5, 2002. He stated that
Higdon telephoned him on that date and told him that he and some others were planning on
getting revenge on some people that had stolen a pound and a half of marijuana from him.
(R:8:215) Medley went to Higdon's house, and then departed with persons named John Fowler
and "Chunky" to shoot automatic rifles at the persons Higdon held responsible for the theft.
(R:8:215-16) The persons resided in a neighborhood known as North Pass in Montgomery. The

weapons used (an AK-47 and an SKS rifle) were both owned by Medley, but had been kept at Higdon's home since November, 2002, for safekeeping. (R:8:218-19) Medley identified the two weapons presented to him by the United States as his, and testified that each rifle was used to fire thirty 7.62 millimeter bullets, or rounds, at the automobiles and home of the alleged robbers on December 5, 2002. (R:8:221-23) After the shooting, the three returned to Higdon's house, whereupon Higdon telephoned the targets of the shooting and demanded his money. Medley testified that Higdon knew of, agreed with, and encouraged the December 5, 2002 shooting in North Pass. (R:8:229)

Medley then recounted his actions during the January 21, 2003 purchase of methamphetamine that he made with Tammy Porter, and acknowledged that he was arrested on January 28, 2003, as a result of his participation in that methamphetamine sale. (R:8:230-32) Subsequent to his arrest, he was informed by Higdon that someone named Eric would be willing to state that Medley was at Higdon's home the entire evening of December 5, 2003. (R:8:238)

Other testimony by Medley clarified that when he took his weapons to Higdon's home, they were kept in a green duffle bag, and that he did not place any weapon next to Higdon's couch. (R:8:239) He also stated that he was aware of the electronic surveillance equipment at Higdon's home, and that he had installed some of the equipment at Higdon's request so that he could see who was approaching. (R:8:239-41) Medley testified that he met someone named Eric at Higdon's house, and that he witnessed Eric purchase "ice" and marijuana from Higdon. (R:8:241-42) After the December 5, 2002 shooting, Eric drove Medley to Traffic Operations Road in Montgomery to wait for Higdon's money to be delivered. (R:8:243)

During cross-examination, Medley acknowledged that he initially approached Higdon to

16

purchase drugs, but that later, Higdon would contact him when there were quantities of drugs to be sold. (R:8:260) He then reviewed the quantities and frequencies of his drug purchases from Higdon. (R:8:261-64)

Detective S.E. Thompkins of the Montgomery Police Department testified that he received a call to investigate a shooting during the early morning hours of December 5, 2002. (R:8:274) Upon arriving at the address of the incident, 752 North Pass, he encountered a scene where an adult male had been shot in the neck, several bullet holes were apparent throughout the premises, and three automobiles in front of the residence were riddled with bullets. (R:8:277-81) Thompkins found approximately 30 shell casings of 7.62 millimeter bullets at the scene of the shooting. (R:8:283-85)

Thomas Halasz is a special agent with the United States Drug Enforcement Administration (DEA) assigned to Montgomery, Alabama, and in that capacity conducts investigations of the federal Controlled Substances Act. In so doing, he became familiar with Higdon, and participated in the controlled drug transactions between Shane Carlton and Higdon on November 12, 2002 and December 10, 2002. (R:8:288-302) The substances purchased in each transaction tested positive for methamphetamine, and were forwarded to the DEA laboratory in Dallas, Texas for further analysis. (R:8:300, 305) On December 11, 2002, Agent Halasz participated in a search of Higdon's home pursuant to a warrant. (R:8:309) In the converted carport of Higdon's home a bag containing 6.9 grams of a substance that tested positive for methamphetamine was located on the top of a desk lamp. (R:8:310) Halasz verified that this quantity became the subject of count four of the indictment against Higdon, and that it was also verified to be "ice" by the DEA laboratory in Texas. (R:8:310-11) He also testified that

Higdon had a Mossberg 12 gauge shotgun within his reach when the agents entered his home. (R:8:313)

Also located in Higdon's home was a loose quantity of a substance that the DEA laboratory identified as methamphetamine, located adjacent to the lamp in the converted carport (R:8:314-15). Halasz identified two assault rifles, an AK-47 and an SKS, that were found in a green duffle bag in a closet in the front of Higdon's house. (R:8:318) He also identified a digital scale, a balance scale, and a flip-top scale of the sort used to weigh controlled substances, that were located in the converted carport room of Higdon's house. Halasz testified that such items are frequently found at the site of controlled substance sales and marketing areas. (R:8:318-20)

Finally, Halasz testified that, during a second search of Higdon's home on January 28, 2003, a note was found on the bedstand in Higdon's bedroom. (R:8:333) The unsigned note was addressed to someone named "Jerry." The content of the note suggested that an unnamed amount of money should be paid to unnamed persons "as quickly as possible." (R:8:343)

During cross-examination, Halasz stated that the search of Higdon's home produced small plastic zip-lock bags. He also stated that the scales found in Higdon's home were not tested for operability. (R:8:350) Halasz testified that he could not elaborate on the cryptic contents of the note addressed to "Jerry," and had no information on its origins. (R:8:353-54)

Carla Haas is a forensic chemist with the DEA in Dallas, Texas and was qualified as an expert in the field of forensic chemistry. (R:8:374; 377) She stated that, in the course of her employment, she examined evidence in an investigation against defendant Higdon. (R:8:377-78) Hass testified that her analyses of the substances sold by Higdon to Shane Carlton on November 12, 2002 and December 10, 2002 revealed that they were, in fact, "ice" methamphetamine.

18

(R:8:382)  The contents of the bag found on the lamp in Higdon's home on December 11, 2002 also met the purity level required for classification as "ice."  However, The substance distributed by Higdon on January 21, 2002, through Tammy Porter and Gabriel Medley, was not pure enough to be considered "ice."  (R:8:383-84)

Catherine Richert testified that she was a forensic scientist specializing in firearms and tool marks examination for the State of Alabama.  (R:8:389) After being qualified as an expert in that area, she proceeded to identify Medley's AK-47 rifle and SKS semiautomatic rifle, which had been entered into evidence along with some of the ammunition confiscated during the search of Higdon's home.  She stated that she test fired both weapons and found them to be operational.  (R:8:390-92) She also explained that, because of lacquer coating or brass plating on the ammunition, she could not match the fired ammunition, either recovered from the scene of the North Pass shooting or her own lab, with either weapon.  (R:8:394-96)  However, she was able to match the head stamps on fired ammunition recovered from North Pass with the unfired ammunition taken from Higdon's home, and through photographic evidence, demonstrated the matches to the jury.  (R:8:397-402)

Buzz Sawyer testified that he is a manager at Thrifty Car Rental at the Montgomery, Alabama, airport.  (R:8:416) He identified documents maintained in the ordinary course of his business which showed that, from September 28 through October 10, 2002, Higdon rented a car from Thrifty.  (R:8:417-22) During cross-examination, Sawyer conceded that he had no way of determining whether the car was given to someone else to drive, or where the car was driven during the time Higdon rented it.  (R:8:422-23)

At the close of the United States's evidence, the defense made a motion for judgment of

19

acquittal.  (R:8:434) The district court denied the motion.  (R:8:442)

Eric Culpepper testified for the defense.  He stated that he was present at Higdon's home on the evening of December 5, 2002, with Gabriel Medley, John Fowler, and "Chunky," but that noone indicated that they were "going to go anywhere or do anything."  (R:10:447-48)  On cross-examination, Culpepper discussed his use of marijuana and methamphetamine, and that he had seen "ice" laying around Higdon's house.  (R:10:452-54; 465-66)  Culpepper later clarified that he was at home all evening on December 4th, and at Higdon's home on the night of December 5, 2002, into the morning of December 6, 2002.  He then conceded that because the North Pass shooting occurred during the early morning of December 5th, he did not have first hand knowledge of the events at Higdon's home in the early morning hours of December 5, 2002.  (R:10:472-473)

While testifying in his own defense, Higdon stated that he initially knew Shane Carlton as a co-worker at the Alabama Department of Transportation, and that in August of 2002, Carlton approached him to purchase drugs.  Higdon stated that he believed Carlton approached him for this purpose because he had long hair.  (R:10:478-79) He admitted selling drugs to Carlton, but explained that he only obtained the drugs because of Carlton's constant badgering on the subject.  (R:10:481) Higdon added that he became concerned for his safety when Carlton continued to badger him for drugs and began to relate stories of crimes that he had committed.  (R:10:482)

Higdon testified that the car he rented from Thrifty Rental Car was for Medley's use.  (R:10:479) He added that he met Medley around September of 2002, that he allowed Medley to stay in his house from November until December 10, 2002, and that "just about everything" in the side room was Medley's, with the exception of computer equipment.  (R:10:480-81)  He stated

that he became concerned for his safety when Medley brought the assault rifles to his home on

December 6, 2002, with the explanation that he (Medley), John Fowler and a man named Chunky

were responsible for a shooting in North Pass.  (R:10:482) According to Higdon, Medley told him

to lie in order to better his chances at securing a favorable deal with the United States, and that his

own deal depended upon securing Higdon's conviction through telling falsehoods at trial.

(R:10:482-83)  Higdon stated that he asked Medley to install cameras installed on his property

because he was usually unable to hear visitors knocking, and that the cameras were useful when

company was arriving.  (R:10:483-84)

        During cross-examination, Higdon acknowledged two separate sales of 7 grams of "ice" to

Carlton on November 12 and December 10, 2002.  He also confirmed that he agreed to sell more

"ice" to Carlton on December 11, 2002.  (R:10:489-90) Higdon repeated that the scales found in

the side room belonged to Medley, and that Medley lied when he stated that Higdon dealt

methamphetamine.  (R:10:492-93)  However, he then acknowledged that he bought "ice" from

Landon Birch, but that Birch delivered it to his home.  (R:10:493) Higdon stated that Eric

Culpepper would not have seem methamphetamine lying around his home until Medley began to

live there, and that on December 11, 2002, he was waiting for Medley to arrive so that he could

collect the keys to his home.  (R:10:496-97) He then explained that the "ice" that was bagged and

placed on the lamp on that date had been left by Medley, and that it was not intended for sale to

Carlton.  (R:10:498-99)

        When questioned about the testimony of Carlton and Medley, Higdon replied that the pair

was lying.  (R:10:502-03)  He stated that he had no idea how Medley knew that Eric Culpepper

would testify that he was at Higdon's around the time of the North Pass shooting.  (R:10:504) In

explaining the note addressed to "Jerry," Higdon acknowledged that he was the addressee, and

that the note referred to payment for a guitar amplifier and speakers. (R:10:507) He testified that

Medley initially told him that the North Pass shooting arose from a dispute between persons

named Calvin Couch and Daniel Pitts, but that he subsequently discovered that Medley himself

was responsible. (R:10:522) Finally, Higdon testified that he did not have an agreement to sell

drugs with Medley, and that he only agreed to make two sales of "ice" to Carlton. (R:10:523)

### III.  CLAIMS RAISED IN THE § 2255 MOTION

As far as the United States can discern, Higdon raises the following issues in his motion

under § 2255:

1. Trial counsel was ineffective for failing to properly raise a <u>Blakely</u>/<u>Booker</u> claim at
   Higdon's sentencing hearing.

2. Trial counsel was ineffective for failing to properly investigate the confidential informants
   that testified against Higdon.

3. Trial counsel was ineffective for failing to object to the introduction of audiotapes played
   as evidence in the case.

4. Higdon was denied due process because the government failed to turn over evidence
   required by <u>Brady v. Maryland</u>.

5. Higdon was denied due process because the government failed to correct known false
   testimony by government witnesses.

6. Higdon was denied due process because the district court improperly enhanced his
   sentence based on known unreliable statements.

### IV.  RESPONSE TO CLAIMS FOR RELIEF

**A.**    **<u>Higdon Has Met The One-Year Statute Of Limitations Deadline For
       The Filing of Claims Under 28 U.S.C. § 2255</u>.**

The United States notes that Higdon has filed his motion in a timely manner. He filed his motion under § 2255 on April 6, 2007. Paragraph six of 28 U.S.C. § 2255 provides a one-year period of time within which to file a motion under the rule. The applicable provision in this case requires that a movant file his § 2255 motion within one year from "the date on which the judgment of conviction became final."

Higdon's convictions were affirmed by the Eleventh Circuit Court of Appeals on April 7, 2007, and the final mandate was entered on April 17, 2007. Higdon filed his 28 U.S.C. Section 2255 petition on April 6, 2007. It is, therefore, timely.

**B.    Higdon's Non-Ineffective Assistance Of Counsel Claims Numbered Four and Six Above Are Procedurally Barred And Not Properly Considered In This § 2255 Proceeding Because They Were Raised on Direct Appeal and Decided Against Higdon .**

The Eleventh Circuit has held that claims decided against a petitioner on direct appeal are precluded from further review in a subsequent collateral proceeding. See  Davis v. United States, 417 U.S. 333 (1974); United States v. Rowan, 663 F.2d 1034, 1035 (11th Cir. 1981);  Mills v. United States, 36 F.3d 1052, 1056 (11th Cir. 1994). Higdon's claims that he was denied due process because the government failed to turn over evidence required by Brady v. Maryland and that the district court improperly enhanced his sentence based on known unreliable statements were raised by him on appeal as pointed out previously in this response. He is therefore procedurally barred from raising them anew in this petition.

**C.    Higdon's Non-Ineffective Assistance Of Counsel Claim Numbered Five (5) Above That The Government Failed To Correct Known False Testimony Is Procedurally Barred And Not Properly Considered In This § 2255 Proceeding Because It Could Have Been Raised On Direct Appeal.**

Higdon claims in this petition that he was denied due process because the government

failed to correct known false testimony by government witnesses. Where, as here, a defendant has failed to raise a claim on direct appeal, the claim is barred from collateral review on a § 2255 petition unless the petitioner can demonstrate "cause" for the default of normal appellate procedure and actual "prejudice" from the alleged violation on which the claim is based. United States v. Frady, 456 U.S. 152, 164-65, 102 S.Ct. 1584, 1592- 93, 71 L.Ed.2d 816 (1981); Mills v. United States, 36 F.3d 1052, 1055-56 (11th Cir. 1994), cert. denied, 115 S.Ct. 1966 (1995); United States v. Jordan, 915 F.2d 622, 629 (11th Cir. 1990), cert. denied, 499 U.S. 979 (1991); Cross v. United States, 893 F.2d 1287, 1289 (11th Cir.), cert. denied, 498 U.S. 849 (1990); Greene v. United States, 880 F.2d 1299, 1305 (11th Cir. 1989), cert. denied, 494 U.S. 1018 (1990); Parks v. United States, 832 F.2d 1244, 1246 (11th Cir. 1987). Under the cause and prejudice test, "'[c]ause' ... must be something external to the petitioner, something that cannot fairly be attributed to him[,]" Coleman v. Thompson, 501 U.S. 722, 753, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991), and the "prejudice" must be so substantial that it undermines the integrity of the entire trial. United States v. Frady, 456 U.S. at 169-70, 102 S.Ct. at 1595-96. Since Higdon has not asserted any specific instance in which the government failed to correct know false testimony it goes without saying that he has not met his burden showing justifiable cause for failing to raise the issue on appeal and certainly has not even alleged prejudice much less demonstrated that any such event undermined the integrity of the entire trial.

Higdon does not provide any information in his petition as to what false testimony he claims the government failed to correct. If he is referring to the testimony of Medley contradicted by the post trial affidavit of Stevens then he is barred by Davis and Rowan, supra, because he raised this claim on appeal and it was decided against him.

24

**D.**     **Higdon's Legal Claims Are Without Merit.**

Even if this Court does not apply the procedural bars to Higdon's claims numbered four

(4), five (5), and six (6), asserted above, his substantive legal claims and allegations of error at

sentencing are without merit and may be dismissed without a hearing.  "A hearing is not required

on patently frivolous claims or those which are based upon unsupported generalizations."

Stephens v. United States, 14 F.Supp.2d 1322, 1334 (N.D. Ga. 1998), quoting United States v.

Guerra, 588 F.2d 519, 520-21 (5th Cir.1979).  "[I]n this circuit, as well as in the Supreme Court,

when a § 2255 petitioner sets out detailed factual allegations ... the petitioner is entitled to a

hearing unless the motion and the files on record conclusively show the petitioner is entitled to no

relief....  Typically, this circuit has found some form of corroboration to a petitioner's allegations

before requiring a hearing."  Potts v. Zant, 638 F.2d 727, 751 (5th Cir. 1981)(citations omitted).[1]

Because Higdon's  motion and the record offer no factual basis or proof – and certainly no

corroboration of his claims – they should be dismissed.

**E.**     **Higdon's Ineffective Assistance of Counsel Claims Should Be Rejected**
          **Because They Are Without Factual Support.**

Higdon asserts three distinct grounds of ineffective assistance of counsel.  They are as

follows: (1) Trial counsel was ineffective for failing to properly raise a Blakely/Booker claim at

Higdon's sentencing hearing.  (2) Trial counsel was ineffective for failing to properly investigate

the confidential informants that testified against Higdon.  (3) Trial counsel was ineffective for

failing to object to the introduction of audiotapes played as evidence in the case.  To succeed on a

claim of ineffective assistance of counsel, a defendant must prove both that his counsel's

---

[1]

performance was deficient and that the deficient performance prejudiced his case.  Strickland v. Washington, 466 U.S. 668, 694 (1984); see also, Bell v. Cone, 535 U.S. 685, 697-98 (2002) (reaffirming the Strickland v. Washington standard for reviewing ineffective assistance of counsel claims); Caderno v. United States, 256 F.3d 1213, 1217 (11th Cir. 2001) (applying two-part test of Strickland v. Washington).  More specifically, Gordon must show that (1) identified acts or omissions of counsel fell below an objective standard of reasonableness, and (2) that his counsel's alleged errors or omissions resulted in prejudice to him to such an extent that, without counsel's alleged errors or omissions, there is a reasonable probability that the outcome of his trial would have been different.  Yordan v. Dugger, 909 F.2d 474, 477 (11th Cir. 1990).

In analyzing counsel's performance under the performance prong of Strickland, this Court must presume that the conduct of counsel was reasonable, Yordan v. Dugger, 909 F.2d at 477.  A "[d]efendant must prove deficient performance by a preponderance of competent evidence, and the standard is 'reasonableness under prevailing professional norms.'" Gallo-Chamorro v. United States, 233 F.3d 1298, 1303-04 (11th Cir. 2000) (footnotes omitted).  The Eleventh Circuit has described a defendant's burden with regard to the deficient performance prong of an ineffective assistance of counsel claim as follows:

> Because there is such a wide range of constitutionally acceptable performance, a petitioner seeking to rebut the presumption of adequate performance must bear a heavy burden:
>
> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. ...  We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

. . . Thus, in order to show that counsel's performance was unreasonable, the petitioner must establish that no competent counsel would have taken the action that his counsel did take....

Grayson v. Thompson, 257 F.3d 1194, 1216 (11th Cir. 2001) (internal citations omitted).

The Eleventh Circuit has described a defendant's burden in demonstrating that his counsel's deficient performance prejudiced his case as "high," noting that it is not enough to show that any errors had some conceivable effect on the outcome of the proceeding. Robinson v. Moore, 300 F.3d 1320, 1343-44 (11th Cir. 2002). To succeed on the ineffective assistance of counsel claim, the defendant must show that, but for counsel's unprofessional errors, the outcome of the proceeding would have been different.

As the Eleventh Circuit has noted, "[i]t is well established that a habeas petitioner must demonstrate both deficient performance and prejudice, and that a failure to demonstrate either prong constitutes a failure to demonstrate ineffective assistance of counsel." Bottoson v. Moore, 234 F.3d 526, 532 (11th Cir. 2000); accord, Robinson v. Moore, 300 F.3d at 1343. In raising ineffective assistance of counsel, Higdon has failed to plead facts sufficient to demonstrate that his counsels performance was deficient and/or that he was prejudiced by any of counsel's actions. For that reason, his § 2255 motion should be summarily dismissed.

Higdon's charges that counsel was ineffective as to (1) failing to properly raise a Blakely/Booker claim at Higdon's sentencing hearing. (2) failing to properly investigate the confidential informants that testified against Higdon. (3) failing to object to the introduction of audiotapes played as evidence in the case must fail because none of the claims have legal merit. See Part I, supra. Counsel cannot be ineffective for failing to raise a merit less point. See United States v. Nyhuis, 211 F.3d 1340, 1344 (11th Cir. 2000).

27

In Part I, supra, the United States provides this court with the legal analysis of the Eleventh Circuit Court of Appeals rejecting on procedural grounds any claim that Higdon is entitled to relief under Blakely, supra; or Booker, supra. Simply put, the issue was waived because it was not raised on appeal. United States v. Dockery, 401 F.3d 1261 (11th Cir. 2005). Higdon's claim that his counsel was ineffective for failing to anticipate this change in the law and preserve/raise this issue on appeal before such a claim was recognized has no legal merit. See, United States v. Levy, 391 F.3d 1327, 1334, n.3, (11th Cir. 2004), which provides "... an attorney's failure to anticipate a change in the law does not constitute ineffective assistance of counsel...". See also, United States v. Fuller, 398 F.3d 644, 650, n.4, 7th Cir. 2005); citing United States v. Smith, 241 F.3d 546, 548 (7th Cir. 2001); which both hold that "no such argument would be tenable".

As pointed out in the dissenting opinion issued with the Eleventh Circuits decision upholding Higdon's conviction and sentence the Apprendi, Blakely, and Booker, supra, opinions were all based on the premise that "any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt". Higdon's sentences for all four counts of conviction are for the statutory maximum and do not exceed it. Therefore, Higdon has not been sentenced in violation of the constitutional premise of those cases. The statutory maximum was imposed in each case and the sentences were run consecutively by the district court. This is something the court was empowered to do whether Higdon's counsel had raised the issue at sentencing or not.

Higdons's inability to set forth valid legal grounds for the remaining two claims of ineffective assistance invalidates his companion claims of ineffective assistance of failing to

properly investigate confidential informants and failing to object to the introduction of the audiotapes.  In his affidavit filed by order of this court counsel for Higdon states that he did properly investigate the "confidential informant" who was Higdon's co-worker. (**See Affidavit of Defense Counsel Attached As Exhibit 6**)   He tried to interview the confidential informant and the informant declined to be interviewed.  He conducted several interviews of Higdon in preparation for trial and believes his competent representation in this regard is reflected by the fact that Higdon was acquitted of the conspiracy charge and two of the distribution charges, as well as, all of the firearms offenses.  Lastly, counsel for Higdon states that he did not object to the introduction of the audio tapes because there was no basis for objecting to them.  He is correct. The record so reflects and Higdon has not offered any basis upon which the tapes could have been properly objected to by defense counsel.  Under the circumstances it is clear that counsel's performance was not deficient and that Higdon was not prejudiced by any deficient performance by his trial counsel.  Based upon all of the foregoing, Higdon's ineffective assistance of counsel claims are due to be denied.

## V.  A HEARING IS NOT NECESSARY IN THIS MATTER

Higdon has not pleaded facts or presented sufficient evidence or argument which, if true, show that he is entitled to an evidentiary hearing, and his claims for relief should be denied without an evidentiary hearing.  See Blacklidge v. Allison, 431 U.S. 63, 73-74 (1977); Tejada v. Dugger, 941 U.S. 1551, 1559 (11th Cir. 1991); United States v. Laetividal-Gonzalez, 939 F. 2d 1455, 1465 (11th Cir. 1991).  Should this Court determine that Higdon has made any arguments not addressed in this response, the United States would request the opportunity to further respond to those arguments.

## VI.  CONCLUSION

For the above reasons, Defendant/Movant Jerry Joseph Higdon has failed to demonstrate that he is entitled to any relief from this Court, and his § 2255 motion should be denied without an evidentiary hearing.

Respectfully submitted this 14th day of May, 2007.

/s/ Stephen P. Feaga, Sr.
STEPHEN P. FEAGA, SR.
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
steve.feaga@usdoj.gov

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| **JERRY JOSEPH HIGDON** | ) |
| | ) |
| **Defendant/Movant,** | ) |
| | ) |
| **vs.** | ) |
| | ) |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

**CASE NO. 2:07cv-310-MEF
(CR NO. 99-00043-N-1)**

## CERTIFICATE OF SERVICE

I hereby certify that on May 14, 2007, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, and I hereby certify that I have mailed the document by United States Postal Service to the following non-CM/ECF participant: Jerry Joseph Higdon, AIS#11167-002, USP Beaumont, U.S. Penitentiary, P.O. Box 26030, Beaumont, TX 77720.

Respectfully submitted,

LEURA G. CANARY
UNITED STATES ATTORNEY

/s/ Stephen P. Feaga, Sr.
STEPHEN P. FEAGA, SR.
Assistant United States Attorney
Post Office Box 197
Montgomery, Alabama 36101-0197
(334) 223-7280
(334) 223-7135 fax
steve.feaga@usdoj.gov

31

**FILED**

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

FEB 2 7 2003

CLERK
U. S. DISTRICT COURT
MIDDLE DIST. OF ALA.

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR. NO. 03-43-N |
| | ) | [21 USC 846; |
| JERRY JOSEPH HIGDON, JR. | ) | 21 USC 841(a)(1); |
| JOHN GABRIEL MEDLEY, and | ) | 18 USC 924(c)(1)(A)(ii) |
| TAMMY KINCAID PORTER | ) | 18 USC 924(c)(1)(A)(iii) |
| | ) | 18 USC 924(c)(1)(B)(i) |
| | ) | 18 USC 36(b)] |
| | ) | |
| | ) | INDICTMENT |

The Grand Jury charges:

### COUNT 1

That from an unknown date but commencing at least as early as in or about the month of May 17, 2002, and continuing thereafter until January 28, 2003, the exact dates being unknown to the Grand Jury, in Montgomery County, within the Middle District of Alabama, and elsewhere,

JERRY JOSEPH HIGDON, JR.,
JOHN GABRIEL MEDLEY, and
TAMMY KINCAID PORTER,

defendants herein, did knowingly and intentionally conspire, combine and agree together and with other persons known and unknown to the Grand Jury to distribute and possess with intent to distribute "Ice" methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846.

<u>COUNT 2</u>

On or about the 12th day of November, 2002, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR.,

defendant herein, did knowingly and intentionally distribute approximately 7.0 grams of "Ice" methamphetamine, a Schedule II Controlled Substance, in violation of Title 18, United States Code, Section 2; and Title 21, United States Code, Section 841(a)(1).

<u>COUNT 3</u>

On or about the 10th day of December, 2002, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR.,

defendant herein, did knowingly and intentionally distribute approximately 7.0 grams of "Ice" methamphetamine, a Schedule II Controlled Substance, in violation of Title 18, United States Code, Section 2; and Title 21, United States Code, Section 841(a)(1).

<u>COUNT 4</u>

On or about the 12th day of December, 2002, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR.,

defendant herein, did knowingly and intentionally possess with the intent to distribute approximately 6.9 grams of "Ice" methamphetamine, a Schedule II Controlled Substance, in violation of Title 18, United States Code, Section 2; and Title 21, United

2

States Code, Section 841(a)(1).

COUNT 5

On or about the 12th day of December, 2002, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR.,

defendant herein, did knowingly and intentionally possess with the intent to distribute approximately .76 grams of "Ice" methamphetamine, a Schedule II Controlled Substance, in violation of Title 18, United States Code, Section 2; and Title 21, United States Code, Section 841(a)(1).

COUNT 6

On or about the 21st day of January, 2003, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR.,<br>JOHN GABRIEL MEDLEY, and<br>TAMMY KINCAID PORTER,

defendants herein, did knowingly and intentionally distribute approximately 2 grams of "Ice" methamphetamine, a Schedule II Controlled Substance, in violation of Title 18, United States Code, Section 2; and Title 21, United States Code, Section 841(a)(1).

COUNT 7

On or about the 12th day of December, 2002, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR.,

defendant herein, did knowingly use, carry, and brandish a firearm,

3

to wit: a Mossberg, 12 gauge, pistol grip, pump shotgun, during and in relation to a drug trafficking offense, to wit: possession with intent to distribute methamphetamine, a Schedule II Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1), a drug trafficking crime prosecutable in a Court of the United States, all in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii).

### COUNT 8

On or about the 5th day of December, 2002, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR., and<br>JOHN GABRIEL MEDLEY,

defendants herein, did knowingly, during and in relation to a drug trafficking offense, to wit: distribution and possession with the intent to distribute methamphetamine and marijuana, Schedule I and II Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1), drug trafficking crimes prosecutable in a Court of the United States, use and carry a firearm which was discharged, to wit: an AK-47 assault rifle, 7.62x39 millimeter, and an SKS assault rifle, 7.62x39 millimeter, all in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii).

### COUNT 9

Between on or about the 5th day of December, 2002, and the 28th day of January, 2003, in Montgomery County, within the Middle District of Alabama,

4

JERRY JOSEPH HIGDON, JR., and
JOHN GABRIEL MEDLEY,

defendants herein, did knowingly, during and in relation to a drug trafficking offense, to wit: distribution and possession with the intent to distribute methamphetamine and marijuana, Schedule I and II Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1), drug trafficking crimes prosecutable in a Court of the United States, use and carry a firearm which was a semi-automatic assault weapon, to wit: an AK-47 assault rifle, 7.62x39 millimeter, and an SKS assault rifle, 7.62x39 millimeter, all in violation of Title 18, United States Code, Section 924(c)(1)(B)(i).

## COUNT 10

On or about the 5th day of December, 2002, in Montgomery County, within the Middle District of Alabama,

JERRY JOSEPH HIGDON, JR., and
JOHN GABRIEL MEDLEY,

defendants herein, did knowingly, in furtherance of a major drug trafficking offense, to wit: conspiracy to distribute marijuana and methamphetamine, Schedule I and II Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1), a drug trafficking crime prosecutable in a Court of the United States, with the intent to intimidate, harass, injure, or maim, fire a weapon, to wit: an AK-47, 7.62x39 millimeter, and a SKS assault rifle, 7.62x39 millimeter, into a group of two or more

5

persons, and thereby cause grave risk to a human life, all in violation of Title 18, United States Code, Section 36(b).

FORFEITURE ALLEGATION

A.    Counts 1 through 10 of this indictment are hereby repeated and incorporated herein by reference.

B.    Upon conviction for the violations of Title 21 United States Code, Sections 846 and 841(a)(1) and/or Title 18, United States Code, Sections: 924(c)(1)(A)(ii), 924(c)(1)(A)(iii), 924(c)(1)(B)(i), and 36(b) as alleged in Counts 1 - 10 of this indictment, the defendants,

JERRY JOSEPH HIGDON, JR., and
JOHN GABRIEL MEDLEY,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924 and Title 28, United States Code, Section 2461(c), all firearms and ammunition involved in the commission of this offense, including but not limited to the following:

1 - a Mossberg, 12 gauge, pistol grip, pump shotgun

1 - an AK-47 assault rifle, 7.62x39 millimeter

1 - an SKS assault rifle, 7.62x39 millimeter

1 - an AK-47 assault rifle, 7.62x39 millimeter

C. If any of the property described in this forfeiture allegation, as a result of any act or omission of the defendant

(1)    cannot be located upon the exercise of due diligence;

(2)    has been transferred and sold to, and deposited

6

with a third person;

(3)     has been placed beyond the jurisdiction of the court;

(4)     has been substantially diminished in value; or

(5)     has been commingled with other property which cannot be divided without difficulty;

the court shall, pursuant to Title 21, United States Code, Section 853, as incorporated by Title 28, United States Code, Section 2461(c), order the forfeiture of any other property of the defendant up to the value of any property described in paragraph B above.  All in violation of Title 18, United States Code, Sections 922 and 924.

A TRUE BILL:

_____
Foreperson

_____
LEURA GARRETT CANARY
United States Attorney

_____
JOHN T. HARMON
Assistant United States Attorney

_____
STEPHEN P. FEAGA, SR.
Assistant United States Attorney

7

Page 3

probation officer has placed them with her responses in the
revised presentence report. Those remain our objections as
well, Your Honor.

THE COURT: Do you anticipate putting on any
testimony in support of any of the objections that have been
noted?

MR. PETERSEN: We may. We have one individual that I
had subpoenaed as Your Honor knows. Depending on how the
course the testimony that Mr. Feaga is going to put on
through his witnesses, I may call that witness, I may not. I
am not absolutely certain at the moment, Your Honor.

THE COURT: If you will stand. Since there's some
objections listed, out of an abundance of precaution I am not
going to go through the base level offense and the criminal
history category conclusions and findings of fact that the
Court is required to do until after that testimony has been
presented and given the Defendant an opportunity to rebut
anything that the Defendant wishes to rebut under the
circumstances.

I note for the record that the six objections that
have been listed by the Defendant and included in the
presentence report are objections based upon an adjustment
for obstruction of justice, an adjustment for the failure of
any adjustment for acceptance of responsibility, an
adjustment for the role in the offense by the Defendant, an

---

**IN THE UNITED STATES DISTRICT COURT FOR**

**THE MIDDLE DISTRICT OF ALABAMA**

**NORTHERN DIVISION**

UNITED STATES OF AMERICA

Vs.                    CR. NO. 03-43-N

JERRY JOSEPH HIGDON

*   *   *   *   *   *   *   *

SENTENCE HEARING

*   *   *   *   *   *   *   *

Before Hon. Mark E. Fuller, Judge,

at Montgomery, Alabama, Commencing

on August 8, 2003

*   *   *   *   *   *   *   *

APPEARANCES: For the Government: Stephen P. Feaga and

J.B. Perrine,

Assistant U.S. Attorneys

For the Defendant: Michael J. Petersen,

Attorney at Law

---

Page 2

(The above case coming on for hearing at Montgomery,
Alabama, August 8, 2003, before Honorable Mark E. Fuller,
Judge, the following proceedings were had commencing at 10:00
a.m.:)

THE COURT: Call the case of United States of
America versus Jerry Joseph Higdon. Is the United States
prepared to go forward?

MR. FEAGA: We are, Your Honor.

THE COURT: Is the defense prepared to go forward?

MR. PETERSEN: We are, Your Honor.

THE COURT: Mr. Higdon, have you and your attorney
reviewed the presentence report before today's date?

THE DEFENDANT: Yes, Your Honor.

THE COURT: I noted that there were some written
objections but I am required to ask you this question, do you
have any objections to any of the content of the presentence
report, Mr. Higdon?

THE DEFENDANT: No, sir, Your Honor.

THE COURT: Mr. Petersen, are there any objections
to the content of the presentence report?

MR. PETERSEN: Your Honor, our objections to the
contents of the presentence report are set out in the
objections contained in the revised presentence report. There
are approximately one, two, three, four, five, six objections
that we have registered with the probation officer and the

---

Page 4

objection based upon the drug quantity and base offense
level, another objection based upon the calculations of the
total offense level, and a request for a departure. Do those
fairly and accurately describe the objections and the request
for departure that have been made by the Defendant in this
case?

MR. PETERSEN: Yes, they do, Your Honor.

THE COURT: It is my understanding that you do not
have any witnesses that you are going to put on in support of
any of the objections that you have made at this point?

MR. PETERSEN: At this point, no, Your Honor.

THE COURT: Does the United States have any evidence
or testimony it wishes to put on at this time?

MR. FEAGA: Your Honor, yes. What we'd like to do,
with the Court's indulgence if this is the way the Court
would like to handle it, is make argument. I would like to
break the argument as I go through these objections and put
on a witness or two to I think highlight the position of the
government for the Court. I think -- and beyond doing that,
some of what I intend to do is to -- and I will seek guidance
from the Court -- is to point out for the Court the
government's position on certain evidence that's already a
matter of record and identify where it is in the record. And
recognizing that the Court was here during the trial of the
case. I don't want to belabor that too much but I think it

Page 5

1  might be useful to have some of these matters on the record.
2      So with the Court's permission, yes, we do intend to
3  call a couple of witnesses. What I would propose to do at
4  this time, Your Honor, is just address the Defendant's
5  objections, and I guess the easiest way to do that would be
6  to address them in the order that they appear in the
7  presentence investigative report.
8      THE COURT: The problem that I am having is I find
9  it difficult to make findings on any objections without any
10  testimony or anything being presented other than the
11  respective sides' positions that I have read in the
12  presentence report.
13      MR. FEAGA: Yes, sir.
14      THE COURT: So what I would do or require the
15  parties do in this case is present any testimony that you
16  wish for the Court to consider as far as any mitigating or
17  aggravating circumstances that would go into the
18  conclusions -- findings of fact and conclusions of law that
19  the Court would have to make before it assigns a base offense
20  level and a criminal history category to make a computation
21  as to Mr. Higdon's sentence in this case.
22      MR. FEAGA: Yes, sir. Your Honor, addressing the
23  issue of whether or not Mr. Higdon should receive two points
24  in calculating his total offense level for obstruction of
25  justice, the United States would ask the Court to consider

Page 6

1  that there are two reasons that -- three actually reasons,
2  any one of which standing alone would be sufficient for Mr.
3  Higdon to receive the two points under which we argue the
4  guidelines require that he receive those two points.
5      The first of those, Your Honor, is that Mr. Higdon
6  took the stand in this trial and directly contradicted the
7  testimony of several witnesses called by the government,
8  denied the truth of statements that he made, that was made on
9  tape that we played for the Court. For instance, denying
10  going to -- having three ounces of methamphetamine that he
11  could go to Atlanta and pick up. Claiming he had never been
12  to Atlanta to pick up dope, and that Mr. Birch brought
13  whatever small amount of methamphetamine he admitted to
14  having to him in Montgomery. So we have him lying on the
15  stand is what I am saying, Your Honor, and I will point with
16  specificity where those are in the record to the Court.
17      In addition to that we have him denying that he was
18  involved in any way in the drive-by-shooting which the jury
19  convicted him of. So, it's clear that the jury concluded that
20  he lied to them about the drive-by-shooting. If the jury's
21  verdict weren't enough, we have him on tape, in a transcript
22  that was admitted into evidence. The tape itself was played
23  for the Court and the jury, wherein he says the following
24  things. And I am referring to the last two pages of the
25  transcript where the following conversation took place

Page 7

1  between Mr. Higdon and the confidential source, Mr. Shane
2  Carlton.
3      He says all right. Well -- this is the confidential
4  source. All right. Well, let me go get off this where I can
5  reup tomorrow. Are you going to do me better tomorrow? Come
6  on, man. Mr. Higdon, who admitted at the trial that this is
7  him on the tape, Dude, you have got to understand. The CS
8  says, you are playing high dollar, ain't you? Mr. Higdon said
9  no. Not only that, did you hear about all that shit over at
10  North Pass? CS says, I thought that was all dope. Higdon says
11  the shooting and all that MSG. who is MSG? DO you know who
12  they are? The source says no. Higdon says J.B. and D, all
13  these niggers over in North Pass. The source says, I don't
14  fuck with them. Higdon says, them fuckers stole my dope. The
15  source says, what? Higdon then says, that's me over there
16  with that AK-47 shooting up fucking North Pass. The CS says,
17  they stole your dope? Higdon says yeah. This guy -- The CS
18  says, well, yeah, your pot. Higdon says, this guy came over
19  here and he got some pot. They stole your pot, right? Higdon
20  says pounds of pot. He already had like half a pound that he
21  had money for, and I was like just get me all the money when
22  you get back, because I was busy. The source says yeah.
23  Higdon says, I didn't know he was going over to F'ing North
24  Pass to sell a pound of dope so he gets ripped off. CS says,
25  man, please be careful. Higdon says, like 85 hundred dollars

Page 8

1  of mine. Source says man, please be more careful, please.
2  Higdon says dude, I was here, I was -- I tell you one thing,
3  these niggers ought to be fucking doing something by now.
4  Hell, we shot one of them the last time we were there. Shot
5  him in the neck. I done told him, I called him right after we
6  left, I said look, by Christmas I will be in your house doing
7  this, I want my mother-fucking money.
8      He took that stand and he denied having any
9  involvement in that shooting. Mr. Medley said he did have
10  involvement in it and it was admitted on tape. We would
11  submit to you that that lie in and of itself is enough for
12  the Court to award two points -- to assess two points against
13  him. So you have him lying on the stand, but you also have
14  him lying about some other things, Your Honor, in addition to
15  that. The testimony was that he had rented a vehicle to go to
16  Atlanta for Mr. Medley. That Mr. Medley and he went to
17  Atlanta on one of these occasions. And we put the rental
18  records in and the testimony of Gabe Medley. He denied on the
19  stand having rented a car to go to Atlanta and claimed that
20  he rented the car for Medley so that he could go visit his
21  uncle in Tennessee. That was one of the lies.
22      He lied about his knowledge of the assault weapons.
23  I am referring to page eight of the transcript of his
24  testimony that I think the Court has been supplied a copy of,
25  if I am correct. On page nine of the transcript he told the

Page 9

1  jury that Mr. Medley was lying on him and that he was doing
2  it because his proffer depended upon a conviction. He denied
3  having possessed the scales that were found in his home. And
4  the Court may recall the testimony of Shane Carlton that when
5  he went to buy the dope that Higdon weighed it when they were
6  out in the car on some portable scales, electronic scales.
7  And then when I showed him those scales at the trial he
8  claimed that those, in addition to the other two sets that
9  were found at his house, that those belonged to Medley. Both
10  Mr. Medley and Shane Carlton testified that those scales were
11  Higdon's. And in particular both of them testified that the
12  electronic set had to have been Higdon's because Higdon was
13  using it when he sold the dope to Mr. Carlton, that he
14  admitted to the Court that he sold to him. So that was
15  another lie.
16       As I pointed out to the Court already, on page 20 of
17  the transcript of his testimony he stated that he did not go
18  to Atlanta to buy dope as Mr. Medley testified that they did.
19  And then he denied when I asked him, I said well, you are on
20  one of those tapes saying all you have got to do is go to
21  Atlanta and get your three ounces. Answer, he says I believe
22  I am on one of those tapes saying there's three ounces in
23  Atlanta. And my question was, but you said all I have got to
24  do is go get it. And Your Honor, the transcript of the
25  testimony of his own statement made during the course of the

Page 10

1  trial, which he admitted, was his -- was he was on that tape.
2  He says on the tape, I have a guy in Atlanta that's got three
3  ounces sitting there waiting for me. The source says, waiting
4  for you? And Higdon says, all I have to do is go get them.
5  But he denied that at the trial.
6       Your Honor, also the Court may recall that Mr.
7  Medley -- before the defense obviously put on any evidence in
8  the case, Mr. Medley testified that the Defendant had told
9  him that he was going to get a guy named Eric to come to the
10  trial and testify as an alibi for both he and Medley, that he
11  was with them on the night in question so they couldn't have
12  done what we were alleging that they did now and arguing that
13  that was before Medley made his deal. Once Medley made his
14  deal obviously the alibi is not going to be for Medley any
15  more. But Eric did, in fact, after Mr. Medley testified
16  about having been told that he was going to be a witness in
17  the case, Eric did appear and testify.
18       That kind of crosses two thresholds for us. One,
19  that's Higdon obstructing justice in terms of procuring a
20  lie, but it's also Higdon obstructing justice in terms of
21  procuring a witness and going out and finding a witness to
22  come in and commit perjury before the Court. So one, he is
23  accusing Mr. Medley of lying, but he is also obstructing
24  justice by bringing in a witness and getting that witness to
25  perjure himself.

Page 11

1  And in light of the jury's verdict it's obvious they
2  discounted Mr. Culpepper's testimony based on what they heard
3  from the tapes and based on what they heard from Mr. Medley
4  about what happened the night of the shooting. And when I
5  asked him about that, I actually cross-examined him on this
6  question of Eric coming up. I asked him, how did Gabe Medley
7  know you were going to call Eric Culpepper if you didn't talk
8  to him about your defense? Because he was denying that he
9  talked to Medley, that's where he accuses Medley of the lie.
10  And he says I have no idea. In other words, he lied again,
11  Your Honor.
12       I could go on through this, but the record is rife
13  with instances of him denying the testimony and statements of
14  other people. One thing I do want to bring up, which I think
15  is pointed for the Court in terms of the complete lack of
16  candor by the Defendant in this case, was when I questioned
17  him about the document that was found on his bedside table.
18  Government's Exhibit 21. We went through that entire note,
19  but the note said Jerry, I am still here, your boy never
20  came. The people that I have to go back and deal with are
21  the last people on earth you would want on your bad side. You
22  have helped me out a lot in the past and I am going to give
23  you the benefit of the doubt. I honestly don't think you are
24  trying to rip me off, so please for the benefit of both of us
25  let's hurry up and get this paid off. I am keeping them calm

Page 12

1  right now, but just trust me when I say we need to take care
2  of this as quickly as possible. That amount of money we will
3  be able to make back in no time, especially the way things
4  have been picking up. Call me.
5       In addition to trying to pass this off as a note
6  about some band equipment that he had procured for a band up
7  in Birmingham, he tried to pass off the fact that while
8  telling that story that he didn't even know who wrote the
9  note, couldn't remember the name of the fellow who wrote him
10  this note. When you put that note in the context of the
11  evidence we know we have in this case of a man who is going
12  to Atlanta and buying large quantities of ice methamphetamine
13  and/or marijuana, and the context of him admitting on the
14  tape he was involved in a shooting where eight thousand five
15  hundred dollars was stolen from him, it is crystal clear that
16  he was lying to the jury about this note and lying about it
17  big-time. And I went through that note with him, Your Honor,
18  and the Court was here, line by line, and we'd submit to you
19  that he lied about every single question I asked him about
20  that letter.
21       In essence, Your Honor, the Court we believe should
22  assess two points here because of the fact that he obstructed
23  justice by lying and presenting perjured testimony to the
24  jury. However, Your Honor, we also have the additional matter
25  of something that came up while he was incarcerated prior to

## Page 13

1  the time that we are here today to be sentenced involving a
2  matter that I will now call a witness with the Court's
3  permission to address, which is allegations that he was
4  involved in an attempt to escape from the city jail. And with
5  the Court's permission on this issue of obstruction of
6  justice we'd now like to call United States Marshal Athen
7  Reeves.
8       MR. PETERSEN: Your Honor, may I have a moment of
9  the Court's time as an objection to this line of questioning?
10      THE COURT: You certainly may.
11      MR. PETERSEN: We would object to this line of
12  questioning in that this is a completely separate crime, it
13  can be charged as a separate crime. The government is asking
14  the Court to consider these allegations and increase the
15  Defendant's sentence, effectively find him guilty of a crime
16  based on a preponderance of the evidence abrogating the
17  Defendant's right to a trial, abrogating his right to
18  cross-examine the witnesses, to place the evidence before a
19  jury of his peers.
20      And we would object to the Court's considering the
21  fact of an allegation of escape when no charges have been
22  brought. And this was not a part of what we are here before
23  the Court today. If the government wishes to pursue Mr.
24  Higdon for an attempted escape situation then I would suggest
25  that the government needs to bring that and present it to a

## Page 14

1  grand jury and ask for an indictment from a grand jury and
2  proceed to trial on an escape charge rather than trying to
3  slip it in under the radar through a preponderance of the
4  evidence standard, when the Court knows and everybody in here
5  knows that it's a completely lower standard than what is
6  necessary in a trial.
7       MR. FEAGA: Your Honor, our response would be that
8  United States Sentencing Guidelines Section 3C1.1 states
9  that -- in the commentary at note 4(e), the guidelines
10 provide for a two point enhancement for obstruction of
11 justice if the Defendant escaped or attempted to escape from
12 custody before trial or sentencing. Now, the standard at
13 sentencing for establishing matters that will impact the
14 Court's assessment of points under the guidelines is a
15 preponderance of the evidence. It's not necessary for us to
16 prove his guilt beyond a reasonable doubt. It's only
17 necessary for the Court to be satisfied that we have
18 established by a preponderance of the evidence that he was
19 involved in such an effort. And we propose to do so by
20 calling a witness or two for the Court.
21      THE COURT: objection overruled. You may proceed.
22      THE CLERK: You do solemnly swear or affirm that the
23 testimony you give in this cause to be the truth, the whole
24 truth, and nothing but the truth, so help you God.
25      THE WITNESS: I do.

## Page 15

1       ATHEN REEVES, witness for the Government, having
2  been duly sworn or affirmed, testified as follows:
3            DIRECT EXAMINATION
4  BY MR. FEAGA:
5  Q. Sir, would you for the record, please, state your name
6  and tell the Court what you do for a living.
7  A. My name is Athen, A-T-H-E-N, Reeves, R-E-E-V-E-S, and I
8  am a Deputy for the United States Marshal Service.
9  Q. How long have you been a deputy with the United States
10 Marshal Service?
11 A. Since May of 1998.
12 Q. Okay. And pursuant to your duties and responsibilities
13 as a United States Marshal do you have occasion to deal with
14 persons who are incarcerated pending trial and/or persons who
15 are otherwise in federal custody?
16 A. Yes, sir.
17 Q. Do you have occasion if there is any sort of mishap or
18 event at a facility where these people are being housed, do
19 you have occasion to become involved in investigating such
20 matters?
21 A. Yes, sir.
22 Q. Do you know or have you become familiar with the name of
23 an individual named Jerry Higdon?
24 A. Yes, sir.
25 Q. Do you know who Jerry Higdon is?

## Page 16

1  A. Yes, sir.
2  Q. Is he present in the courtroom today?
3  A. Yes, sir.
4  Q. Would you point him out to the Court, please.
5  A. He is the gentleman sitting at counsel table next to Mr.
6  Petersen in the orange jumpsuit.
7  Q. Sir, have you had occasion to become involved in any
8  investigation into an allegation that Mr. Higdon may have
9  been involved in an escape attempt at the federal detention
10 facility maintained at the Montgomery city jail?
11 A. Yes, sir.
12 Q. And pursuant to that investigation did you have an
13 opportunity to interview witnesses?
14 A. Yes, sir.
15 Q. Did you talk to an individual named John Bradley?
16 A. Yes, sir.
17 Q. And what, if any, reason did you have for talking to Mr.
18 Bradley?
19 A. John Bradley's name came up in an interview that we did
20 with another inmate as someone that we should talk to, that
21 this other inmate told us that he believed Mr. Bradley had
22 information about this attempted escape.
23 Q. Tell the Court what you were investigating.
24 A. On April the 17th our office was contacted by the U.S.
25 Attorney's office about a possible escape attempt at the

## Page 17

1  Montgomery city jail. Myself and Deputy Robert Reynolds
2  responded to the Montgomery city jail that evening and we got
3  the staff at the jail to do a shakedown in the particular
4  cell that we were told about, cell 210 in pod C-4. The jail
5  staff went to that cell, did a shakedown, came back about 30
6  minutes later and said that yes, in fact, it appeared that
7  someone had been trying to dig around the window in the cell
8  and that they found some metal implements that they believed
9  were being used to do this.
10  Q. Okay. What did you observe when you went to the cell, if
11  you went there? Did you go there?
12  A. I went to the cell the next day to take pictures. The
13  jail staff didn't want us going there at that time. They just
14  didn't want us going there at that time while they were doing
15  the shakedown but we went back the next morning.
16  Q. What did you see when you went back the next morning?
17  A. The window in the cell, it was obvious that it had been
18  dug -- the concrete had been dug out from around the window
19  with some sort of object, and there were holes in the
20  concrete. One of them was enough that you could actually feel
21  a draft of air coming through around the window.
22  Q. Okay. Now, during the shakedown do you know whether or
23  not the Montgomery correctional officers, city jail
24  correctional officers found anything?
25  A. Yes, sir, they did.

## Page 18

1  Q. Tell the Court what they found.
2  A. They found two pieces of metal. They found a metal rod
3  that was about ten inches long, about a quarter of an inch in
4  diameter, and then a long, about the same length, about a ten
5  or 12 inch long of thick metal wire inside one of the
6  mattresses in the cell.
7  Q. Pursuant to your investigation were you able to
8  ascertain what either of these metal implements were?
9  A. We didn't figure out what the wire was, but the longer
10  thicker piece of metal was determined to be a mop bucket
11  handle that had been broken off.
12  Q. And how were you able to determine that this mop bucket
13  handle had been broken off?
14  A. Through interviews with a number of inmates over at the
15  jail.
16  Q. Now, this cell that you observed these things in, and
17  that -- is this the same cell that you have been talking
18  about as being the cell that the jail personnel told you was
19  the one that they thought an escape attempt had originated
20  from?
21  A. Yes, sir.
22  Q. Was Jerry Higdon ever an occupant of that cell?
23  A. Yes, sir.
24  Q. Okay. Was an occupant of that cell at the time that
25  you came over here to make your observations after receiving

## Page 19

1  this report?
2  A. No, sir.
3  Q. Okay. How long had he no longer been an occupant of the
4  cell?
5  A. The information that we had is he had been out of the
6  cell for approximately four to five days before the
7  discovery.
8  Q. Now, did you have occasion to interview -- you said you
9  did interview an inmate named John Bradley?
10  A. Yes, sir.
11  Q. What, if anything, did you want to find out from Mr.
12  Bradley?
13  A. Just information about who was involved, how many
14  inmates were involved, how it was being done, what they
15  planned to do when they got out, what instruments, if any,
16  they were using to effect the escape.
17  Q. Did he agree to answer your questions?
18  A. Yes, sir.
19  Q. Okay. Would you tell the Court what Mr. Bradley told you
20  about this escape attempt?
21  A. He said that the inmates that were in the cell, it was
22  Alvin McCary, Mr. Higdon, a former inmate by the name of
23  Chance Gaines, and another inmate by the name of Raphael
24  Murrillo, he was not in that particular cell, he was in
25  another cell, that they had come up with a plan on how they

## Page 20

1  were going to escape from the jail. And -- two plans. They
2  came up with two different plans on how to do it. One of the
3  plans was to use this mop handle bucket -- I mean mop bucket
4  handle, excuse me, to chip away the concrete around the
5  window. The other plan was to get hacksaw blades sent in
6  through the legal mail at the jail and attempt to saw --
7  there's -- in the windows in the cell there's a very thick
8  metal bar approximately three to four inches wide that runs
9  right down the middle of the window. Their plan was to saw --
10  get hacksaw blades, saw this bar out, knock the window out
11  and then use bed sheets to climb down to the parking lot
12  below. And --
13  Q. Would that have been one of the two ways you described?
14  A. That was one of the two ways.
15  Q. What was the other way?
16  A. The other way was using the mop bucket handle to dig
17  around the window and actually dig the window frame out and
18  escape that way. At some --
19  Q. Now, if anything, did Mr. Bradley tell you then that he
20  had observed or seen or overheard regarding the efforts to
21  further either of these escape attempts?
22  A. He said on at least one occasion he observed Raphael
23  Murrillo using the metal implement to dig around the window.
24  And on this same occasion, according to him, Mr. Higdon had a
25  blanket or sheet or something wrapped around the metal bar

## Page 21

1  and was tugging on it, like in an attempt I guess to pull
2  the -- see if he could pull it away.
3  Q. And he observed it?
4  A. He said he observed this.
5  Q. Did you ask him whether or not he knew how they had
6  gotten the mop bucket handle?
7  A. He stated that he observed Alvin McCary and Jerry Higdon
8  go to the shower area in their pod and come out with the
9  piece of metal.
10  Q. Now, what, if anything, else did he tell you about the
11  escape effort?
12  A. He said that apparently somewhere along the way Alvin
13  McCary, who seemed to have some sort of background in
14  construction, realized that they were not going to be able to
15  dig out around the window, that the flashing or whatever on
16  the metal part of the window extends too far into the cinder
17  block and it would just be almost impossible to do that, so
18  they opted for plan B, which was to get hacksaw blades in and
19  saw the metal bar out of the window.
20  Q. What, if anything, did they do to further that scheme?
21  A. There was an attempt to -- they actually came up with an
22  elaborate plan to get these hacksaw blades mailed in. The
23  former inmate, Chance Gaines, he got -- he was released
24  around the first part of April. The plan was that Alvin
25  McCary was going to mail a legal size envelope out to a

## Page 22

1  fictitious address. That envelope would be sent back return
2  to sender. He would then take that envelope that was stamped
3  return to sender, put it in a separate envelope, mail that to
4  Chance Gaines, who at the time was living at Mr. Higdon's
5  house over on Rigby Street.
6  Q. This would have been after Mr. Gaines was released from
7  prison?
8  A. This was after Mr. Gaines was released.
9  Q. From the jail?
10  A. Yes, from the jail.
11  Q. Were you able to verify whether or not Mr. Gaines was
12  actually residing at Mr. Higdon's residence?
13  A. Yes, sir.
14  Q. Did Mr. Bradley tell you -- give you any identifying
15  information about where Mr. Higdon lived or you might find
16  Mr. Gaines?
17  A. He said that he saw one of the envelopes that Mr. McCary
18  had written up and it was addressed to Chance Gaines at a
19  Rigby Lane or Rigby Street address in Montgomery, he didn't
20  know the actual house numbers.
21  Q. Did you go there to that address?
22  A. Yes, sir.
23  Q. And what, if anything, did you find when you got there?
24  A. We talked to Mr. Higdon's, I believe it's his fiance, we
25  talked to her and she confirmed that Mr. Gaines had been

## Page 23

1  there, but that he had left sometime in the middle part of
2  April.
3  Q. Okay. So she confirmed that Mr. Gaines had actually been
4  at that residence.
5  A. Yes, sir.
6  Q. Did she identify herself as his fiance?
7  A. We asked if -- I am trying to remember. I asked her if
8  they were married and she said yeah, kind of, sort of, and --
9  Q. Okay.
10  A. -- so we left it at that.
11  Q. You were describing the second scheme which was mailing
12  out, and what, if anything, else did he tell you about what
13  would happen if they mailed this postmarked first envelope
14  that was marked return to sender to the Rigby address, what
15  was supposed to happen, did he tell you?
16  A. Yeah, they would -- once the envelope got to Chance
17  Gaines, Gaines was to take some hacksaw blades, put them in
18  the middle, tape them on the back of pieces of paper in legal
19  mail. Put this supposed legal mail in the return to sender
20  envelope. And their belief was that since it had already
21  been returned to the jail once stamped return to sender that
22  when it got back to the jail the guards wouldn't check it,
23  they would simply just take it to Mr. McCary and he would
24  have his saw blades in the middle of the legal mail. The
25  other assumption was that based on the way at the time the

## Page 24

1  jail searched legal mail, according to the prisoners they
2  simply would take it out of the envelope and just shake it
3  because they were afraid of being accused of reading
4  prisoners' legal mail, they would simply pick it up and shake
5  it and the thought was if the blades were taped to the inside
6  of the paper by simply shaking it they would never discover
7  the blades and they would get them that way.
8  Q. What, if anything, else happened after he told you about
9  this?
10  A. There was -- at some point there was a falling out
11  between Mr. McCary and Mr. Higdon. And there was -- some sort
12  of measurement system was used to basically measure Mr.
13  Higdon and Mr. Higdon was found to be too big to fit through
14  the window using the hacksaw method.
15  Q. With the frame still in the wall.
16  A. With the frame still in the wall. The window was very
17  narrow, and Mr. Higdon is kind of a big guy and they figured
18  out that he would not fit through the window. According to
19  Mr. Bradley, because of that Mr. McCary and Mr. Higdon had a
20  falling out. And that is when Mr. Higdon decided that he
21  wanted to switch cells, and approximately four to five days
22  before the discovery Mr. Higdon and another inmate by the
23  name of Jonathan Weldon who was in cell 110 at the time, they
24  switched cells.
25       MR. FEAGA: Might I have just a moment, Your Honor?

Page 25

1   (pause)
2   Q. In your discussions with Mr. Bradley did Mr. Bradley
3   provide any information to you regarding any concern he might
4   have for his own safety as a result of
5   providing information to you about Mr. Higdon?
6   A. Yes, sir.
7   Q. Tell the Court what, if anything, he told you about
8   that.
9   A. On this past Tuesday morning when Mr. Bradley was before
10  Your Honor being sentenced, Mr. Bradley had approached me in
11  the back and told me he needed to be separated from another
12  inmate, Raphael Murrillo. And later on I asked him why he
13  felt like he needed to be separated from Mr. Murrillo, and he
14  informed me that he had been receiving threats over at the
15  jail from Mr. Higdon, and that according to Mr. Bradley Mr.
16  Higdon was attempting to get information about the addresses,
17  phone numbers, whereabouts of family members, specifically
18  his children, Mr. Bradley's children, and he was using
19  another inmate to I guess try and get this information from
20  Mr. Bradley. And also where Mr. Bradley -- on at least two
21  occasions Mr. Murrillo tried or attempted to bring another
22  inmate with him to physically attack Mr. Bradley. They
23  weren't successful but that's -- according to Mr. Bradley, he
24  attempted twice.
25  Q. All right, sir.

Page 26

1       MR. FEAGA: No further questions for this witness at
2   this time, Your Honor.
3       THE COURT: Any cross, Mr. Petersen?
4       MR. PETERSEN: Yes, Your Honor.
5           CROSS-EXAMINATION
6   BY MR. PETERSEN:
7   Q. Deputy Reeves?
8   A. Yes, sir.
9   Q. When did you state that Mr. Higdon had been moved out of
10  that cell or did you find out?
11  A. Our information was that he was moved out about four to
12  five days before the discovery. The discovery was on April
13  the 17th, so sometime say around April the 12th, at least
14  according to information we had.
15  Q. Did you attempt to interview Mr. Higdon at all?
16  A. Yes, sir.
17  Q. And what was the result of that interview?
18  A. Mr. Higdon didn't want to talk to us.
19  Q. Did you advise his counsel that you wished to talk to
20  Mr. Higdon?
21  A. No, sir.
22  Q. Did Mr. Higdon decline to talk to you because he wanted
23  his counsel present?
24  A. Mr. Higdon explained to us, is that he had talked to you
25  and that you and the United States were in some sort of

Page 27

1   meetings about working out a deal for information. I told Mr.
2   Higdon I was not aware of that, that I would check into that
3   and see what I could find out. After that Mr. Higdon was
4   taken back to the city jail.
5   Q. When did that occur? Do you recall?
6   A. It's been at least a month ago.
7   Q. So basically the -- what you are telling the Court, if I
8   may sum up, is that you did not interview Mr. Higdon because
9   he refused to talk to you, but rather you did not interview
10  Mr. Higdon because his attorney was not present at that time
11  and you never tried to go back again to interview him when
12  his attorney was present; is that correct?
13  A. No, sir. We just did not interview him at that time
14  because I did not know what meetings or plans had been made
15  between yourself and the U.S. Attorney's office.
16  Q. Did you ever attempt to contact Mr. Higdon's attorney to
17  find out if there would be an appropriate time to interview
18  Mr. Higdon concerning this matter?
19  A. No, sir.
20  Q. So basically you ignored Mr. Higdon's potential
21  testimony to you and went to Mr. Bradley. Did you interview
22  Mr. Murrillo?
23  A. Yes, sir.
24  Q. Did he implicate Mr. Higdon?
25  A. To some degree, yes, sir.

Page 28

1   Q. Did you find out why Mr. Higdon was moved? Did you find
2   out why Mr. Higdon was moved from 210 into whatever, one
3   something or another?
4   A. The information we had is that Mr. Higdon moved from 210
5   to 110, that he just wanted to switch cells with Mr. Weldon,
6   Jonathan Weldon.
7   Q. He wanted to switch cells with Jonathan Weldon?
8   A. Yes, sir.
9   Q. Did you interview any of the detention facility officers
10  or supervisors as to why Mr. Higdon was moved?
11  A. No, sir.
12  Q. So basically you are -- you based your conclusions
13  concerning his movement out of that cell on inmate testimony
14  and nothing from detention facility officers; is that
15  correct?
16  A. Yes, sir.
17  Q. Was it John Bradley -- yeah, John Bradley -- do you know
18  if Mr. Bradley has been sentenced yet or not?
19  A. Yes, sir, Tuesday.
20  Q. Was he sentenced prior to your talking to him?
21  A. No, sir.
22  Q. So when you were interviewing Mr. Bradley he was still
23  awaiting sentencing; correct?
24  A. No, sir.
25  Q. Was Mr. Bradley -- were you at Mr. Bradley's sentencing?

## Page 29

1  A. Yes, sir.
2  Q. Did Mr. Bradley receive an adjustment, an enhancement
3  for obstruction of justice for attempted escape?
4  A. No, sir.
5  Q. Was the attempted escape raised at Mr. Bradley's
6  sentencing?
7  A. No, sir.
8  Q. Has Raphael Murrillo been sentenced to your knowledge?
9  A. Yes, sir.
10 Q. Was he sentenced before or after this attempted escape?
11 A. After.
12 Q. Was Mr. Murrillo adjusted for attempted escape?
13 A. No, sir.
14 Q. Has any one of these, all these names that you have
15 interviewed, were any of these adjusted for attempted escape?
16 A. No, sir.
17 Q. Who were the occupants of cell 210 when this attempted
18 escape occurred, do you know?
19 A. You mean when it was discovered?
20 Q. When it was discovered.
21 A. Alvin McCary, David Cotney, John Bonner, and Jonathan
22 Weldon.
23 Q. Did any of those individuals -- were any of those
24 individuals charged with attempted escape, still under
25 investigation for attempted escape, or did they have their

## Page 30

1  sentences enhanced for attempting to escape?
2  A. There are persons that are still under investigation for
3  that.
4  Q. Have any of them had their -- that have been sentenced,
5  have they had their sentences enhanced for attempted escape?
6  A. I don't believe that any of those four have been
7  sentenced yet.
8  Q. Do you know, and this may be beyond your knowledge, do
9  you know if they are going to be charged with attempted
10 escape?
11 A. There is at least one that will be.
12 Q. Is that Mr. Higdon?
13 A. That's Mr. McCary.
14 Q. Mr. McCary is going to be charged with attempted escape.
15 A. It is our --
16 Q. Your belief?
17 A. Belief.
18 Q. That's fine. Did you interview any of the other
19 occupants of the room and outside of Alvin McCary -- no,
20 Raphael Murrillo and John Bradley, did they implicate Mr.
21 Higdon?
22 A. Can you say that again?
23 Q. If I recall your testimony correctly John Bradley and I
24 believe Raphael Murrillo you stated implicated Mr. Higdon in
25 this attempted escape?

## Page 31

1  A. Yes, sir.
2  Q. Did you interview any of those other individuals in cell
3  210?
4  A. Alvin McCary was interviewed, not by me, but he was
5  interviewed.
6  Q. Are you aware of whether Mr. McCary, excuse me,
7  implicated Mr. Higdon in that attempted escape?
8  A. Yes, sir, he did.
9  Q. Did anyone else implicate Mr. Higdon in that attempted
10 escape?
11 A. One other inmate, Allen Nelson, had information that he
12 believed that Mr. Higdon was involved.
13 Q. What did Mr. -- what was his name?
14 A. Allen Nelson.
15 Q. Allen Nelson, what is -- is Mr. Nelson Mr. Bradley's
16 cellmate, has been his cellmate or do you have any knowledge
17 of that?
18 A. It's my understanding they were not cellmates. I don't
19 know if they are cellmates now, they were not cellmates then
20 that I am aware of.
21 Q. Okay.
22     MR. PETERSEN: I don't believe I have anything
23 further of this witness at this time, Your Honor.
24     THE COURT: Anything further from the United States?
25     MR. FEAGA: No, Your Honor.

## Page 32

1      THE COURT: May this witness step down and be
2  excused?
3      MR. FEAGA: Yes, Your Honor, from the United States.
4      THE COURT: Any objections?
5      MR. PETERSEN: No, Your Honor.
6      THE COURT: You may step down.
7      MR. FEAGA: Your Honor I am going to --
8      THE COURT: Do you have any more witnesses on this
9  issue?
10     MR. FEAGA: No, sir, Your Honor. Before leaving this
11 issue I would just make the following statement to the Court,
12 Your Honor. United States Sentencing Guidelines Section
13 3C1.1, note 4(a), says that threatening, intimidating or
14 otherwise unlawfully influencing a co-Defendant, witness,
15 directly or indirectly, a co-Defendant or a witness, directly
16 or indirectly, or attempting to do so is an example of
17 obstruction of justice. We have the effort to intimidate a
18 witness on the issue of this very obstruction in this escape
19 attempt coming from Mr. Bradley. We have the effort to
20 influence the testimony of Mr. Medley by telling him he is
21 going to provide an alibi for both of them. We have the
22 effort to influence the testimony of Eric, and I apologize, I
23 can't recall his last name, but the witness that was called,
24 who attempted to provide an alibi that Mr. Medley testified
25 would have been a bogus alibi. As it turns out it didn't work

Page 33

1  out too well as the Court may recall because they got the
2  night wrong because of the early morning hours that this
3  occurred.
4      But you also have Mr. Medley testified, starting at
5  paragraph four, page 42, the following colloquy took place --
6  excuse me, line four on page 42 of that transcript. My
7  question was, did this Defendant, referring to Mr. Higdon,
8  tell you that he knew someone named Eric who would say that
9  you and he were at his house all night on December 5th,
10  2002? Answer, yes, sir. Question, was that before you
11  entered into the agreement with the government to testify
12  truthfully in this trial today? Yes, sir.  Did this Defendant
13  tell you after you were both arrested that he was having
14  Tammy followed because he was worried that she might turn
15  state's evidence? Which the Court will take note she did, in
16  fact, do. And his answer was yes, sir. So our argument, Your
17  Honor, is the Court can certainly apply the obstruction of
18  justice under that commentary for having attempted to
19  intimidate or otherwise unlawfully influence or threaten a
20  co-Defendant or a witness, or attempting to do so.
21      Also, Your Honor, pursuant to note 4(b), permitting,
22  suborning or attempting to suborn perjury is also an example.
23  That's note 4(b). He committed perjury. We have already
24  outlined to the Court how he did so when he testified. He
25  suborned perjury when he put Eric, last name unknown to me at

Page 34

1  this time -- Eric Culpepper. And in attempting to get Mr.
2  Medley to go along with this. And finally, Your Honor, as
3  already pointed out, note 4(e), they provide for it if the
4  Defendant escaped or attempted to escape from custody before
5  trial or sentencing. Our argument is that he deserves the
6  points under any one of the three, and certainly deserves it
7  based on the violation of all three of them.
8      I am going to move on from that now, Your Honor, to
9  what I believe is the next objection by the defense, which is
10  objection number two, and I am going to give it have short
11  script, Your Honor. I think the assertion of the defense that
12  Mr. Higdon should receive any reduction in his guideline
13  sentence level for acceptance of responsibility is absurd
14  based on the facts of this case. And I would rest on the
15  argument I have already made to the Court about why he should
16  get obstruction of justice.
17      And also the responses of the United States
18  probation office, Your Honor, I am relying on those as well,
19  and would adopt them as arguments of the United States in
20  support of these calculations that the Court has in the PSI.
21  Objection number three --
22      THE COURT: Let's let the defense put on any
23  testimony that he may wish or any evidence in support of the
24  acceptance of responsibility argument. Do you have any
25  argument or any testimony you wish to put on in support of

Page 35

1  that application?
2      MR. PETERSEN: Yes, Your Honor, I have some argument
3  I would like to raise for the Court's consideration. A new
4  case that just came out, United States versus Perry, this is
5  an 11th Circuit case.
6      THE COURT: You have a cite on that?
7      MR. PETERSEN: I do not have a cite.  I have a copy
8  that I can give to the Court in just a moment.  It came out
9  on August 5th, 2003. It's nonargument calendar, numbered
10  02-16-776. It says that as for -- and we are going to get
11  into a role adjustment for being a manager, et cetera, et
12  cetera, and aggravating roles. But U.S. versus Perry says
13  that both -- the Court can consider at the same time both an
14  enhancement for being a manager, and a downward departure or
15  a lessening for having accepted part of the responsibility of
16  his crime. And Mr. Higdon, as the Court will recall, as to
17  counts two, three and four sat there in the chair under oath
18  in the witness stand and testified that yes, that was his
19  methamphetamine. And the jury believed him and found him
20  guilty of that.
21      I would submit to the Court that the Court should
22  consider for acceptance of responsibility under United States
23  versus Perry that Mr. Higdon did, in fact, accept
24  responsibility for those things that he admitted were his. He
25  denied the facts of -- other facts of the case, and evidently

Page 36

1  the jury did believe him as they found him not guilty of the
2  conspiracy, not guilty of count five, which was a substantive
3  drug count, not guilty of count six, not guilty of count
4  seven, and not guilty of count eight or count nine. And then
5  they found him guilty on count ten.
6      And if the Court will recall -- if I may address
7  some of what Mr. Feaga addressed in his statements as to
8  objection number one, I would like to draw the Court's
9  attention to Mr. Medley's testimony at trial, and Mr.
10  Medley's -- and what the Court is saying. Number one, Mr.
11  Medley testified at trial that it was he, John Fowler and a
12  person, unknown name, nicknamed Chunky, who went over -- and
13  as the Court obviously remembers, Mr. Medley testified that
14  Mr. Higdon directed that. And the jury found Mr. Higdon
15  guilty based upon I believe an aiding and abetting charge.
16      However, Mr. Feaga just made much of an audio tape
17  of Mr. Higdon wherein he said we went over there, in other
18  words, Mr. Higdon, went over to North Pass and did the
19  shooting. I'm sorry, Your Honor, the government can't have it
20  both ways. Either Mr. Higdon was telling the truth on the
21  audio tape and Mr. Medley was lying, perjuring himself on the
22  stand as to who was actually involved in the drive-by, or Mr.
23  Higdon was puffing up himself, blowing off, making himself
24  scarier to this confidential informant on the audio tape and
25  Mr. Medley was telling the truth as to the facts of the

Page 37

1  drive-by.
2      Your Honor, I would submit to the Court that the
3  Court government can't have it both ways. Mr. Higdon can't be
4  lying on one hand and Mr. Medley about the same thing be
5  telling the truth. There are also other inconsistencies with
6  Mr. Medley's testimony, and the Court has a copy of the
7  transcript and I would draw the Court's attention to that
8  portion of the transcript in which Mr. Medley is discussing
9  the numerous quantities of drugs that he allegedly purchased
10  from Mr. Higdon. In one instance it will be I bought it
11  twice a week, the next second it's five times a week, the
12  next second it's pot, and the next second it's this. And I
13  will leave that to the Court to review rather than me sit
14  here and draw the time out even further by going through
15  that. But there are inconsistencies here. And I would like
16  to remind the Court that the only individual that placed Mr.
17  Higdon with any involvement in the drive-by was Mr. Medley,
18  and it was his testimony and his testimony alone.
19      Even concerning the guns, Mr. Medley's testimony is
20  somewhat inconsistent, because as the Court would remember
21  Mr. Medley testified to Agent Halasz, and I believe Agent
22  Halasz would be able to confirm this, that when he was
23  arrested that he claimed that the SKS belonged to somebody
24  else. It was not his. Yet -- and I believe he even stated
25  that in the proffer. I am not positive because I have never

Page 38

1  read the proffer, or I don't recall reading that in the
2  proffer and that's not under oath anyway. But Mr. Medley did
3  testify at trial that those guns were all his.
4      And then he turns around and later on in the
5  testimony he states -- well, on page 21 of Mr. Medley's
6  testimony, line 19, question by Mr. Feaga, did those two
7  weapons belong to anyone? Yeah, they were mine. I had left
8  them at Jerry's house. I believe sometime in November.
9  Question, tell the ladies and gentlemen of the jury why you
10  left those guns at Jerry's house sometime in November. I got
11  into an altercation with a roommate of mine. He tried to rob
12  me and I didn't have electricity at my house and I was kind
13  of worried about him stealing my stuff, you know. So right
14  there Mr. Medley testified under oath that the guns were his.
15      Then on page 56, line 12 -- no, line ten, question,
16  from Mr. Petersen, I'm sorry, Mr. Medley, do you own the
17  AK-47 and the Mossberg? Yes, sir. Question, and how about the
18  SKS? That was Jason Ingalls', my ex-roommate's. That's the
19  guy that just a new pages before he stated he was having
20  problems with so he took the guns out of the house. So
21  effectively Mr. Medley just testified that he stole Jason
22  Ingalls' SKS. On one hand Mr. Medley is claiming that all the
23  guns are his and then 16 pages later roughly -- 13 pages
24  later -- no, 23 pages later, Your Honor, he is claiming that
25  the SKS is Jason Ingalls'. Your Honor, who do we believe?

Page 39

1      I know who the jury believed as to the
2  drive-by-shooting, but it's our position, Your Honor, that
3  the government has got to pick one or the other. You know,
4  they can't have the audio tape and say that's Mr. -- they
5  can't ask for an adjustment for obstruction saying Mr. Higdon
6  lied on that audio tape, and then at the same time say that
7  evidently Mr. Medley didn't lie as to the drive-by, the jury
8  believed him, but Mr. Medley said that Mr. Higdon wasn't at
9  the drive-by, it was just those three individuals at the
10  drive-by.
11      THE COURT: I will let you make your arguments about
12  the totality of anything that you want to do, I think that
13  more or less goes towards mitigating or aggravating
14  circumstances.
15      MR. PETERSEN: Yes, Your Honor.
16      THE COURT: The only thing I am interested in right
17  now is the second objection that you have made, and that is a
18  request for the acceptance of responsibility application
19  which has not been included in the calculations at this
20  point. The government has rested on the testimony and
21  arguments they have already made, and I am just asking you do
22  you have anything else that you wish to present or argue in
23  response to the acceptance of responsibility?
24      MR. PETERSEN: No, Your Honor. Our position is that
25  by testifying to ownership in those three counts that he was

Page 40

1  convicted of, the Court should consider in sentencing his
2  acceptance of responsibility as to that quantity of drugs.
3      THE COURT: Okay. It's your argument that he
4  testified truthfully about his possession in the counts two,
5  three and four.
6      MR. PETERSEN: Yes, Your Honor. It is our position
7  he testified truthfully in those counts, and it's our
8  position that that is substantiated by the jury's finding of
9  finding him guilty as to those three counts. They had the
10  confidential informant who testified that he was there, and
11  Mr. Higdon got up and said yes, those were my drugs. The jury
12  believed him and convicted him on those three counts. We feel
13  that he should have acceptance of responsibility, or at least
14  that should be considered by the Court in its calculations
15  because of that. Thank you, Your Honor.
16      MR. FEAGA: Judge, may we just respond briefly? And
17  I will be very brief. I would merely want to point out for
18  the record that Mr. Higdon's admissions regarding the limited
19  distributions that he conducted were made under the guise of
20  an entrapment defense. In other words he wasn't admitting
21  responsibility for anything, he was claiming he was set up,
22  he was trapped into doing it. So we would argue that that
23  argument doesn't carry any water for that reason.
24      The inconsistency that Mr. Petersen alleges is in
25  the transcript, it just doesn't exist. It's not there. The

Page 41

1   transcript of the testimony of Mr. Higdon -- I should say the
2   transcript of what he was saying when he was talking to the
3   confidential source on the date that the buy was made, that
4   particular buy, he says on there that's me over there with
5   that AK-47. They stole your dope? He says this guy -- he is
6   talking about we are over there. If you read on in that on
7   the very last page of the transcript, when the CS is telling
8   him man, please start being more careful. He says dude, I
9   was here, I was -- it's obvious what he is saying is he was
10  responsible for them being over there shooting just exactly
11  like Mr. Medley told the Court but that he didn't go over
12  there and do it himself. So there is no inconsistency in the
13  transcript.
14      Mr. Petersen argued that the only evidence of his
15  involvement in the drive-by is Mr. Medley. They have
16  repeated that assertion over and over and over again. I know
17  there's lots of evidence of it, but the key piece of evidence
18  supporting Mr. Medley is his admission on the transcripts and
19  on those tapes that we played for the Court and the jury. So
20  it isn't just Mr. Medley, it is the Defendant's own statement
21  that he was involved.
22      I would only point out too that Mr. Petersen points
23  to a -- what he alleges is a discrepancy in Mr. Medley's
24  testimony about the guns. Would point out for the Court
25  that -- one thing I had not already, and that is Mr. Higdon,

Page 42

1   during the course of his testimony, the Court will recall
2   made the assertion that the reason that they could believe
3   him, the jury could believe him that everything that he was
4   saying Medley had done and not he was because that part of
5   the house where all this stuff was found was Mr. Medley's
6   part of the house. And after getting him to basically admit
7   that, and then getting him in an effort to bolster his own
8   testimony he said there was -- we had these cinder block
9   walls inside and out poured full of cement and there was a
10  deadbolt locked door between these two facilities and it
11  stayed locked. And so that's how I know everything out there
12  was Medley's and not mine.
13      But he forgot again, Judge, as is often the case
14  when you tell a lie, it's the old saying oh, what a
15  complicated web we weave when first we practice to deceive.
16  He forgot that the evidence was that the guns were found in a
17  closet on the inside of that concrete block wall behind that
18  deadbolted and constantly locked door and then he backed up.
19  He said well, the door wasn't locked 24/7. That's the only
20  explanation he could give for how the guns wound up on his
21  side of the house.
22      So we would merely argue to the Court that any
23  discrepancy of the guns, it goes much more towards the
24  Defendant having obstructed justice than it does towards any
25  inconsistency in the government's evidence.

Page 43

1       THE COURT: Objection number three as to paragraph
2   number 36, adjustment for role in the offense.
3       MR. FEAGA: Your Honor, we -- the United States
4   would rely on the evidence at trial. We have no additional
5   evidence to present to the Court. We rely and adopt the
6   argument of the United States probation officer. We add to it
7   this. Pursuant to United States Sentencing Guideline Section
8   3B1.1(a) -- pardon me, Your Honor. Yes, sir, pursuant to
9   United States Sentencing Guidelines Section 3B1.1(a), the
10  offense level is increased by four levels if the Defendant
11  was a leader or organizer of a criminal activity that
12  involved five or more participants or was otherwise
13  extensive.
14      We would submit to you that the Court should award
15  four points for both of those reasons. And either one of them
16  is sufficient. This was extensive criminal activity. And it
17  most certainly involved five or more participants. I will let
18  the Court -- the Court heard the evidence, I will not make
19  further argument on the otherwise extensive activity involved
20  in this case. But I would point out for the Court that in
21  addition to what the United States probation officer has
22  given the Court, which we would submit is correct and is a
23  sufficient basis to find five participants, those being Mr.
24  Higdon, Mr. Medley, Chunky, Mr. Fowler and Jamie Barnes who
25  was the fellow that robbed Higdon's dope dealer when he went

Page 44

1   over there that caused the shooting to take place.
2       But there are two other people at least
3   involved in this -- three, I will name three. One of them is
4   Eric, who Mr. Medley testified, the Court will recall, was
5   over there the night that they came back from the shooting
6   and when Mr. Higdon made the phone call that he admits on
7   the -- during his conversation with the CS, that's taped and
8   was played for the jury, when he admits he called over there
9   and told them he wanted his money back. Mr. Medley testified
10  that Eric drove him over to the place where Mr. Higdon had
11  told Mr. Barnes to bring his money back to him. Said he
12  wanted his money back and Mr. Medley testified, and it's part
13  of his -- contained in the transcript. Would it be helpful
14  to the Court if I point out where?
15      THE COURT: It would. Whose testimony is this, Mr.
16  Culpepper's?
17      MR. FEAGA: This would be Mr. Medley's testimony.
18  Page 46 of the transcript that the Court has, Your Honor,
19  starting at line five. I asked Mr. Medley, you testified
20  about you and Chunky and John Fowler being at Higdon's house
21  on December the 5th talking about this shooting over at North
22  Pass, do you remember testifying about that? He said yes,
23  sir. Question, was there anyone else there at any time while
24  you were either discussing -- while you either discussed
25  going over there or when you got back? Answer, I believe Eric

Page 45

1 was there also. Question, and did Eric in any way, shape or
2 form participate or assist in y'all's activities that night?
3 Answer, yeah. I believe after the phone call he told them to
4 drop, the leader, the money off on Traffic Operations Road.
5 Now, that's supported by Mr. Higdon's statement when he
6 didn't know he was being taped where he says he made that
7 phone call and told them he wanted his money back. Yeah, I
8 believe after the phone call he told them to drop, the
9 leader, the money off on Traffic Operations Road. Who told
10 who do that? I asked. He said, Jerry had told the guy that
11 robbed him to drop the money off. Eric took me over there and
12 I sat and waited for them to drop it off. I asked him, did
13 Eric know why he was taking you over there? And he said
14 yeah. Question, was Eric present when Jerry made the
15 threatening phone call over to the guy? And you go to page
16 47, the very top, and he says yes, sir.
17     That's five participants counting the Defendant,
18 Your Honor. If you count Jamie Barnes, that's six. If you
19 count Landon Birch who was selling the dope that's involved
20 in the scheme to Higdon, that's seven. That's all that's
21 necessary, Your Honor. And we would submit that the
22 enhancement for being a leader or an organizer of five or
23 more participants or an otherwise extensive criminal
24 activity, it is clear from the Defendant's statements made
25 while he was unknowingly being taped and from the testimony

Page 46

1 of Mr. Medley, that he was the organizer and leader of this
2 criminal activity. That's all we have on that, Your Honor.
3     THE COURT: Any argument or testimony from the
4 Defendant?
5     MR. PETERSEN: I have some argument. I have some
6 argument, Your Honor. First of all I would like to remind the
7 Court that the jury heard all of this evidence as to a large
8 group of individuals or a group of individuals, that was part
9 of the government's conspiracy case. The jury heard it all,
10 considered it all, and rejected it. Count one was
11 conspiracy. The jury acquitted Mr. Higdon of that
12 conspiracy. Therefore it's our position, Your Honor, that
13 there may have been a group of people involved, there may
14 have been two or three people together, but it was not a five
15 or more, it was not a massive operation. The jury heard all
16 of this testimony that Mr. Feaga just referred to and
17 rejected that testimony. They considered it to be less than
18 the level of proof the government required -- was required to
19 meet and said we don't find him guilty of a conspiracy.
20     Also, Your Honor, Mr. Feaga just spoke of Mr.
21 Medley's testimony on page 46 of his transcript concerning
22 the night of the drive-by. And if I recall Mr.
23 Culpepper' testimony -- now, I do not have a transcript of
24 Mr. Culpepper's testimony -- but if I recall his testimony
25 correctly, Mr. Culpepper testified that he was not there the

Page 47

1 night after he described. And as Mr. Feaga just pointed out a
2 little bit ago to the Court Mr. Culpepper was off by a night.
3 So therefore Mr. Culpepper testified he was not there the
4 night of the drive-by, then I guess it's going to be up to
5 the Court to decide who to believe, Eric Culpepper or John
6 Gabriel Medley as to what happened on the night of the
7 drive-by. Mr. Medley in his testimony says that Eric
8 Culpepper was there.
9     And also if I remember correctly Mr. Barnes or the
10 individual who was shot testified at trial that he did not
11 recall receiving a telephone call that night. I am not
12 positive about that because as I stated earlier I do not have
13 that trial transcript testimony either. But I believe I
14 recall the victim in the -- of the drive-by stating that he
15 does not recall a telephone call that night.
16     Once again, Your Honor, Mr. Medley is the
17 government's star witness. Mr. Medley has had then, and has
18 now, because he has not yet been sentenced, a vested interest
19 in his believability. He is looking at 15 years or less for
20 his testimony. Whether the jury buys it or not, but as long
21 as the government continues to believe that he has not
22 perjured himself he's going to get the benefit of all of his
23 testimony, convictions or none, as the Court is well aware.
24     It's our contention, Your Honor, the government
25 can't have it both ways. Either Eric Culpepper was making up

Page 48

1 a story, and if he was making up a story why in the devil
2 would he testify to the wrong night. The Defendant knew what
3 date and what time the incident occurred, we had the reports
4 from the police. Eric Culpepper testified for the Defendant.
5 Eric Culpepper was mistaken in that he thought he was present
6 on the night of the shooting. He was not. He admitted that
7 under oath. He didn't perjure himself. He told -- it's our
8 contention that Mr. Culpepper told the truth. He was honest
9 to the jury. And when his mistake was pointed out, which, by
10 the way, counsel for the defense had missed as well, he
11 admitted that he was wrong. And if I recall correctly he
12 stated he was not there the night of the shooting.
13     So, Your Honor, I would rest on the fact that one,
14 the jury found him not guilty of conspiracy, which kind of
15 mitigates against a role enhancement for being a leader or an
16 organizer, et cetera, and the points that I have just made
17 concerning the testimony. Thank you, Your Honor.
18     MR. FEAGA: Your Honor, just very briefly. I am not
19 going to address any of his argument, I think the Court has
20 it at this point, with one exception. For the record I want
21 to point out that count ten charges that or about the 5th day
22 of December, 2002, the night of the shooting, Jerry Higdon
23 did knowingly in furtherance of a major drug trafficking
24 offense, to wit, conspiracy to distribute marijuana and
25 methamphetamine, Schedule I and II controlled substances, and

Page 49

1  it goes on to allege the intention to intimidate, harass,
2  injure or maim, fired a weapon into a group of two or more
3  people. So the argument that the jury didn't find a
4  conspiracy to distribute marijuana or methamphetamine simply
5  flies in the face of the facts. The charge speaks to itself.
6  That's all we have on that.
7       THE COURT: Any further reply, Mr. Petersen, as to
8  objection number three?
9       MR. PETERSEN: As to number three, no, Your Honor, I
10 do not. I would also like to remind the Court of United
11 States versus Perry which I will provide to the Court at any
12 time.
13      THE COURT: I believe I have a copy of the United
14 States versus Perry. It's a 2003 West Law cite, 21790357; is
15 that it?
16      MR. PETERSEN: Your Honor, I got mine directly from
17 the 11th Circuit, and it was published as a PDF file and they
18 did not have a West Law or Lexus cite on it.
19      THE COURT: Case number 02-16776?
20      MR. PETERSEN: Yes, Your Honor, that's the one.
21      THE COURT: I have it and I will review it.
22      MR. PETERSEN: Thank you, Your Honor.
23      MR. FEAGA: Your Honor, if the Court is ready I will
24 proceed to the next objection involving drug quantity and
25 base offense level.

Page 50

1       THE COURT: Yes, objection number four.
2       MR. FEAGA: Yes, sir. Your Honor, with the Court's
3  permission the United States would like to call Special Agent
4  Tom Halasz of the Drug Enforcement Administration.
5       THE CLERK: You do solemnly swear or affirm that the
6  testimony you give in this cause to be the truth, the whole
7  truth, and nothing but the truth, so help you God. Ridge.
8       THE WITNESS: Yes, I do.
9       THOMAS HALASZ, witness for the Government,
10 having been duly sworn or affirmed, testified as follows:
11          DIRECT EXAMINATION
12 BY MR. FEAGA:
13 Q. Sir, would you state your name for the record, please.
14 A. Thomas Halasz. Last name is spelled H-A-L-A-S-Z.
15 Q. And are you the same Thomas Halasz who testified during
16 the course of the trial of this matter, United States versus
17 Jerry Higdon, and identified yourself as a long time law
18 enforcement officer and a long time agent with the Drug
19 Enforcement Administration?
20 A. Yes, I am.
21 Q. Agent Halasz, during the course of your investigation of
22 the matters involving Mr. Higdon that you testified about
23 previously, you have been for all intents and purposes what
24 we call the case agent involving the case of United States
25 versus Jerry Higdon?

Page 51

1  A. Yes.
2  Q. Did you pursuant to your duties and responsibilities as
3  case agent participate in the debriefing of Mr. Gabe Medley
4  before he testified in this Court and before any agreement
5  was reached with him about the resolution of his charges?
6  A. Yes, I did.
7  Q. Would you recount if you would, please, and I am not
8  going to go through all of it, but would you tell the Court
9  regarding methamphetamine actual -- ice methamphetamine, is
10 ice methamphetamine methamphetamine actual?
11 A. It is -- ice methamphetamine is defined by the law as 80
12 percent or higher purity.
13 Q. Okay. Very good.
14      MR. FEAGA: Your Honor, we would ask the Court to
15 take judicial notice of the fact that the guidelines provide
16 that methamphetamine of 80 percent purity or higher is meth
17 actual.
18      THE COURT: The Court will take judicial notice of
19 all of the pertinent statutes and regulations.
20      MR. FEAGA: Yes, sir.
21 Q. Now, during the course of your debriefing of Mr. Medley,
22 did you ask him how much actual meth, ice methamphetamine, he
23 and the Defendant, Jerry Higdon, participated in distributing
24 and/or purchasing during the course of their activity
25 together in the distribution of methamphetamine?

Page 52

1  A. Yes, I did.
2  Q. Tell the Court what he told you in regards to that.
3  A. He stated that Jerry Higdon had been obtaining two to
4  three ounces at a time on an average of twice a week from
5  Landon Birch in Atlanta. And that this had taken place -- as
6  far as Medley's knowledge had taken place from late summer
7  until the time that they were both arrested in January.
8  Q. Okay. Now, late summer, let's just for purposes of
9  discussion I want to ask you some hypotheticals. If we term
10 late summer to be September the 15th, and we -- did he
11 identify to you, did you ask him what late summer was?
12 A. He believed it was around the beginning of September,
13 the end of August, he wasn't sure of exact dates, however
14 that was the time frame that he placed on beginning.
15 Q. Giving Mr. Higdon the benefit of the doubt, and, of
16 course, the Court will be the ultimate determiner of that,
17 but let's assume we start off 15 September of 2002. When was
18 Mr. Higdon arrested? Mr. Higdon and Mr. Medley, when were
19 they arrested?
20 A. The last week of January.
21 Q. Okay. Let's again give Mr. Higdon the benefit of the
22 doubt and let's just go from the 15th of September to the
23 15th of January, what time frame would that be, how many
24 months?
25 A. It would be four months.

Page 53

1  Q. Now, how much methamphetamine did Mr. Medley tell you he
2  and Mr. Higdon were involved in distributing during that time
3  frame? Did he quantify on a some basis, daily, weekly?
4  A. Two to three ounces two times a week.
5  Q. Let's make it then two ounces, that would be then four
6  ounces per week?
7  A. Per week.
8  Q. Let's assume that in four months there are 16 weeks,
9  giving again Mr. Higdon the benefit of the doubt as to the
10  time frame. If you have four ounces being distributed per
11  week during those 16 weeks, how many ounces of
12  methamphetamine would they have been involved in distributing
13  during that four month time frame?
14  A. Approximately 64.
15  Q. All right. Now, do you know how many grams of
16  methamphetamine are in an ounce of methamphetamine?
17  A. 28.
18  Q. And then would it be safe to say that there were 28
19  grams in each of those 64 ounces?
20  A. Yes.
21  Q. If would you, Agent Halasz, would you multiply for us
22  and tell the Court how much -- how many grams of
23  methamphetamine there are if you have 64 ounces of
24  methamphetamine.
25  A. I would have to calculate that.

Page 54

1  Q. Would you do it.
2  A. I get one thousand seven hundred and 93.
3  Q. In any event it's over five hundred, is that right,
4  grams?
5  A. Yes.
6  Q. Okay. Now, you were here when Mr. Medley testified at
7  trial; is that right?
8  A. Yes, I was.
9  Q. Okay. You and I interviewed Mr. Medley at some length
10  prior to the trial and after you took this proffer from him;
11  is that right?
12  A. That's correct.
13  Q. And the reason we were meeting with him was to prepare
14  for trial; is that right?
15  A. Correct.
16  Q. I would like to show you a copy of the transcript, what
17  I will represent is a copy of the transcript of Mr. Medley's
18  testimony at the trial. And I will mark it as Government's
19  Exhibit 1 for identification purposes. And ask you if you and
20  I had an occasion to go over that yesterday afternoon in my
21  office?
22  A. Yes, we did.
23  Q. And was the purpose that we went over that to ascertain
24  what quantity of drugs Mr. Medley testified to at trial that
25  he and the Defendant distributed?

Page 55

1  A. Yes.
2  Q. Okay. Do you recall us discussing his testimony starting
3  at line 24, page five, as to when he first began to buy ice
4  methamphetamine from the Defendant, Jerry Higdon?
5  A. It was in August of 2002.
6  Q. Okay. And do you recall what he said about how much he
7  was buying from him starting the first of August, 2002?
8  A. Yes, he said he was purchasing an eight-ball on an
9  average of every other day, eighth of an ounce.
10  Q. Did you have an opportunity to take a calendar and a
11  calculator and figure out how many eight-balls he would have
12  bought then if he was buying it every other day from the
13  first of August, 2002 until the time that they were arrested
14  in January of 2003?
15  A. It would have been about 87.
16  Q. About 87 eight-balls?
17  A. Yes.
18  Q. How many ounces of methamphetamine is 87 eight-balls?
19  A. It would be just under 11 ounces.
20  Q. Now, do you recall us discussing how much
21  methamphetamine the transcript of Mr. Medley's testimony
22  reflected that Mr. Higdon fronted to him as opposed to having
23  sold to him?
24  A. Yes.
25  Q. Okay. And how much methamphetamine did Mr. Medley

Page 56

1  testify Mr. Higdon fronted to him?
2  A. He said that he was fronted amounts on an average of
3  twice, usually each weekend, for him to then subsequently
4  sell and return the money.
5  Q. Okay. And did he say that he was fronted a quarter of an
6  ounce twice a weekend during this time frame?
7  A. Yes. And that sometimes that amount would be an ounce.
8  Q. Okay. Did he identify how many sometimes out of these --
9  this period of time on that weekend it would be an ounce
10  instead of two quarter ounces or a half an ounce?
11  A. I believe he said about a dozen times he got an ounce.
12  Q. Okay. If he got an ounce a dozen times during that 25
13  week period from the first -- from the first of August until
14  they were arrested in late January, how many ounces would he
15  have gotten during that time frame?
16  A. He would have gotten total would have been 18 ounces.
17  Q. Well, that would be counting the half ounces that he got
18  the other 13 weeks; is that right?
19  A. Correct.
20  Q. So a total of 18 ounces. And you have just testified
21  that he purchased rather than being fronted this 18, how many
22  ounces?
23  A. Slightly under 11, I calculated ten point nine.
24  Q. Did you add those two amounts together, the amount
25  fronted and the amount that Mr. Medley purchased from Mr.

## Page 57

1  Higdon?

2  A. Yes, I did.

3  Q. What did that come up to?

4  A. 28 point nine.

5  Q. Okay. Would you tell the Court how many grams of

6  methamphetamine 28 point nine ounces is.

7  A. Again, I would have to calculate that. I can calculate

8  that somewhere around 21 hundred, I believe, just estimating.

9  Q. If you would, would you do the calculation, I wouldn't

10  want you to estimate it. If you would, figure out how many

11  grams of methamphetamine there are in how many ounces did you

12  say, 28 point --

13  A. 28 point nine.

14  Q. 28 point nine. Forget the point nine if you would, Agent

15  Halasz, just do 28 ounces, how many grams is that?

16  A. I get seven hundred and 84.

17  Q. Okay. Is that more than five hundred grams?

18  A. Yes.

19  Q. Now, there was testimony about marijuana and other

20  controlled substances during the course of this case; is that

21  right?

22  A. Yes.

23  Q. But based on the methamphetamine actual alone testified

24  to, whether you look at the proffer or you look at the trial

25  testimony, we are talking about in excess of five hundred

## Page 58

1  grams of methamphetamine actual that was testified to in this

2  case and/or proffered in this case; is that right?

3  A. That's correct.

4      MR. FEAGA: No further questions for this witness at

5  this time, Your Honor.

6      THE COURT: Any cross?

7      MR. PETERSEN: Yes, Your Honor.

8          CROSS-EXAMINATION

9  BY MR. PETERSEN:

10  Q. Agent Halasz, do you know about how much ice in this

11  quantity would be worth, how much money we are talking about

12  here?

13  A. An ounce roughly 28 hundred to 32 hundred dollars.

14  Q. So on --

15      MR. FEAGA: Your Honor, I want to object to the

16  relevancy of the question, it sounds to me like defense

17  counsel is attempting to re-litigate the guilt or innocence

18  issue as opposed to attempting to quantify the amount of

19  drugs involved. We object to it on relevancy.

20      THE COURT: Overruled.

21  Q. Agent Halasz, when you -- what I am looking at is a

22  question as to whether these relevant conduct drugs that we

23  are speaking of, because I believe that's what we are talking

24  about now, because these are outside of the indicted drugs,

25  these drugs that Mr. Medley testified to, and I am just

## Page 59

1  trying to get my hands around them. Would you have any idea

2  how much money we are talking about total here?

3  A. As far as profit or as far as total amount?

4  Q. Just money, total money involved.

5  A. I think a rough estimate could be made if we multiply

6  three thousand dollars times each ounce.

7  Q. So I believe we were talking about --

8  A. Three thousand dollars times 29 roughly.

9  Q. I'm sorry, I didn't hear that?

10  A. I said roughly three thousand dollars per ounce times

11  approximately 29 ounces.

12  Q. Okay. So we are talking about a considerable chunk of

13  change, at least in my book. Did you find evidence when you

14  conducted your investigation or your searches or your

15  seizures that would lead you to believe that that kind of

16  money was available to either of these Defendants, any of

17  these Defendants?

18  A. Well, again, sir, I think we have profit and we have the

19  total value of the drugs. The three thousand dollars times 29

20  ounces represents the total value of the drugs. Obviously

21  someone who is selling drugs is going to pay approximately 28

22  hundred dollars an ounce and make profit of two to four

23  hundred dollars an ounce if it's sold for 28 hundred to 32

24  hundred. I think I am --

25  Q. Okay.

## Page 60

1  A. I am confused as to whether we are talking about total

2  value or profit.

3  Q. Did you interview Tammy Porter?

4  A. Yes, I did.

5  Q. Did she provide in either her proffer or her testimony

6  testimony as to how much methamphetamine she and Mr. Medley

7  were obtaining from Mr. Higdon, do you recall?

8  A. I believe it was a gram to eight-ball amounts.

9  Q. An eight-ball or -- to an ounce, is that what you said?

10  A. No, I think gram to eight-ball amounts, the best of my

11  recollection.

12  Q. Gram to eight-ball amounts. Did she state how often she

13  and he were getting that?

14  A. Without looking at the debriefing I don't remember

15  offhand.

16  Q. That's fine.

17      MR. PETERSEN: I have nothing further for this

18  witness, Your Honor.

19      THE COURT: Any further redirect?

20      MR. FEAGA: No, Your Honor.

21      THE COURT: You may step down.

22      THE COURT: Any more witnesses on this objection?

23      MR. FEAGA: Yes, Your Honor, I would just like to,

24  for purposes of the record, call -- may I have just a moment,

25  Your Honor?

Page 61

1    (pause)
2    MR. FEAGA: I would like to call the United States
3  probation officer to the stand that's present here today. I
4  know it was -- Ms. Caple who wrote the report in another
5  proceeding but I don't think I have to have her.
6    THE CLERK: You do solemnly swear or affirm that the
7  testimony you give in this cause to be the truth, the whole
8  truth, and nothing but the truth, so help you God.
9    THE WITNESS: I do.
10    DWAYNE SPURLOCK, witness for the Government,
11  having been duly sworn or affirmed, testified as follows:
12    DIRECT EXAMINATION
13  BY MR. FEAGA:
14    MR. FEAGA: First of all, Your Honor I want to
15  apologize to Mr. Spurlock, I just drew a blank, I'm sorry.
16  A. That's okay.
17  Q. Sir, would you state your name for the record and what
18  you do for a living.
19  A. My name is Dwayne Spurlock, I am a supervising U.S.
20  probation officer over the presentence unit at the federal
21  probation office.
22  Q. As part of your duties and responsibilities do you have
23  occasion to supervise other United States probation officers?
24  A. I do.
25  Q. Do you know an individual named Jacqueline Caple?

Page 62

1  A. Yes, she is in my unit. She is the guidelines
2  specialist in the presentence unit.
3  Q. Is it part of your duties and responsibilities to act as
4  her supervisor?
5  A. That is correct.
6  Q. Have you been provided prior to coming in here today
7  with a copy of a document dated July 31st, 2003, styled at
8  the top in the letterhead United States District Court,
9  Middle District of Alabama, probation office, a cover letter
10  on it that has that, and then it is styled United States of
11  America versus Jerry Joseph Higdon, presentence investigation
12  report?
13  A. I do not have that in front of me and those dates do
14  sound familiar, I believe. I have seen the presentence report
15  in this case.
16  Q. All right. Did you have an opportunity as the
17  supervising United States probation officer to review the
18  report prepared by Ms. Caple?
19  A. Yes, I reviewed the report several times and we have had
20  lengthy discussions about the case.
21  Q. And did you find the report to be accurate based on your
22  review of the matter with Ms. Caple?
23  A. Yes, I did.
24  Q. Would you tell the Court -- I am going to, if I may,
25  hand you a copy of a document that I will mark for

Page 63

1  identification purposes as Government's Exhibit 2 and ask you
2  if this is the report that you had an opportunity to review?
3  A. Yes, this is it.
4  Q. Would you tell the Court what the conclusion of Ms.
5  Caple and your office was regarding drug quantity based on
6  your review of the evidence in this case?
7  A. The report goes into extensive detail about the amounts
8  of drugs involved in the case. Ms. Caple used a number of
9  different things in computing the drug guidelines. She, in my
10  opinion, was conservative in her estimates, trying --
11  Q. Is that consistent with your office's policy to be
12  conservative?
13  A. It is. When a proffer statement says something, for
14  example, that we made four to five trips over a period of a
15  number of months, we will always use the lower amount of the
16  trips. When a statement may say we bought one to three ounces
17  we will always calculate on the lower number of ounces just
18  to be more favorable to the Defendant and give him the
19  benefit of the doubt.
20  Q. So you will do it on the lower number quantity, you will
21  also do it in regards to dates and times?
22  A. That's correct.
23  Q. And give them the maximum benefit of doubt.
24  A. That's correct.
25  Q. Somebody says sometime in August, you would go to the

Page 64

1  furthest end of August to give the Defendant the ultimate
2  benefit of the doubt.
3  A. That's right. We were not exactly sure, Mr. Medley's
4  proffer statement was not exactly clear on exactly when they
5  started, the deliveries of ice to Mr. Higdon from Birch, and
6  Ms. Caple began her estimates in the middle of September,
7  2002. And we calculated beginning mid-September, 2002,
8  through --
9  Q. Did you also use the lowest quantity that Mr. Medley
10  provided?
11  A. Yes, we did.
12  Q. Okay. How much actual methamphetamine did the United
13  States probation office calculate based on its review of the
14  evidence in this case?
15  A. You want the total or do you want me to break it down
16  how each individual amount and proffer statements and --
17  Q. Whatever is easiest for you, because I am trying to
18  clarify it for the Court and for the record. I know that
19  because there was marijuana also involved you had to convert.
20  A. That's correct.
21  Q. And so what I want to do is if you can, from looking at
22  the report, would you tell the Court how much methamphetamine
23  you converted to marijuana.
24  A. Okay. And Judge, I brought here with me my notes from my
25  conversation with Ms. Caple and we went through the same

Page 65

1  thing yesterday and broke it down.
2  Q. Well, if you would then whatever you are most
3  comfortable with, would you break it down for the Court.
4  A. All right. Let me start with the 85 hundred dollars of
5  kind bud marijuana, and the deal involving the North Pass
6  situation. Ms. Caple converted -- determined that that amount
7  of marijuana was one point 88 pounds of marijuana. And this
8  information came from a recorded statement collected from the
9  CI, and Mr. Medley's confirmation in his proffer statement,
10  paragraph number four.
11        THE COURT: How many pounds?
12        THE WITNESS: One point 88 pounds.
13        THE COURT: Okay.
14  A. And if you do the conversions based on the conversion
15  charts in the guidelines, that amount -- to keep it as simple
16  as possible, that amount converts to point 852 kilograms of
17  marijuana. Okay. Ms. Caple used the tox reports to determine
18  the amount of ice in the case. In looking at the tox reports
19  there were -- she used 39 point 31 grams of ice, based on
20  those actual -- the reports. And that converts to seven
21  hundred 86 point two kilograms of marijuana.
22        THE COURT: Give me that number again.
23        THE WITNESS: Seven hundred 86 point two kilograms
24  of marijuana. Okay. And she also used the tox reports that
25  were not specific about the purity and the strength and

Page 66

1  determined that to be, in benefit of the Defendant, a mixture
2  amount.
3  Q. Which would make it convert at less high a level than
4  actual.
5  A. That's correct. The conversion would be at a lower
6  level. That conversion, we had a total of point 63 grams of
7  methamphetamine mixture, and converted that to one point 26
8  kilograms of marijuana. Okay. Next we discussed Mr. Medley's
9  proffer statements, and this is where we started breaking it
10  down per paragraph in the proffer statements.
11        In paragraph one there was discussion of two ounces
12  of ice that Ms. Caple did not count. This was a situation
13  where she was concerned that that might be a duplicate amount
14  and so she just, benefit of the doubt, did not calculate that
15  two ounces. In paragraph two of his proffer statement is
16  where he starts talking about Birch delivered ice to Higdon
17  two to three times per week, and we started mid-September,
18  2002, and we used two weeks for the month of September, then
19  we had October, four weeks, November, four weeks, December,
20  four weeks of 2002, for a total of 14 weeks. And multiplied
21  that by two ounces for a total of 28 ounces.
22        Proffer statement, paragraph number five, Medley was
23  sent to Atlanta by Higdon to buy ice, two ounces per three
24  trips, for a total of six ounces of ice. And if you add the
25  28 ounces of ice that we talked about in the paragraphs one

Page 67

1  and two, to the ice in paragraph five, that's 34 ounces of
2  ice that we used to calculate. And that also converts to 19
3  thousand two hundred 78 kilograms of marijuana.
4  Q. And where in the United States Sentencing Guidelines is
5  the base offense level for that amount of marijuana? Is that
6  the total amount adding them all up?
7  A. I am not quite there.
8  Q. I'm sorry.
9  A. The proffer statement paragraph number four, Higdon made
10  seven to eight trips to Atlanta to buy kind bud, one to two
11  pounds per trip. We multiplied out one pound of kind bud
12  times seven trips for seven pounds of kind bud and converted
13  that to three point 18 kilograms of marijuana. So our -- if
14  you add those converted marijuana equivalencies you get a
15  grand total of 20 thousand 69 point 492 kilograms of
16  marijuana.
17        And to find out where the base offense level would
18  be, you would look at USSG 2D1.1 of the guidelines,
19  subsection C, which is the drug quantity table, and
20  subsection two is level 36. And it allows level 36 for at
21  least ten thousand kilograms but less than 30 thousand
22  kilograms of marijuana, so he would fall with the amount we
23  have calculated into a level -- base offense level of 36.
24  Q. Thank you.
25        MR. FEAGA: No further questions for this witness,

Page 68

1  Your Honor.
2        THE COURT: Any cross?
3        MR. PETERSEN: Yes, Your Honor.
4        CROSS-EXAMINATION
5  BY MR. PETERSEN:
6  Q. Good morning, Officer Spurlock.
7  A. Good morning.
8  Q. Are these additional drugs that you were just talking
9  about, the marijuana and methamphetamine, are these being
10  included in the base offense level under relevant conduct or
11  what?
12  A. Relevant conduct section of the guidelines does allow
13  for consideration of other drugs.
14  Q. So these are being included as relevant conduct.
15  A. That's correct.
16  Q. All right. Now, if, hypothetically -- and you are our
17  expert on the guidelines -- if the drugs included as relevant
18  conduct, the marijuana and the additional methamphetamine, if
19  those were not included, if the Court were to consider only
20  the drugs actually indicted and found and proven at trial,
21  can you tell the Court what you would estimate that level,
22  that base offense level to be?
23        MR. FEAGA: Your Honor, just for purposes of clarity
24  on the record could Mr. Petersen make it clear what quantity
25  he is talking about was found by the jury for purposes of

Page 69

1 getting this question answered?
2     MR. PETERSEN: I am speaking of the quantities in
3 counts two, three and four. And I believe those were,
4 according to the PSR, in count two, seven grams of ice, count
5 three, seven grams of ice, count four, six point nine grams
6 of ice. And point 76 grams -- no, excuse me, forget the point
7 76. I went down one too many lines.
8 A. On those three counts I come up with a total of 20 point
9 94 grams of ice. 20 point 94. And I am going to refer here,
10 it will take me just a minute.
11     THE COURT: Can you tell the Court what you are
12 referring to in the sentencing guidelines?
13     THE WITNESS: I am looking at 2D1.1, subsection C to
14 determine the base offense levels for that amount of drugs.
15 And let me see, you said 20 point 94, at least 20 grams but
16 less than 35 grams of methamphetamine actual, or ice, would
17 be a level 28.
18 Q. Thank you, Officer Spurlock.
19     MR. PETERSEN: I have nothing further for this
20 witness, Your Honor.
21     THE COURT: Anything else?
22     MR. FEAGA: Just one question.
23         REDIRECT EXAMINATION
24 BY MR. FEAGA:
25 Q. If you were to -- if you would, could you -- I note that

Page 70

1 you had a calculator?
2 A. I do, I have the trusty pocket calculator here with me.
3 Q. Would you convert the ice methamphetamine that you just
4 used to make that calculation to marijuana.
5 A. Okay. 28 grams of ice. You said convert it to marijuana?
6 Q. Yes. Because what I am going to ask you to do in a
7 minute before you get started is then add in the eight
8 thousand five hundred dollars worth of marijuana that's part
9 of count ten by the testimony, and see how much marijuana we
10 get and see if that impacts the guideline level that you have
11 just testified to.
12 A. 28 grams of ice calculates to five hundred and 60
13 kilograms of marijuana.
14 Q. All right. And you said Ms. Caple -- in the calculations
15 you went through before, you said Ms. Caple attributed to the
16 drive-by-shooting incident one point 88; is that right?
17 A. That's correct.
18 Q. One point 88 kilograms of marijuana?
19 A. Pounds.
20 Q. Pounds. Would you now convert that, or if you haven't
21 already, would you convert that to kilograms of marijuana.
22 A. Okay. As I previously testified to that would convert to
23 point 852 kilograms of marijuana.
24 Q. All right. Add the two together in terms of marijuana
25 equivalent and if you would for the record state what

Page 71

1 guideline level that puts you at.
2 A. That total calculation that we have just discussed is
3 560 point 852 kilograms of marijuana. Five hundred and 60.
4 Referring to the guideline manual at 2D1.1 again, that would
5 place us at a level 28, which is at least four hundred
6 kilograms of marijuana to seven hundred kilograms of
7 marijuana.
8 Q. So adding in the marijuana doesn't alter the ultimate
9 guideline level using just the ice actual charged in the
10 case.
11 A. That's correct.
12 Q. All right. And that would be charged in the substantive
13 distribution counts. When I talk about the ice actual, those
14 figures you gave for the actual amount of ice in coming up
15 with a guideline level of 28 is calculated using the amounts
16 that are contained in the distribution counts, the specific
17 amounts attributable to those counts.
18 A. That's correct. We used the tox reports to come up with
19 that actual amount. We were not at the trial but looked at
20 those tox reports to come up with that actual amount of ice.
21 Q. So that would not include any amounts that the jury
22 might have concluded were part of a conspiracy to distribute
23 methamphetamine or marijuana that was referred to in count
24 ten.
25 A. It's hard for me to say what the jury would have used.

Page 72

1 Q. Right.
2 A. But based on relevant conduct and the authority the
3 guidelines give us to use relevant conduct that's what we
4 come up with.
5 Q. Very good.
6     MR. FEAGA: Nothing further, Your Honor.
7     THE COURT: Anything else?
8     MR. PETERSEN: Nothing for this witness, Your Honor.
9     MR. FEAGA: Nothing further, Your Honor.
10     THE COURT: You may step down. Why don't we recess
11 for lunch, it's just before the noon hour.
12     MR. FEAGA: We don't have any more witnesses, Your
13 Honor. I don't know how much argument Mr. Petersen has. Do
14 you anticipate this being much longer? I think that's the
15 last witness we were going to call. We are ready to turn it
16 over to the Court I think. Other than just arguing based on
17 the quantities we have presented to the Court under any of
18 the methods that we used to calculate you come up with that
19 base offense level of 36 unless you adopt the Defendant's
20 argument that you would only have the specific amounts, and
21 we concede if that's what you do then it would be a 28.
22     THE COURT: Mr. Petersen, the witness that you
23 anticipated calling, do you anticipate calling that witness?
24     MR. PETERSEN: No, Your Honor. Your Honor, for your
25 consideration basically all I have left is some argument as

| Page 73 | Page 75 |
|---|---|

**Page 73**

1  to the relevant conduct issue.

2      THE COURT: we have been going two hours here, there

3  are some things that the Court is going to do such as reading

4  the U.S. versus Perry case. Why don't we take a recess and we

5  will begin back at 1:30.

6      THE CLERK: Court will be in recess until 1:30.

7      (At which time, 11:58 a.m., a recess was had until

8  1:30 p.m., at which time the hearing continued.)

9      THE COURT: we will resume from our sentencing this

10  morning or the conduct of the sentencing hearing this

11  morning, and when we broke for lunch we had covered

12  objections one through four listed in the presentence

13  investigation report. That brings us down to objection number

14  five, which are objections to paragraphs numbered 38, 41, 65

15  and 71 for the adjusted offense level subtotal, total offense

16  level, custody, guideline provisions and probation, and the

17  guideline provisions. Is there anything, Mr. Petersen, that

18  you wish to present as far as evidence or argument as to the

19  application of these sections and your objection as noted in

20  objection number five?

21      MR. PETERSEN: Your Honor, as to objection number

22  five, the offense level as computed by Officer Spurlock

23  earlier before lunch, level 28, I would agree with that as

24  being the -- what we would compute as our base offense level

25  and then remain with what we have suggested as in our

**Page 74**

1  objection number five as to the total offense level, which

2  would bring it to -- if the Court were to give a recognition

3  for his acceptance of responsibility of two, it would take it

4  to a level 26. And that's what we would state as to objection

5  number five, Your Honor.

6      THE COURT: Any response from the United States?

7      MR. FEAGA: None not previously offered, Your

8  Honor. We adopt the position of the United States probation

9  officer to the extent we haven't done so already and we -- to

10  the extent that the Court would like to have any further

11  argument on your part, if you will tell us where, we will be

12  happy to do it, but we are satisfied right now with the way

13  things are before the Court.

14      THE COURT: Objection number six seems to be, if I

15  read it as you intended it, Mr. Petersen, as basically a

16  request for a downward departure.

17      MR. PETERSEN: Yes, Your Honor, it is. Based upon

18  what I have already offered to the Court as to United States

19  versus Perry and the fact that the Court can consider both

20  mitigating and aggravating roles simultaneously, and we have

21  offered to the Court that Mr. Higdon has admitted

22  responsibility as to counts two, three and four and the

23  amounts of drugs therein charged.

24      THE COURT: Any response, Mr. Feaga?

25      MR. FEAGA: May I have just a moment, Your Honor?

**Page 75**

1      THE COURT: Okay.

2      MR. FEAGA: This was in regard to objection number

3  six, Your Honor; is that correct?

4      THE COURT: Yes.

5      MR. FEAGA: Your Honor, given the fact that there

6  hasn't been any recommendation for an upward departure and

7  the United States is not seeking one, basically based on the

8  same reasons that -- we certainly would argue that the facts

9  are there, Your Honor, for the Court do so should the Court

10  consider it, based on -- as the probation office points out,

11  based on the fact that the guideline level as we believe it

12  to be correct is 44 and it already calls for a life sentence.

13  We are not asking the Court to upward depart if the Court

14  reaches the conclusion that the recommendations by the

15  probation office and the United States are correct and found

16  them soundly under the law and the facts. If for some reason

17  or another the Court were to find that one of the sentencing

18  factors that is included in the total computation that

19  probation and the United States have done is not there, then

20  we might very well ask the Court to upward depart, but no,

21  not right now.

22      THE COURT: So as I understand it objection number

23  six is basically a request from the government that says if

24  there should be a sentence computed less than the 40 years

25  and 30 years respectively in counts two through four and

**Page 76**

1  count ten, then consider a 5K2.17 or 5K2.2 as upward

2  departures of the sentence calculated?

3      MR. FEAGA: Yes, sir, we think it would be

4  appropriate for the Court to consider it based on the fact

5  that someone got shot in the neck. But given the fact that it

6  would be somewhat meaningless if the Court concludes that the

7  offense level is correct as computed we are not asking the

8  Court to do it right now, we are not urging the Court to do

9  it.

10      THE COURT: Any further response, Mr. Petersen?

11      MR. PETERSEN: No, Your Honor, not as to number six.

12      THE COURT: Is there any argument that you wish to

13  make based upon the objections or are there any other

14  objections that you have to the report other than the ones

15  that we have already covered?

16      MR. PETERSEN: Your Honor, I have no further

17  objections to the report. I would just like to point out in

18  general as to the relevant conduct issue, in preparation for

19  this, Your Honor, counsel has reviewed 11th Circuit case law

20  on relevant conduct rather extensively and counsel has not

21  found a single case beginning with United States versus

22  Maxwell which was the originating 1994, 11th Circuit

23  decision, and that's 34 F.3d 1006, speaking of relevant

24  conduct and the application of relevant conduct to

25  sentencing, in particular either acquitted or uncharged

Page 77

1 conduct, as in this case with the additional drugs. Every
2 case that counsel could find indicated that these were -- the
3 individuals were convicted of a conspiracy count.
4     None of the cases that counsel could find in his
5 research indicated that the Defendant was either acquitted of
6 a conspiracy charge or not charged with a conspiracy, and
7 these additional drugs came in. All of the cases I found
8 spoke of conspiracy, and then the relevant conduct was as a
9 result of the conspiracy.
10    As an example, Your Honor, in -- as an example, Your
11 Honor, in United States versus Gomez, which is an 11th
12 Circuit, 1999 decision, 164 F.3d 1354, the Court discussed
13 the fact that the Defendant Gomez was involved in a
14 conspiracy to distribute cocaine through the Sparkman City
15 Car Wash operation. In addition, there was testimony at trial
16 in that case that another sale was made outside of that
17 distribution, of cocaine as well. This was a cocaine
18 distribution effort. The 11th Circuit reversed the sentencing
19 and removed the additional cocaine from that second separate
20 operation finding that when an act of misconduct can easily
21 be distinguished from the charged offense a separate charge
22 is required. In this case the sale to Soldana is conceptually
23 distinct from the Sparkman City Car Wash conspiracy and
24 easily could have been brought as a separate charge against
25 Gomez. It was therefore inappropriate to use this sale in

Page 78

1 calculating the sentence for Gomez' conspiracy conviction.
2     That's what counsel would like to point out for the
3 Court. Each one of the cases that counsel could find -- we
4 have got six of them, I won't trouble the Court with listing
5 all of them, those were two exemplars -- each one of the
6 cases led to a result like that. They either -- the 11th
7 Circuit either affirmed it as being a part of the conspiracy
8 or ordered a remand for resentence finding that the outside
9 relevant conduct drug at sentencing was inappropriate. But
10 each one of them was a conspiracy charge. It wasn't a
11 situation such as what we find ourselves here where the
12 primary conspiracy charge of count one was acquitted by the
13 jury where they found no conspiracy or found not enough proof
14 of a conspiracy.
15    THE COURT: okay.
16    MR. PETERSEN: That's all I have, Your Honor. I
17 would also like to raise again all six objections and
18 preserve them for appeal purposes as necessary, Your Honor.
19    THE COURT: You have done that.
20    MR. PETERSEN: Thank you, Your Honor.
21    THE COURT: Any response from the government?
22    MR. FEAGA: Your Honor, we would just point out to
23 the Court the case of United States versus Watts, in which
24 the Supreme Court of the United States -- I will give the
25 Court -- U.S. versus Watts, 519 United States 148, 117

Page 79

1 Supreme Court 633, 136 Lawyers Edition Second 554, it's a
2 1997 case. Which held that conduct underlying charges for
3 which the Defendant has been acquitted may be relied on in
4 sentencing. The Court noted that sentencing courts have broad
5 discretion to consider various kinds of information and the
6 jury can can not be said to have necessarily rejected any
7 facts when it returns a general not guilty verdict.
8     Since that case, Your Honor, we believe it has been
9 the holding in all of the Circuits that conduct that was part
10 of a charge that resulted in a not guilty verdict can be
11 considered by the Court as relevant conduct in determining
12 sentencing. And the reason for that is obvious, that is, at
13 sentencing, as we pointed out earlier in this proceeding, and
14 as the Court knows, the burden of proof that the government
15 has is by a preponderance of the evidence as opposed to proof
16 beyond a reasonable doubt.
17    I also think that the argument that Mr. Petersen is
18 making is somewhat misplaced under the facts of this case,
19 and that is because count ten did require the jury to find
20 the Defendant guilty of distribution -- a conspiracy to
21 distribute both methamphetamine or marijuana. And therefore
22 it can't be said with any clarity, certainly not with any
23 believability, that this jury did, in fact, find this
24 Defendant was not involved in a methamphetamine distribution
25 conspiracy. And the facts we think we adduced at trial make

Page 80

1 it abundantly clear to the Court, whatever the jury's verdict
2 may have been, that he was, in fact, involved in a conspiracy
3 to distribute methamphetamine. And that would be -- there
4 certainly was a basis for the jury to conclude that he was in
5 convicting him of count ten.
6     And we would simply argue to the Court that it's
7 just as likely, in fact, it's probably more likely under the
8 facts of this case, given the decision that the jury
9 rendered, that the decision not to convict him of a
10 conspiracy charged in count one was something other than a
11 decision that he wasn't involved in a conspiracy to
12 distribute methamphetamine. The Court may recall a question
13 the jury asked, and we all were somewhat -- we urged
14 different things for the Court to do.
15    But when they came out of their deliberations at one
16 point the recollection of this Assistant United States
17 Attorney is they asked the Court a question that said can the
18 Defendant be convicted of conspiring with persons not named
19 in the indictment. And the United States I believe urged the
20 Court to tell them yes. And I think the Court, and it was
21 certainly the Court's proper exercise of its discretion to
22 decide how to charge that jury, elected to merely reread them
23 the instruction.
24    And the United States would submit to the Court that
25 it is just as likely that that decision to acquit was a

Page 81

1  compromise verdict or that it was a result of the jury not
2  having a clear understanding of the fact that they could
3  convict him based on some of these other folks being involved
4  that resulted in that decision.
5      So we don't accept the defense's premise that their
6  acquittal meant that, both from the standpoint of what
7  occurred at trial, the evidence before the Court and the
8  conviction on count ten. But even if the Court were to so
9  conclude we would urge the Court to interpret United States
10 versus Watts to be a statement by the United States Supreme
11 Court that the defense's position is meritless.
12     THE COURT: Anything further?
13     MR. PETERSEN: No, Your Honor.
14     THE COURT: Let's take about a ten or 15 minute
15 recess and let me read this case and we will come back and
16 proceed with the sentencing. You can remain in the courtroom
17 if you would like, we will get started as soon as I have a
18 chance to read these cases.
19     THE CLERK: Court will be in recess a few minutes.
20     (At which time, 1:43 p.m., a recess was had until
21 2:18 p.m., at which time the hearing continued.)
22     THE COURT: I will begin by discussing the findings
23 of fact and conclusions of law that I will be making in this
24 case so that I can hopefully be as clear as absolutely
25 possible in the sentence that will be imposed and the record

Page 82

1  will be protected for each side's respective post-trial
2  consideration.
3      I have reviewed the case of United States versus
4  Perry, and understand that it is incumbent upon the Court to
5  consider an adjustment for the Defendant's role in the
6  offense, i.e., being a leader of the offense, and his ability
7  in this case to receive credit for any acceptance of
8  responsibility. I want the record to indicate that I have
9  considered both of those in this case in reaching the
10 sentence that will be imposed.
11     As far as the relevant conduct issue, I have read
12 the cases of the United States versus Maxwell, United States
13 versus Manner, and United States versus Gomez, as has been
14 cited by counsel previously. I have also looked at the case
15 of United States versus Watts which is the United States
16 Supreme Court's decision on the issue.
17     In the Maxwell and the Gomez decisions it is the
18 finding of this Court that the trial court considered
19 unrelated drug activity for sentencing which was not charged
20 in the indictment and tried to a jury. And specifically in
21 Maxwell evidence of unrelated drug activity was introduced
22 under Rule 404 of the Federal Rules of Evidence to show plan,
23 scheme, motive, intent or other nonsubstantive means of
24 conviction. And even though there was a conviction on the
25 conspiracy charges in each of those cases, they being Gomez

Page 83

1  and Maxwell, the 11th Circuit remanded the case back to the
2  District Court for resentencing on the aspect of the Court's
3  consideration of relevant conduct in those cases in which it
4  had used the drug activity to show motive, intent, plan or
5  scheme.
6      However, the 11th Circuit did say in its commentary
7  about Section 1B1.3(a)(2) of the United States Sentencing
8  Guidelines that -- about relevant conduct, that in a drug
9  distribution case quantities and types of drugs not specified
10 in the count of conviction are to be included in determining
11 the offense level if they were part of the same course of
12 conduct or part of a common scheme or plan as the count of
13 conviction.
14     Which brings me to the case of United States versus
15 Manner, a 1991 case from the 11th Circuit cited at 936 F.2d
16 1238. In that case there was a conviction under some parts of
17 the indictment and an acquittal for the conspiracy count
18 which was, as in this case, count one, but the trial court
19 used the quantity of drugs alleged in the conspiracy as part
20 of the sentencing.
21     And that issue was taken up and the 11th Circuit
22 held that the District Court is permitted to aggregate all
23 drug quantities involved in the same course of conduct even
24 if certain amounts are not specified in the count of
25 conviction. And it goes on further to say this Circuit made

Page 84

1  this point clear in a non-guidelines case by stating, quote,
2  furthermore, an acquittal does not bar a sentencing court
3  from considering the acquitted count in imposing a sentence,
4  end quote. Therefore, the question before this Court today is
5  whether or not, and to what extent the relevant conduct is to
6  be included in considering the base level offense
7  calculations for Mr. Higdon.
8      With that said, I will begin by addressing the
9  findings of fact that I have made as to the six objections
10 listed by the defense and argued by the respective sides
11 today. In determining the drug quantity and the base offense
12 level which are objections number four and five, the Court
13 finds that the Defendant's objections are overruled or
14 without merit, and find that the quantity of drugs the
15 Defendant admitted to possessing in counts two, three and
16 four are to be included with relevant conduct of the
17 Defendant and Mr. Medley in computing the quantity of drugs
18 which, in this case, is computed based upon the testimony of
19 the probation office as being a total equivalency of 20
20 thousand 69 point 492 kilograms of marijuana. And based upon
21 2D1.1 subsection (2) quantity of drugs of marijuana
22 equivalent being between ten thousand kilograms but less than
23 30 thousand kilograms will equate to a base offense level of
24 36.
25     Going back to objection number one -- I'm sorry,

Page 85

1  objection number three, which is the adjustment for the
2  Defendant's role in the offense, the Court finds by a
3  preponderance of the evidence based upon the testimony and
4  arguments of counsel today and the testimony that was heard
5  from Agent Halasz as well as the Court's recollection of the
6  testimony at trial of this case, that even though the jury
7  acquitted Mr. Higdon of the conspiracy count, which was count
8  one of the indictment, that a four level adjustment for his
9  role in the offense will be added.
10     And the Court further finds that there were at least
11  five participants involved in the shootings in count -- as
12  set forth in count ten, and I will identify those individuals
13  that the Court has found were part of the criminal activity
14  or participants in the criminal activity, those being the
15  Defendant, Mr. Higdon, Mr. Medley, the individual identified
16  as Chunky, Mr. Birch, who was further identified as the
17  Defendant's supplier in Georgia, Mr. Fowler, Eric Culpepper,
18  and Tammy Kincaid Porter. The Court is limiting the
19  adjustment for the Defendant's role in the offense as to the
20  conduct in count ten only, and will not consider the four
21  point enhancement as part of the Defendant's conduct in
22  counts two through four.
23     Next I will address the objection number one based
24  upon the Defendant's obstruction of justice, a two point
25  enhancement. Based upon the Defendant's testimony and based

Page 86

1  upon the post-trial conduct involving the Defendant's
2  participation or alleged participation in a scheme to escape
3  from custody and the Defendant's intimidation of an
4  individual by the name of John Bradley, the Court finds that
5  the Defendant's testimony at trial was intentionally false
6  and an attempt to impede the administration of justice in the
7  trial of this case, and an obstruction related to the charged
8  offense. But I specifically do not find that the Defendant
9  obstructed justice based upon any testimony that I heard
10  today regarding his involvement in the scheme to escape from
11  the Montgomery city jail or in his intimidation of John
12  Bradley.
13     Lastly, the findings regarding the request for
14  acceptance of responsibility credit. As I stated earlier, the
15  Court has considered the case of United States versus Perry
16  and the Court's finding is that the Defendant in this case
17  was not truthful in admitting any relevant conduct under the
18  offense alleged in count ten, even though it was argued that
19  he did freely admit his possession of drugs as set forth in
20  counts two, three and four. Therefore, I have considered the
21  relevant conduct under Section 3E1.1, but do not find that it
22  should be applied in this case.
23     The only other objection that was made was objection
24  number six regarding upward departures, which I find do not
25  apply and would have no effect upon the Court's sentencing in

Page 87

1  this case. Mr. Petersen, I will call you and your client
2  forward at this time.
3     MR. FEAGA: Your Honor, I may have misunderstood the
4  Court but just for purposes of clarity, on regards to the
5  Court's decision that two points should be assessed against
6  the Defendant for obstruction of justice, I heard the Court
7  say based on in part, and I am paraphrasing, the intentional
8  misleading and false testimony that he provided at the trial,
9  I heard the Court I believe say based also upon his
10  participation in an attempt to escape at the jail, and I
11  wanted to make sure I am clear, the record is clear on that.
12     THE COURT: Made a specific finding I did not
13  consider that in assessing the two point adjustment for
14  obstruction of justice.
15     MR. FEAGA: All right, sir. So then the basis for
16  the Court finding it is strictly of the testimony of the
17  Defendant.
18     THE COURT: Testimony of the Defendant.
19     MR. FEAGA: Yes, sir, thank you.
20     THE COURT: The podium is fine. Mr. Higdon, after
21  having made the findings as to the objections to the
22  presentence report, the Court finds that the offense level is
23  44, the criminal history category is I, the relevant
24  guideline range is life. However, since the guideline range
25  or the guideline sentence is restricted to 40 years as to

Page 88

1  each of the counts set forth in counts two, three and four,
2  and 25 years as to count ten, the Court will be bound by
3  those time limits in the sentence that will be imposed. The
4  supervised release term is from four to five years as to each
5  of counts two, three and four, and three to five years as to
6  count ten. The guideline fine range is from 25 thousand to
7  six million dollars. Mr. Petersen, do either you or your
8  client have anything to say in mitigation or otherwise before
9  the Court pronounces sentence in this case, that has not
10  already been said?
11     MR. PETERSEN: Your Honor, counsel has nothing, but
12  I believe the Defendant would like to say something.
13     THE DEFENDANT: I would just like to thank the Court
14  for the fairness it's shown in the facts that have been
15  presented to it. I wish to thank the jurors for the 11 plus
16  hours they took in the deliberation of this case. And I
17  would like to thank my counsel.
18     THE COURT: Anything further?
19     THE DEFENDANT: That's all, sir.
20     THE COURT: The sentence will now be stated, but you
21  will have a final chance to make legal objections before the
22  sentence is imposed. Pursuant to the Sentencing Reform Act of
23  1984, it is the judgment of the Court that you are hereby
24  committed to the custody of the Bureau of Prisons to be
25  imprisoned for a total of one hundred and 45 years. This term

Page 89

1   consists of four hundred and 80 months on each count in
2   counts two, three and four, and three hundred months on count
3   ten, all to be served consecutive to one another.
4        The Court recommends that you be designated to a
5   facility where intensive residential substance abuse
6   treatment is available. You are remanded to the custody of
7   the United States Marshal. You shall pay to the United States
8   District Court Clerk a special assessment fee of four hundred
9   dollars, which is due immediately. Based upon your inability
10  to pay the Court waives the imposition of a fine.
11       It is further ordered that you make restitution in
12  the total amount of three thousand four hundred and 78
13  dollars. Two thousand five hundred and 15 dollars payable to
14  Holloway Credit Solutions at P.O. Box 230609, Montgomery,
15  Alabama, 36123, attention Jan Lang; five hundred 38 dollars
16  payable to Delta Recovery Systems, account number 47732, at
17  P.O. Box 606, One East Mill Road, Long Valley, New Jersey,
18  07853, attention Jackie Johnson; and four hundred and 25
19  dollars payable to ProBill, account number 507046, at 533 4th
20  Avenue, Huntington, West Virginia, 25701, attention Kim Ell.
21  The restitution is due immediately. Any balance remaining at
22  the start of any supervised release shall be paid at the rate
23  of not less than one hundred $50 per month. The Court waives
24  the imposition of any interest.
25       If released from imprisonment you shall be placed on

Page 90

1   supervised release for a term of five years. This term
2   consists of five years on each of counts two, three, four and
3   ten. All such terms to run concurrently. Within 72 hours of
4   release from custody you shall report to the probation office
5   in the District to which you are released. While on
6   supervised release you shall comply with the mandatory and
7   standard conditions of supervised release on file with this
8   Court.
9        The Court also orders the following special
10  conditions: You shall participate in drug testing and/or
11  treatment if directed by the probation officer. You shall
12  contribute to the cost of any treatment based upon your
13  ability to pay and the availability of third-party payments.
14  You shall provide the probation officer any requested
15  financial information. You shall submit to a search of your
16  person, residence, office or vehicle pursuant to the search
17  policy of this Court.
18       The sentence is imposed at one hundred and 45 years
19  because of the resultant effective guidelines sentence is
20  life and the provisions of the United States Sentencing
21  Guidelines Section 5G1.2, subparagraph D, provide for
22  consecutive sentences as to each count to the extent
23  necessary to produce a combined sentence equal to the total
24  punishment.
25       Are there any objections to the sentence or to the

Page 91

1   manner in which the Court pronounced it? For example, do you
2   have any objections to the Court's ultimate findings of fact
3   or conclusions of law? If you fail to state such fully
4   articulated objections at this point you run the risk of
5   being unable to raise any such objections on appeal.
6        MR. PETERSEN: Your Honor, we would renew our
7   objections previously raised in the court as to the Court's
8   findings of fact and in our objections to the PSR.
9   Specifically we would object to the Court's finding of the
10  drug quantity. We would object to the -- which I believe is
11  objections four and five of the PSR. We would object to the
12  Court's finding of the objection number three for the role
13  adjustment, specifically the findings of the four level
14  enhancement. We would also renew our objection as to
15  objection number one in the PSR, and the Court's finding as
16  to obstruction of justice as to the Defendant's testimony. We
17  would renew our objection as to the Court's finding of
18  acceptance of responsibility and the finding that the
19  Defendant was not truthful in his testimony. As to relevant
20  conduct and a failure to the Court's not finding a downward
21  departure for acceptance of responsibility. And as to the
22  upward departure for -- the Court found did not apply, we do
23  not object to that one.
24       THE COURT: Mr. Higdon, the sentence is ordered
25  imposed as stated. You have the right to an appeal. If you

Page 92

1   can not afford the cost of an appeal you have the right to
2   apply for leave to appeal in forma pauperis. You have ten
3   days to perfect your appeal. I wish you the best of luck.
4        THE DEFENDANT: Thank you, sir.
5        THE COURT: Anything before we leave?
6        MR. FEAGA: Nothing from the United States, Your
7   Honor.
8        THE COURT: Anything from the defense, Mr. Petersen?
9        MR. PETERSEN: Nothing from the defense.
10       THE COURT: We will be in recess.
11       THE CLERK: Court will be in recess until further
12  order.
13       (At which time, 2:43 p.m., the hearing was
14  adjourned.)
15            *  *  *  *  *
16       I certify that the foregoing is a correct transcript
17  from the record of proceedings in the above-entitled matter.
18  This the 16th day of October, 2003.
19
20                    Official Court Reporter
21
22
23
24
25

CASE NO. 03-14365-JJ

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff/appellee,*

v.

JERRY JOSEPH HIGDON, JR.,
*Defendant/appellant.*

On Appeal from the United States District Court
for the Middle District of Alabama
Northern Division
CR-03-00043-N

BRIEF OF THE APPELLANT
JERRY JOSEPH HIGDON, JR.

MICHAEL J. PETERSEN
Counsel for Appellant
Petersen Law Office, LLC.
631 South Perry Street
Montgomery, Alabama, 36104
Telephone No. (334) 269-1506

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

## United States v. Jerry Joseph Higdon, Jr.
## Case No. 03-14365-JJ

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

1.    The Honorable Mark E. Fuller, United States District Judge, Middle District of Alabama

2.    Stephen P. Feaga, Assistant United States Attorney, Middle District of Alabama

3.    Michael J. Petersen, Counsel for Appellant

4.    Jerry Joseph Higdon, Jr., Appellant

5.    Joseph P. Van Heest, Esq., Formerly Counsel for Gabriel Medley

6.    Russell T. Duraski , Counsel for Gabriel Medley

7.    Gabriel Medley, Co-defendant

7.    William R. Blanchard, Esq. Counsel for Co-defendant Kincaid

8.    Tammy Porter (Kincaid), Co-defendant

9.    The Honorable Charles S. Coody, United States Magistrate Judge, Middle District of Alabama

10.   The Honorable Vanzetta P. McPhearson, United States Magistrate Judge,

i

Middle District of Alabama

11.     United States of America, Plaintiff/Appellee


_____

**MICHAEL J. PETERSEN**
**AL Bar Code: PET045**
**Attorney for Jerry Joseph Higdon, Jr.**


OF COUNSEL:

Petersen Law Office, LLC.
631 South Perry Street
Montgomery, Alabama 36104
TEL:  (334) 269-1506
FAX: (334) 269-1505

## STATEMENT REGARDING ORAL ARGUMENT

Jerry Jospeh Higdon, Jr. requests oral argument.  The issues raised in Appellant's brief are complex and may be more adequately articulated by the presentment of oral argument.  Therefore, Higdon respectfully requests the opportunity to present arguments to ensure that his alleged trial errors are properly considered by this Court in rendering its decision.

iii

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . . i

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . iii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

TABLE OF CITATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I     WHETHER THE EVIDENCE AT TRIAL DEMONSTRATED THAT THE
      DEFENDANT WAS ENTRAPPED AS TO COUNTS II AND III AND WAS
      ENTITLED BY THE WEIGHT OF EVIDENCE TO A JUDGEMENT OF
      ACQUITTAL? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II    WHETHER THE DISTRICT COURT ERRED BY NOT ORDERING AN
      EVIDENTIARY HEARING PRIOR TO DENYING HIGDON'S RENEWED
      MOTION FOR NEW TRIAL BASED UPON NEWLY DISCOVERED
      EVIDENCE? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III   WHETHER THE DISTRICT COURT ERRED IN FAILING TO GRANT
      HIGDON'S MOTION FOR JUDGMENT OF ACQUITTAL AT THE
      CONCLUSION OF THE GOVERNMENT'S CASE IN CHIEF AS TO
      COUNT IV ON THE GROUNDS OF INSUFFIEICENT EVIDENCE TO
      SUPPORT A VERDICT THAT HIGDON POSSESSED "ICE"
      METHAMPHETAMIME ON DECEMBER 11, 2002 WITH INTENT TO
      DISTRIBUTE? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

IV    WHETHER THE DISTRICT COURT MISCONSTRUED THE REQUIREMENTS OF FED. R. Cr. P. 33 AS TO MOTIONS FOR NEW TRIAL PRESENTED DURING THE PENDENCY OF AN APPEAL BY DENYING HIGDON'S RENEWED MOTION FOR NEW TRIAL BASED UPON A VIOLATION OF *BRADY V. MARYLAND*? . . . . . . . . . . . . . . . . 1

V    WHETHER THE DISTRICT COURT ERRED AT SENTENCING IN THE AMOUNT OF DRUGS TO BE CONSIDERED IN CALCULATING THE BASE OFFENSE LEVEL? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Course of Proceedings . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT AND CITATIONS OF AUTHORITY

I    WHETHER THE EVIDENCE AT TRIAL DEMONSTRATED THAT THE DEFENDANT WAS ENTRAPPED AS TO COUNTS II AND III AND WAS ENTITLED BY THE WEIGHT OF EVIDENCE TO A JUDGEMENT OF ACQUITTAL? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II    WHETHER THE DISTRICT COURT ERRED BY NOT ORDERING AN EVIDENTIARY HEARING PRIOR TO DENYING HIGDON'S RENEWED MOTION FOR NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

v

III     WHETHER THE DISTRICT COURT ERRED IN FAILING TO GRANT HIGDON'S MOTION FOR JUDGMENT OF ACQUITTAL AT THE CONCLUSION OF THE GOVERNMENT'S CASE IN CHIEF AS TO COUNT IV ON THE GROUNDS OF INSUFFIEICENT EVIDENCE TO SUPPORT A VERDICT THAT HIGDON POSSESSED "ICE" METHAMPHETAMIME ON DECEMBER 11, 2002 WITH INTENT TO DISTRIBUTE? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV     WHETHER THE DISTRICT COURT MISCONSTRUED THE REQUIREMENTS OF FED. R. Cr. P. 33 AS TO MOTIONS FOR NEW TRIAL PRESENTED DURING THE PENDENCY OF AN APPEAL BY DENYING HIGDON'S RENEWED MOTION FOR NEW TRIAL BASED UPON A VIOLATION OF *BRADY V. MARYLAND*? . . . . . . . . . . . . . . . . 24

V     WHETHER THE DISTRICT COURT ERRED AT SENTENCING IN THE AMOUNT OF DRUGS TO BE CONSIDERED IN CALCULATING THE BASE OFFENSE LEVEL? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF SERVICE

vi

# TABLE OF CITATIONS

## CASES :

*Amos v United States*,
  95 US App DC 31, 218 F2d 44 (US App DC 1954) . . . . . . . . . . . . . . . . 18

*Bonner v. City of Prichard*,
  661 F.2d 1206, (11th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Brady v. Maryland*,
  373 U.S. 83, 83 S. Ct. 1194,
  10 L. Ed. 2d 215 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 25, 26, 27

*Breedlove v. Moore*,
  279 F.3d 952, 961 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hays v. Alabama*,
  85 F.3d 1492 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Jacobson v. United States*,
  503 U.S. 540 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15

*Kyles v. Whitley*,
  514 U.S. 419 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Sherman v. United States*,
  356 U.S. 369, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958) . . . . . . . . . . . . . 14, 15

*United States v. Agis-Meza*,
  99 F.3d 1052 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Allen*,
  190 F.3d 1208 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Alston*,
  895 F.2d 1362 (11th Cir.1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

 *United States v. Anderson*,
  200 F.3d 1344 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Brown*,
  43 F.3d 618 (11th Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

vii

*United States v Camacho,*
    188 F Supp 2d 429, (SD NY 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Christopher,*
    923 F.2d 1545, 1557 (11th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Coe,*
    79 F.3d 126 (11th Cir.1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Cronic,*
    466 U.S. 648 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Culliver,*
    17 F.3d 349 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Francis,*
    131 F.3d 1452 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Gates,*
    10 F.3d 765 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Graves,*
    556 F.2d 1319, (5th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Groessel,*
    440 F.2d 602 n. 1 (5th Cir. 1971) . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Ismond,*
    993 F.2d 1498, 1499 (11th Cir.1993) . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. King,*
    73 F.3d 1564 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Khoury,*
    901 F.2d 975 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Lawrence,*
    47 F.3d 1559 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Maddox,*
    492 F.2d 104 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Meros,*
    866 F.2d 1304 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v. Miller*,
    71 F.3d 813 (11th Cir., 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 8, 12

*United States v Polisi*,
    416 F2d 573, (CA2 NY, 1969) . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v. Poole,*
    878 F.2d 1389 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 21

*United States v. Price*,
    65 F.3d 903 (11th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . 12

*United States v. Robinson*,
    870 F.2d 612 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . 23

*United States v. Simpson*,
    228 F.3d 1294 (11th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Spagnoulo*,
    960 F.2d 990 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . 25

*United States v Stofsky,*
    527 F2d 237, (CA2 NY 1975), . . . . . . . . . . . . . . . . . . . . . . . . 18

*United States v Street*,
    570 F2d 1 (CA1 Mass. 1977) . . . . . . . . . . . . . . . . . . . . . . . . 19

*United States v. Thomas*,
    987 F.2d 697 (11th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . 22

*United States v. To*,
    144 F.3d 737 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*United States v. Tokars*,
    95 F.3d 1520 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Wright v. Hopper*,
    169 F.3d 695 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . 25

**STATUTORY AND OTHER AUTHORITY:**

18 U. S.C. § 36(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

18 U.S.C. § 3742 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

21 U.S.C. §841(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. §846 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

21 U.S.C. § 924(c)(1)(A)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 U.S.C. § 924(c)(1)(A)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

21 U.S.C. § 924(c)(1)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiii

Fed. R. Cr. P.  33 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19, 26, 27

11th Cir. R. 26.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

x

## STATEMENT OF JURISDICTION

The district court had jurisdiction of this case pursuant to 18 U.S.C. § 3231 because the defendant was charged with an offense against the laws of the United States.  The court of appeals has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States. The appeal was timely filed on August 23, 2003, from the Judgment and Sentence entered on August 8, 2003 and amended on September 2, 2003, that disposes of all claims between the parties to this cause.

## STATEMENT OF THE ISSUES

I.      WHETHER THE EVIDENCE AT TRIAL DEMONSTRATED THAT
        THE DEFENDANT WAS ENTRAPPED AS TO COUNTS II AND III
        AND WAS ENTITLED BY THE WEIGHT OF EVIDENCE TO A
        JUDGEMENT OF ACQUITTAL?

II.     WHETHER THE DISTRICT COURT ERRED BY NOT ORDERING AN
        EVIDENTIARY HEARING PRIOR TO DENYING HIGDON'S
        RENEWED MOTION FOR NEW TRIAL BASED UPON NEWLY
        DISCOVERED EVIDENCE?

III.    WHETHER THE District court ERRED IN FAILING TO GRANT
        HIGDON'S MOTION FOR JUDGMENT OF ACQUITTAL AT THE
        CONCLUSION OF THE GOVERNMENT'S CASE IN CHIEF AS TO
        COUNT IV ON THE GROUNDS OF INSUFFIEICENT EVIDENCE TO
        SUPPORT A VERDICT THAT HIGDON POSSESSED "ICE"
        METHAMPHETAMIME ON DECEMBER 11, 2002 WITH INTENT TO
        DISTRIBUTE?

IV.     WHETHER THE DISTRICT COURT MISCONSTRUED THE
        REQUIREMENTS OF FED. R. Cr. P. 33 AS TO MOTIONS FOR NEW

1

**TRIAL PRESENTED DURING THE PENDENCY OF AN APPEAL BY DENYING HIGDON'S RENEWED MOTION FOR NEW TRIAL BASED UPON A VIOLATION OF *BRADY V. MARYLAND*?**

**V.    WHETHER THE DISTRICT COURT ERRED AT SENTENCING IN THE AMOUNT OF DRUGS TO BE CONSIDERED IN CALCULATING THE BASE OFFENSE LEVEL?**

## STATEMENT OF THE CASE

**(i)    Course of Proceedings**

Appellant, Jery Joseph Higdon, Jr. (hereinafter "Higdon"), was arrested on January 28, 2003 on a complaint of conspiracy to distribute, and possess with intent to distribute ice methamphetamine. A ten-count Grand Jury indictment and forfeiture allegation was subsequently returned on February 27, 2003.  Count I charged Higdon with conspiracy to manufacture, distribute, and possess with intent to distribute "ice" methamphetamine from at least as early as May 17, 2002 and continuing until January 28, 2003 in violation of  21 U.S.C.§841(a)(1), all in violation of 21 U.S.C.§846; Count II charged that on November 12, 2002, Higdon knowingly and intentionally distributed approximately 7.0 grams of "ice" methamphetamine in violation of  21 U.S.C. § 841(a)(1); Count III charged  that on December 10, 2002, Higdon knowingly and intentionally distributed approximately 7.0 grams of "ice" methamphetamine in violation of 21 U.S.C. § 841(a)(1); Count IV charged that on December 12, 2002, Higdon knowingly and intentionally distributed 6.9 grams of "ice" methamphetamine in violation of  21 U. S.C. § 841(a)(1); Count V charged that on December 12, 2002, Higdon knowingly and intentionally distributed approximately .76 grams of "ice" methamphetamine in violation of 21 U.S.C. § 841(a)(1); Count VI charged that on January 21, 2003, Higdon and co-defendants John Gabriel Medley (hereinafter "Medley") and Tammy Kincaid Porter (hereinafter "Porter") with knowingly and intentionally distributing approximately 2 grams of "ice" methamphetamine in violation of 21 U.S.C. §

3

841(a)(1); Count VII charged that on or about December 12, 2002 Higdon knowingly used, carried, and brandished a Mossberg 12 gauge pistol grip shotgun, during and in relation to a drug trafficking offense in violation of 21 U.S.C. § 924(c)(1)(A)(ii); Count VIII charged that on December 5, 2002, Higdon and Medley used and carried a firearm which was discharged, that is an AK-47 assault rifle and an SKS assault rifle in violation of 21 U.S.C. § 924(c)(1)(A)(iii); Count IX charged that between December 5, 2002 and January 28, 2003 that Higdon and Medley used and carried a firearm which was a semi-automatic assault weapon during and in relation to a drug trafficking offense in violation of 21 U.S.C. § 924(c)(1)(B)(i); Count X charged that on or about December 5, 2002, Higdon and Medley, in furtherance of a major drug trafficking offense, fired a weapon in to a group of two or more persons, with intent to intimidate, harass, injure, or maim, causing grave risk to human life in a "drive by shooting" in violation of 18 U. S.C. § 36(b). (R1: 39: 1-6).  Mr. Higdon entered a plea of not guilty on February 5, 2003.  (R1: 46).

On April 10, 2003, Higdon filed Notices of Alibi defense (R1: 57) and Entrapment defense (R1: 58) and Motion for Disclosure of the name of confidential informant (R1P: 59).

On May 5 through 9, a jury trial was held as to Mr. Higdon before the Honorable Mark E. Fuller, United States District Judge for the Middle District of Alabama. (R3 through R11) On May 9, 2003, a jury verdict acquitting Higdon as to Counts I, V, VI, VII, VIII, and IX and a finding of guilty as to Counts II, III, IV, and

4

X was returned. (R11: 649-654)

On August 8, 2003, a Sentencing Hearing was held and Higdon was sentenced to 480 months each as to Counts II, III, and IV, to be run consecutively and 300 months as to Count X, to be run consecutively, in the custody of the United States Bureau of Prisons. (R1: 137)

On August 23, 2003, Mr. Higdon timely filed Notice of Appeal from the Final Judgment and Sentence as to Counts II, III, IV, and X. (R1: 143)

JERRY JOSEPH HIGDON, JR. IS PRESENTLY INCARCERATED AT FEDERAL TRANSFER FACILITY IN OKLAHOMA CITY, OKLAHOMA.

(ii)    **Statement of Facts**

On May 17, 2002, United States Drug Enforcement Administration (hereinafter "DEA") Special Agent Thomas Halasz received infromation from an unidentified source that Jerry Higdon distributed methamphetamine from his residence located a 2026 Rigby Street, Montgomery, Alabama. Again, in September 2002, SA Halasz received information from a confidential source (hereinafter "CS") that Higdon distributed "ice" methamphetamine in Montgomery and Birmingham, Alabama. As a result of this information, task force agents began a proactive investigation. (R: 2: 4-5)

On November 12 and December 10, 2002, the CS made successful undercover purchases of "ice" methamphetamine from Higdon. Both incidents occurred at Higdon's residence and were recorded by a concealed tape recorder provided by the DEA. (R: 2: 6-7 & 8)

5

During the controlled buy of December 10, 2002, the conversation between the CS and Higdon was recorded and Higdon was heard to admit involvement in a shooting in the North Pass community of Montgomery, Alabama. Higdon used the term "we" which suggested he and others committed this action and did so due to a drug debt of $8,500.00. Contact was made with the Montgomery Police Department and it was determined that an individual was shot in the neck at 752 North Pass Road on December 5, 2002 and that at least two other individuals were in the residence at the time. In addition, two Caprice Classic automobiles were hit by the gunfire. (R: 2: 9-11)

A federal search warrant was issued and executed at Higdon's residence on December 11, 2002. Officers seized suspected drugs; a green duffel bag containing a rubber mask, two-way radios, spare magazines and ammunition, an AK-47 assault rifle with a loaded magazine, and an SKS assault rifle; a loaded 12 gauge Mossberg pistol grip pump shotgun; three scales; assorted drug paraphernalia; and a video surveillance camera. (R: 2: 11-13) Although the Mossberg shotgun was within reach of Higdon, he did not attempt to reach for it and was not resistant to officers. (R: 2: 48) After being advised of his Miranda rights, Higdon stated that the duffel bag and firearms belonged to Medley, and had been left by Medley on December 6, 2002. (R: 2: 13)

On January 17, 2002, SA Halasz interviewed Medley regarding the firearms seized at Higdon's residence. Medley admitted the green duffel bag, the AK-47 assault rifle and the Mossberg shotgun belonged to him. Although he did not indicate

6

who owned the SKS assault rifle, he stated that he took the three firearms to Higdon's residence and left them there. (R: 2: 13)

On January 21, 2002, Medley and Porter sold "ice" methamphetamine to a confidential source (hereinafter "CS2") who was under the supervision of a Montgomery Police Department Narcotics Investigator. (R: 2: 14-15) During the course of the sale, the CS2 provided drug buy money to Porter, who, with Medley then drove to Higdon's residence. Medley entered Higdon's residence and returned to the car. Porter and Medley then returned and met with CS2 and handed over a quantity of suspected "ice" methamphetamine. (R: 2: 15)

A second search warrant was obtained for Higdon's residence and on January 28, 2003, it was executed. Additional suspected drug evidence was seized. (R: 2: 48)

On January 28, 2003, Higdon, Medley and Porter were arrested on a federal complaint. (PSR: 4) On January 29, 2002 a Grand Jury in the Middle District of Alabama returned a ten-count indictment against Higdon, Medley and Porter. (R1: 39: 1-6).

**(iii) Standards of Review**

Whether the defendant was entrapped into committing a criminal act is generally a jury question. Therefore, entrapment as a matter of law is a sufficiency of the evidence inquiry. When an entrapment defense is rejected by the jury, the Court's review is limited to deciding whether the evidence was sufficient for a reasonable jury to conclude that the defendant was predisposed to take part in the illicit transaction. Further, a jury's verdict cannot be overturned if any reasonable construction of the

7

evidence would allow the jury to find the defendant guilty beyond a reasonable doubt. Review is de novo, but the Appellate Court must view all facts and make all inferences in favor of the government. *United States v. Miller*, 71 F.3d 813, 815-816 (11th Cir., 1996) citing *United States v. Brown*, 43 F.3d 618, 622 (11th Cir.1995).

Whether the record contains sufficient evidence to support the jury's verdict is a question of law subject to de novo review. When conducting the review of the record, the court views the evidence in the light most favorable to the government and resolves all reasonable inferences and credibility evaluations in favor of the jury's verdict. The court must uphold the jury's verdict whenever a reasonable fact finder could conclude that the evidence establishes guilt beyond a reasonable doubt. *United States v. To*, 144 F.3d 737 (11th Cir. 1998)

The Court of Appeals reviews the District Court's decisions regarding Motions for New Trial for abuse of discretion. *United States v. Tokars*, 95 F.3d 1520 (11th Cir. 1996).

Whether a reasonable probability existed that the suppressed evidence would have changed the outcome is a mixed question of law and fact, and the court's review is *de novo*. *Hays v. Alabama*, 85 F.3d 1492 (11th Cir. 1996).

The interpretation of a statute is a question of law reviewed de novo. *United States v. Allen*, 190 F.3d 1208, 1210 (11th Cir. 1999).

A district court's interpretation of relevant sentencing statutes and Sentencing Guidelines is reviewed de novo. *United States v. Anderson*, 200 F.3d 1344, 1347 (11th Cir. 2000) *see also United States v. Coe*, 79 F.3d 126, 127 (11th Cir.1996).

8

## SUMMARY OF THE ARGUMENT

The government failed to demonstrate that Higdon was predisposed to distribute "ice" methamphetamine as alleged in Counts II and III and the evidence at trial was contrary to the finding of the jury.  The evidence at trial demonstrated that Higdon was entrapped by the government's agent and therefore the district court erred when it denied his Motion for Judgement of Acquittal as to Counts II and III.

The district court erred when it failed to order an evidentiary hearing as to the newly discovered evidence offered by the defendant contending the testifying co-defendant had committed perjury.

The evidence presented at trial was insufficient to convict Higdon of the possession with intent to distribute as charged in Count IV of the indictment.  It is clear from the evidence presented, viewed in a light most favorable to the government, that the government failed to show that Higdon had the intent to distribute the "ice" methamphetamine seized during the execution of a search warrant on December 11, 2002.   Therefore, the district court erred when it failed to grant Higdon's Motion for Judgment of Acquittal made at the conclusion of the Government's case in chief for insufficient evidence.

The district court erred when it failed to order an evidentiary hearing and decide the question of newly discovered evidence of a *Brady* violation offered by the defendant which contended that the prosecution had suppressed evidence which was favorable and/or exculpatory to Higdon.

9

The district court erred in finding that the Government had proved the quantity of drugs attributable to Higdon by a preponderance of the evidence.

## ARGUMENT AND CITATIONS OF AUTHORITY

I.    **WHETHER THE EVIDENCE AT TRIAL DEMONSTRATED THAT THE DEFENDANT WAS ENTRAPPED AS TO COUNTS II AND III AND WAS ENTITLED BY THE WEIGHT OF EVIDENCE TO A JUDGEMENT OF ACQUITTAL?**

Counts II and III of the indictment alleged that Higdon possessed "ice" methamphetamine with the intent to distribute. (R: 39: 2)  Both of the sales for which Higdon was found guilty were conducted by a confidential informant whose name was revealed to be Shane Carlton.  (R: 6: 48 & 66) At trial, testimony was elicited from DEA agent Thomas Halasz that he had become acquainted with Shane Carlton in July of 2002 some 5 or 6 months prior to the purchases of November and December 2002.  (R: 8: 345) This meeting occurred approximately 3 or 4 months before Shane Carlton testified to having met with Agent Halasz.  (R: 6: 46) Shane Carlton further testified at trial that prior to approaching Higdon he had talked to members of law enforcement and found out what he would be doing and what would be expected of him if he were to make undercover purchases for members of law enforcement.  (R: 6: 95)  He had also been informed that he would get paid for this activity and he frankly stated at trial that "extra money" was one of the reasons he was interested in setting up drug buys.  (R: 6: 95)  Thus, prior to ever approaching Higdon, Shane Carlton was in contact with law enforcement and was acting as their agent.  Shane Carlton further admitted during his trial testimony that it was he that approached Higdon.  (R: 6: 91 & 94) Furthermore, he

11

clearly testified that it was he that had approached Higdon about drugs and that these approaches occurred after he had learned he could be paid and had met with law enforcement.  (R: 6: 94)

An entrapment defense requires two elements: (1) that there is governmental inducement of the crime; and (2) a lack of predisposition on the part of the defendant to commit the crime.  Once the defendant has adduced evidence showing inducement, the burden then shifts to the government to prove beyond a reasonable doubt that the defendant was predisposed to commit the crime.  *United States v. Francis*, 131 F.3d 1452, 1455-1456 (11th Cir. 1997); *United States v. Miller*, 71 F.3d 813, 815 (11th Cir. 1996); *United States v. Price*, 65 F.3d 903, 907 (11th Cir. 1995).  The fact that the district court gave Higdon's entrapment instruction is prima facie evidence that Higdon had produced sufficient evidence to raise a jury issue concerning entrapment. (R: 10: 613)

Following a conviction, the question facing the Court is whether the evidence presented to the jury was sufficient for a reasonable juror to conclude that the defendant was predisposed to take part in the illicit transaction.  *Francis*, 131 F.3d at 1456; *See also United States v. King*, 73 F.3d 1564 (11th Cir. 1996); *United States v. Brown*, 43 F.3d 618, 622 (11th Cir. 1995).  It was clear from Shane Carlton's testimony that he sought out Higdon on several occasions prior to the first buy in November.  (R: 6: 91)  Shane Carlton's testimony at trial is clear that Higdon did not approach him, that the converse was clearly true, and Higdon contends on appeal that he was not predisposed to sell Carlton "ice"

12

methamphetamine and it was only after several months of being asked by Carlton

that he finally agreed to the November sale.

In *Jacobson v. United States*, 503 U.S. 540 (1992), the Supreme Court held

that

> although he had become predisposed to break the law by
> May 1987, it is our view that the Government did not
> prove that this predisposition was independent and not
> the product of the attention that the Government had
> directed at petitioner since January 1985.

*Jacobson* 503 U.S. at 550

That is the situation before the Court in the instant matter.  Shane Carlton met with

law enforcement agents several months prior to the purchases of November and

December 2002 and then proceeded to approach Higdon on several occasions

before the sales actually took place.  Higdon contends that while he may have

become predisposed to break the law by November, that predisposition was the

product of the attention that the Government had directed at him through Shane

Carlton since May.  Higdon would offer that the Government's own agent, Shane

Carlton, testified that Higdon had not approached Carlton concerning the sale of

"ice" methamphetamine, but that over a period of several months Carlton had

come to him.  (R: 6: 91, 93, & 94)

Furthermore, at trial, Higdon took the stand in his own defense and testified

that Shane Carlton began to approach him almost "on a daily basis" asking if

Higdon could procure drugs for him.  (R: 10: 478)  This "constant badgering"

continued until Higdon finally agreed.  (R: 10: 481) Combined with the facts that

Carlton had approached law enforcement agents several months earlier and had

13

found out that he could get paid for his activities and his own testimony that Higdon had never approached Carlton with the proposition of selling drugs to Carlton, clearly demonstrates that Carlton had finally succeeded in predisposing Higdon to the sale of drugs.

While the inducement from a private citizen cannot be deemed sufficient to support a claim of entrapment, *United States v. Maddox*, 492 F.2d 104, 106 (5th Cir. 1976), *cert. denied*, 419 U.S. 851, 95 S. Ct. 92, 42 L. Ed. 2d 82 (1974)[1] it has also been held that entrapment can occur as a result of efforts of informers who are merely private citizens but acting under governmental direction. See *United States v. Groessel*, 440 F.2d 602, 605 n. 1 (5th Cir. 1971), *cert. denied*, 403 U.S. 933, 91 S. Ct. 2263, 29 L. Ed. 2d 713 (1971), citing *Sherman v. United States*, 356 U.S. 369, 373-74, 78 S. Ct. 819, 2 L. Ed. 2d 848 (1958). Where a government informant is acting in the capacity of a law enforcement officer, however, his actions must be governed by the entrapment defense. *United States v. Graves*, 556 F.2d 1319, 1323, 1326 (5th Cir. 1977).

In *Sherman v. United States*, the Supreme Court examined the conduct of an unpaid confidential informant (it must be remembered that in the instant matter, Carlton was undertaking his enterprise for "extra money") and found, in a situation remarkably similar to the present one, that the confidential informant was acting as a governmental agent. *Sherman* 356 U.S. 373-376. At trial, Agent

---

[1]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

14

Halasz testified that Carlton had been paid a total of about $2600.00 for his work with law enforcement which included similar activities in addition those with Higdon. (R: 8: 351) Undoubtedly, it was this "extra money" that provided the impetus for Carlton's activites. (R: 6: 95)

Therefore, it is Higdon's contention that in the present matter, Shane Carlton was not acting as a private citizen, but rather as an agent for the government, and his actions and attempts to persuade Higdon to sell drugs over an extended period of time, which required Carlton to approach Higdon several times before the deal was finally consummated, does not excuse the Government from the activities of its agent Carlton and it was this persuasion that finally predisposed Higdon to agree to sell.

Thus, Higdon would aver that the evidence was insufficient for a reasonable juror to conclude that he was predisposed to commit the crimes for which he was convicted in Counts II and III until he was convinced by the actions of an agent of the Government to agree to a sale. Therefore, the Government failed to met its *Jacobsen* burden of proving beyond a reasonable doubt that Higdon was disposed to commit the criminal act prior to first being approached by Carlton, who was acting as an agent of the government. The Government has failed as a matter of law to adduce the evidence required to support the jury verdict that Higdon was predisposed, independent of the Government's acts and beyond a reasonable doubt, to violate the law by selling "ice" methamphetamine. This consequently demands that the Court should find that he was entrapped into dealing with Shane

15

Carlton and his convictions as to Counts II and III should be vacated.

## II.    WHETHER THE DISTRICT COURT ERRED BY NOT ORDERING AN EVIDENTIARY HEARING PRIOR TO DENYING HIGDON'S RENEWED MOTION FOR NEW TRIAL BASED UPON NEWLY DISCOVERED EVIDENCE?

Count X of the indictment alleged that Higdon took part in a drive-by shooting on or about December 5, 2002 in the North Pass community of Montgomery, Alabama.  (R: 39: 6)  The backbone of the government's case against Higdon as to Count X was the testimony of one person: co-defendant John Gabriel Medley who was testifying pursuant to a plea agreement. (R: 8: 199-200) At trial, Medley testified that Higdon had in fact not been present at the drive-by shooting, but had rather ordered the shooting.  (R: 8: 229) This potential testimony was not merely impeaching, but was in fact exculpatory and supported Higdon's defense that he not only was not present at the drive-by, but had not ordered it and that in fact the drive-by was directed by another individual as well as by the cooperating co-defendant.  (R: 118: Affidavit)

Following the trial, Higdon presented a Petition to File Out of Time Motion and Renewed Motion for A New Trial which was based upon newly discovered evidence in which Higdon contended that an individual had come forward who would testify and who affirmed his statement in a sworn affidavit, that Medley had

16

committed perjury as to his testimony concerning the events of December 5, 2003. (R118: 4)

In this Renewed Motion, Defendant offered as newly discovered evidence that following the conclusion of the trial and rendering of the verdict, Christopher Lee Stevens, who was confined in the Montgomery City Jail with the co-defendant in the instant matter, John Gabriel Medley, approached Higdon and provided the Affidavit attached to and incorporated into the July 21, 2003 Renewed Motion. (R118: affidavit)    At trial, the only evidence the Defendant could introduce to counter the testimony of the co-defendant was that of the defendant himself.  (R: 10: 522) Christopher Stevens was a disinterested individual whose testimony would have the effect of showing that the cooperating co-defendant, Medley, admitted to Stevens that the statement made to the jury during trial laying blame for the direction of the drive-by shooting in Count 10 at the feet of the defendant was false.  The verdict of the jury as to Count 10 clearly indicates that without the testimony of the co-defendant stating that the defendant had directed the drive-by shooting, the verdict would have been not guilty as to Count 10.  The only testimony presented by the government at trial concerning the Defendant's role in the drive-by shooting what that presented by the co-defendant who testified for the government pursuant to a plea agreement.  (R: 8: 215-216)  The evidence of Stevens could not have been made available to the Defendant prior to or during trial because even with the exercise of due diligence, defense counsel could not have discovered the existence of this witness who is presently in confinement in

17

the Federal Detention Facility Annex at the Montgomery City Jail. (R118: affidavit) While it does not appear that the 11th Circuit has rendered a decision in a situation such as this, other circuits have rendered opinions which may be persuasive to this Court. In *Amos v United States* the Court of Appeals for the District of Columbia held that where disinterested witness have become available who could supply evidence of vital importance to defendant, and only similar evidence at trial was that of defendant himself, new trial should have been granted on basis of newly-discovered evidence. *Amos v United States*, 218 F2d 44, 44 (US App DC. 1954). In addition, the 2nd Circuit has held that if a conviction is shown to be based even in part upon perjured testimony, a court will not inquire into the precise effect of the perjury, but will order a new trial if without the perjury the jury might not have convicted. *United States v Polisi*, 416 F2d 573, 577 (CA2 NY, 1969) . Also, in *United States v Stofsky*, another 2nd Circuit decision to which cert was denied, the Appellate Court held that if a material witness perjures himself during criminal trial, the correct standard to apply in determining whether to grant the accused a new trial is whether evidence of perjury "probably" would have produced different verdict, rather than the standard of granting a new trial if jury "might have reached different conclusion." *United States v Stofsky,* 527 F2d 237, 246 (CA2 NY. 1975), *cert denied* 429 US 819, 50 L Ed 2d 80, 97 S Ct 65, 97 S Ct 66 (1976). In the 1st Circuit, the Court has held that a motion for new trial under *Fed. R. Cr. P. 33* must be granted if court is reasonably well satisfied that testimony given by material witness is false and that without it, the jury might

have reached different conclusion; where a motion for new trial does not allege perjury or prosecutorial misconduct, however, the movant-defendant must show that new evidence would probably produce acquittal. *United States v Street*, 570 F2d 1, 4 (CA1 Mass. 1977). In *United States v Camacho* the Southern District of New York held that a co-defendant's hearsay declaration to fellow inmate that he committed murders for which the defendants were convicted was sufficiently credible to permit jury to hear it through testimony of the inmate at new trial, as it would support defendants' motion for new trial based on newly discovered evidence under *Fed. R.Cr.P. 33*, where the only surviving victim of shootings had testified at trial that co-defendant was one of 2 shooters, and the witness had not identified either of the current defendants as shooter. *United States v Camacho*, 188 F Supp 2d 429, 454(SD NY. 2002). In the present matter, the victim testified that he did not and could not identify those who shot him. (R: 6: 116) The testimony of Stevens would exculpate defendant and further would tend to indicate that Medley perjured himself during his testimony. Higdon contends that the verdict of the jury as to Count 10 was clearly based upon the sole testimony of the co-defendant and that with the new testimony from Stevens, this evidence would have called into question the veracity of Medley's testimony not only as to Count 10, all of his testimony, and would have resulted in an acquittal as to Count 10. Higdon contended in his Renewed Motion that he was entitled to a new trial at least as to Count 10 as a result of the statements by Medley to Stevens.

In an Order filed July 28, 2003, the District Court Granted Higdon's Petition

19

to File Out of Time Motion and Denied his Motion for New Trial. (R: 127: 4) The District Court did not hold an evidentiary hearing into the allegations supported by affidavit, and instead held the evidence presented by the affidavit was "merely impeaching." (R: 127: 2)

This Court's holding in *United States v. Culliver*, 17 F.3d 349 (11th Cir. 1994), indicated that "the district court must conduct a hearing to determine whether to grant a motion for a new trial based on newly discovered evidence." *Culliver*, 17 F.3d at 351.

Prior to *Culliver*, this Court had examined the propriety of an evidentiary hearing in a situation where a defendant had, following trial and conviction, presented an affidavit which exculpated a convicted co-defendant. In the holding, this Court stated that while:

> We are aware that post-trial exculpatory statements given by a convicted co-defendant must be viewed with care. We do not suggest or hint that Gates's motion should be granted. But we do hold that it could not be denied without a hearing to explore further and determine whether it has merit.

*United States v. Gates*, 10 F.3d 765, 768 (11th Cir. 1993)

In the instant matter, the District Court failed to comply with this Court's precedent in both *Culliver* and *Gates* and therefore the matter should be remanded to the District Court for an evidentiary hearing as to the allegations of perjury by the cooperating co-defendant raised by Higdon in his July 21 Renewed Motion for New Trial and a finding thereafter if a new trial should be granted.

20

III.    **WHETHER THE District court ERRED IN FAILING TO GRANT
        HIGDON'S MOTION FOR JUDGMENT OF ACQUITTAL AT THE
        CONCLUSION OF THE GOVERNMENT'S CASE IN CHIEF AS TO
        COUNT IV ON THE GROUNDS OF INSUFFIEICENT EVIDENCE
        TO SUPPORT A VERDICT THAT HIGDON POSSESSED "ICE"
        METHAMPHETAMIME ON DECEMBER 11, 2002 WITH INTENT
        TO DISTRIBUTE?**

On December 11, 2002, a search warrant was executed on 2026 Rigby
Street, the residence of Higdon during which, "ice" methamphetamine was
discovered and seized.  (R: 8: 309-311) Subsequently, Higdon was indicted and
charged in Count IV of that indictment with possession with intent to distribute
"ice" methamphetamine.  (R: 1: 39: 2)

During his testimony on direct examination, Higdon presented no evidence
as to the "ice" methamphetamine seized on December 11, 2002 and charged in
Count IV.  (R: 10: 475-486)  In its case in chief, the Government presented only
the testimony of Agent Halasz as to this Count.  (R: 8: 309-311) Agent Halasz
presented no items of evidentiary matter which would indicate that Higdon
intended to distribute that methamphetamine.   In order to convict Higdon of
possession with intent to distribute drugs, the Government must prove beyond a
reasonable doubt that he knowingly possessed them with *intent to distribute* it.
*United States v. Poole,* 878 F.2d 1389, 1391 (11th Cir. 1989) (emphasis added).
Higdon contends as will be shown below, that the Government failed to present

21

sufficient evidence in its case in chief to prove beyond a reasonable doubt that he possessed the drugs seized on December 11, 2002 with intent to distribute.

However, before pursuing this matter, Higdon would assert that, as to Count IV, his presentation of evidence as to the remaining counts involved in the indictment did not waive his right to have his Motion for Judgment of Acquittal as to Count IV reviewed by this Court based on the Government's evidence alone. It is well-established law of this Circuit that when a defendant presents evidence on specific counts of an indictment, but presents no evidence on another count, the defendant has preserved his right to have the nonrebutted count reviewed by the appellate court based on the government's case alone. *United States v. Thomas*, 987 F.2d 697, 703 (11th Cir. 1993) That is the situation in the instant matter. Higdon moved the district court for a Judgement of Acquittal as to Count IV at the conclusion of the Government's case in chief. (R: 8: 434) Subsequently, Higdon presented evidence concerning the other counts of the indictment, but presented no evidence on direct examination as to the "ice" methamphetamine seized at his residence on December 11, 2002. (R: 10: 475-486) A defendant's rights of appeal are preserved when he refrains from presenting evidence on one count, outside of allowable cross-examination. *Thomas*, 987 F.2d at 703. Higdon refrained from presenting evidence on Count IV, therefore his rights to appeal are preserved. Higdon again asserted his rights at the conclusion of the trial. (R: 11: 655) These were then reasserted in writing. (R: 106: 6)

During the presentation of its case in chief, the Government failed to

22

introduce evidence of the requisite *mens rea* necessary to show that the "ice" methamphetamine seized on December 11, 2002 was destined for distribution. The question of whether the quantity of drugs possessed is sufficient to support the "intent to distribute" element of the offense may be demonstrated by the Government through the offer of expert testimony. *United States v. Robinson*, 870 F.2d 612, 613 (11th Cir. 1989) However, in the instant matter, the government presented the testimony of only one expert regarding the drugs in this case, Carla J. Haas, a forensic chemist with the DEA in Dallas, Texas. (R: 8: 374) Ms. Haas did not testify that the quantity of "ice" methamphetamine found on December 11, 2003 was a sufficient amount to indicate an intent to distribute. (R: 8: 374-384)

As was stated hereinabove, the Government did not elicit testimony from its drug expert, Ms. Haas that the quantity of "ice" found on December 11, 2002 was sufficient to indicate the intent to distribute the Government failed to meet its burden of proving all of the elements of the crime charged in Count IV, specifically that Higdon had the intent to distribute that particular "ice" methamphetamine. Therefore, the district court erred in failing to grant his Motion for Judgment of Acquittal as to Count IV on the grounds of insufficient evidence when it was made at the conclusion of the Government's case in chief. Furthermore, Higdon's right to have this Motion ruled on based solely upon the government's evidence was preserved when Higdon did not present evidence as to Count IV during his defense.

Thus, upon review of the evidence presented in the Government's case in

chief, the Court should direct the district court to grant Higdon's Motion for
Judgment of Acquittal as to Count IV and vacate his conviction as to that Count.

IV.    **WHETHER THE DISTRICT COURT MISCONSTRUED THE
REQUIREMENTS OF FED. R. Cr. P. 33 AS TO MOTIONS FOR
NEW TRIAL PRESENTED DURING THE PENDENCY OF AN
APPEAL BY DENYING HIGDON'S RENEWED MOTION FOR
NEW TRIAL BASED UPON A VIOLATION OF *BRADY V.
MARYLAND*?**

On October 29, 2003, Higdon filed a second Petition to File Out of Time
Motion and Renewed Motion for New Trial. (Appendix: Tab 150) The district
court denied Higdon's Motion on November 6, 2003. (Appendix: Tab 151)
Counsel for Higdon presented argument that the Government had withheld
exculpatory evidence in violation of *Brady v. Maryland* to the district court. This
evidence was in the form of a DEA Form 6, *Report of Investigation*, dated
February 27, 2003, which summarized an interview of one Daniel Pitts concerning
methamphetamine trafficking in the Montgomery, Alabama area. The
interviewing officers were Task Force Agent David DeJohn and DEA Agent
Thomas Halasz. (Appendix: Tab150) Task Force Agent David DeJohn testified
for the government at Higdon's trial (R: 6: 145) and DEA Agent Halasz was the
Case Agent at the Higdon trial. (R: 12: 50-51) During the course of this interview,
Daniel Pitts indicated that "During the late summer and fall of 2002, Gabe Medley

24

(your defendant's co-operating co-defendant) became the major source for Montgomery area ice. (Appendix: Tab 150)  This information was not made known to the defendant at any time prior to, during, or after his trial.

At Higdon's trial, the Government's theory of the case was that Higdon was the methamphetamine kingpin of Montgomery, Alabama and that the cooperating co-defendant, Medley, was a minor and subservient member of a drug organization headed by Higdon.  (R: 10: 553)   This suppressed evidence, which was clearly in the government's possession prior to Higdon's trial was not only favorable to Higdon, but also exculpatory.  A post-trial *Brady* claim in this Circuit requires four elements to be successful: (1) the prosecution suppressed evidence, (2) the evidence was favorable to the defense or exculpatory, (3) the evidence suppressed was material, and (4) the defendant did not possess the evidence nor could he obtain it himself with any reasonable diligence.  *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963); *Wright v. Hopper*, 169 F.3d 695, 701 (11th Cir. 1999); *United States v. Meros*, 866 F.2d 1304, 1308 (11th Cir. 1989); and *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir. 1992).  In addition, *Kyles v. Whitley*, 514 U.S. 419, 508-509 (1995) held that information known to the police is attributed to prosecutor.  *See also Breedlove v. Moore*, 279 F.3d 952, 961 (11th Cir. 2002).

In its assessment of "materiality," in *Kyles*, the Supreme Court made four observations about the subject: (1) a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence

would have ultimately resulted in the defendant's acquittal, undisclosed evidence can require a new trial even if it is more likely than not that a jury, seeing the new evidence would still convict. A defendant must show simply that the government's evidentiary suppression undermines confidence in the outcome of the trial. (2) A defendant need not show there was insufficient evidence to convict in view of the suppressed evidence; (3) there is no harmless error review of *Brady* errors; and (4) materiality is to be determined collectively, not "item-by-item." *Kyles* 514 U.S. at 507. In his October Renewed Motion for New Trial, Higdon clearly demonstrated that the Government suppressed the evidence of Daniel Pitt's interview, that this evidence was clearly favorable to the defendant, if not clearly exculpatory, that by being favorable to the defendant, the suppressed evidence was material, and that since Daniel Pitts was interviewed in a completely separate investigation which resulted in a separate indictment of other parties not involved in Higdon's indictment and investigation, and finally, Higdon could not have obtained this evidence through due diligence. Therefore, Higdon clearly demonstrated a *Brady* violation to the district court which at the very least should have resulted in an evidentiary hearing if not an outright granting of a new trial.

As to the actions of the district court in denying his Renewed Motion, Higdon would assert that the district court misapplied the provisions of *F.R.Cr.P Rule 33* and the established law of this circuit as to this situation. If a motion for a new trial on the basis of newly discovered evidence is filed while an appeal is pending, the district court has jurisdiction to entertain the motion and either deny

26

the motion on its merits or certify its intention to grant the motion to the Court of Appeals, which may then entertain a motion to remand the case. *United States v. Cronic*, 466 U.S. 648, 667 n. 42 (1984); *United States v. Khoury*, 901 F.2d 975, 976 n. 3 (11th Cir. 1990). In an earlier decision in *Khoury*, when presented with a DEA-6 which surfaced after Khoury had filed his appeal and the district court failed to hold an evidentiary hearing, the Court remanded the matter to the district court for a hearing to determine whether the DEA-6 constitutes *Brady* material. *Khoury*, 901 F.2d 948, 971 (11th Cir. 1990). In its Order denying Higdon's Renewed Motion, the district court quoted *Fed. R. Cr. P. 33(b)(1)*, stating that "the court may not grant a motion for new trial until the appellate court remands the case." (Appendix: Tab 151) It would appear that the district court failed to understand that it had jurisdiction to entertain the Renewed Motion, conduct an evidentiary hearing to determine if the DEA Form 6 is *Brady* material, and then act upon its merits pursuant to *Cronic* and *Khoury*. In addition to his argument presented herein, Higdon would also incorporate and adopt herein his Argument and Citations of Authority presented as to the actions the district court should have taken to make a decision upon the merits of the argument presented in his October Renewed Motion which were presented in Issue II hereinabove.

Higdon contends therefore, that the district court should have held an evidentiary hearing in order to decide on the merits of Higdon's allegation of a *Brady* violation and then, either deny the motion on the merits or certify to the appellate court that it intended to grant the motion. This would have then allowed

27

Higdon to petition the Court to remand the matter to the district court for new trial.

## V.    WHETHER THE DISTRICT COURT ERRED AT SENTENCING IN THE AMOUNT OF DRUGS TO BE CONSIDERED IN CALCULATING THE BASE OFFENSE LEVEL?

At sentencing, over Higdon's objection, the district court accepted the calculations of the probation officer's report and concluded that a base offense level of 36 was appropriate.  (R: 12: 84) The Pre-Sentencing Report relied upon a proffer by cooperating co-defendant Medley to compute the amount of drugs to be attributed to Higdon in calculating the base offense level.  (R: 12: 66-67)

The Government bears the burden of proving the quantity of drugs that should be attributed to a defendant.  *United States v. Agis-Meza*, 99 F.3d 1052, 1055 (11th Cir. 1996).  However, the calculations in this case were based solely upon the proffered statements of a co-conspirator.  (R: 12: 66-67) These statements were conclusory, uncertain and vague and such statements will not support a drug quantity calculation.  *United States v. Simpson*, 228 F.3d 1294, 1301 (11th Cir. 2000).  At the sentencing hearing the probation officer testified that the additional amounts of drugs being included in calculating the base offense level were included pursuant to relevant conduct and were solely based upon another probation officer's review of the co-defendant's proffer.  (R: 12: 68)   The Government also presented testimony from the case agent which was based upon the co-defendant's trial testimony.  (R: 12: 54) The district court stated upon

28

pronouncement of the sentence that it was relying upon the testimony of the probation officer in calculating the base offense level. (R: 12: 84). Higdon objected to both the calculations in the PSR (R: 12: 4) and also to the findings of the district court at sentencing as to the calculation of Higdon's base offense level. (R: 12: 91)

When a defendant challenges one of the factual bases of his sentence as set forth in the PSR, the Government has the burden of establishing the disputed fact by a preponderance of the evidence. *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir.1993); *United States v. Alston*, 895 F.2d 1362, 1373 (11th Cir.1990). Among others, this Court addressed the problem of the failure of the government to establish the disputed fact by a preponderance of the evidence in *United States v. Lawrence*, 47 F.3d 1559 (11th Cir. 1995). In *Lawrence*, this Court found that the district court had primarily relied on the PSRs as the basis for its findings. In that instance, the PSRs did not provide the necessary evidentiary foundation to support the appellants' sentences. *Lawrence* 47 F.3d at 1567. In the instant matter, the district court received testimony from the case agent as to the quantities of drugs testified to at trial and then appears to have discarded that testimony and relied solely upon the information provided by the probation officer who was present at sentencing. Higdon would also note that this probation officer was not the officer who prepared the PSR. (R: 12: 63)   See *United States v. Christopher*, 923 F.2d 1545, 1557 (11th Cir.1991) (holding that a conclusory statement in a PSR regarding the amount of drugs attributable to an appellant was insufficient because

"no evidence was introduced at [the appellant's] sentencing hearing regarding the amount of cocaine involved"). That would appear to be the situation in the instant matter. The district court relied solely upon the recommendation of the Probation Officer contained in the PSR to calculate the base offense level. Higdon would contend that the district court did not ensure--as it was obligated to--that the Government carried its burden of proof. As a result of this failure, the record in each appellant's case does not support the district court's findings. See *Lawrence*, 47 F.3d at 1568.

Therefore, Higdon would ask that the Court vacate his sentence and remand the matter to the district court for resentencing.

## CONCLUSION

For all of the foregoing reasons, Jerry Joseph Higdon, Jr. respectfully requests that this Honorable Court reverse his convictions in Counts II, III, IV, and X, vacate his sentence, or in the alternative, remand this matter to the district court for one or more evidentiary hearings as to the Motions for New Trial, and/or remand his case to the district court for further proceedings.

---------------------------------

MICHAEL J. PETERSEN
AL Bar Code: ASB-5072-E48M
Attorney for Jerry Joseph Higdon, Jr.

OF COUNSEL:

Petersen Law Office, LLC.
631 South Perry Street
Montgomery, Alabama 36104
Tel./FAX: (334) 269-1506/1505

30

# CERTIFICATE OF SERVICE

I CERTIFY that a copy of the foregoing Brief of Appellant was served by United States mail, postage prepaid and properly addressed this 26th day of January, 2003, upon Hon. Stephen P. Feaga, Assistant United States Attorney, P.O. Box 197, Montgomery, Alabama 36104.

MICHAEL J. PETERSEN
AL Bar Code: ASB-5072-E48M
Attorney for Jerry Joseph Higdon, Jr.


OF COUNSEL:

Petersen Law Office, LLC.
631 South Perry Street
Montgomery, Alabama 36104
TEL: (334) 269-1506
FAX: (334) 269-1505



**CORRECTED**

[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

F I L E D
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT

SEP 28 2004

THOMAS K. KAHN
CLERK

No. 03-14365
Non-Argument Calendar

D. C. Docket No. 03-00043-CR-N-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JERRY JOSEPH HIGDON, JR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Alabama

(SEPTEMBER 28, 2004)

Before ANDERSON, CARNES and HULL, Circuit Judges.

PER CURIAM:

Jerry Joseph Higdon, Jr., appeals his convictions and sentences for two counts of distribution of "ice" methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (Counts Two and Three); possession with intent to distribute "ice" methamphetamine, in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1) (Count Four); and a drive-by shooting, in violation of 21 U.S.C. § 841(a)(1), 18 U.S.C. § 2, and 18 U.S.C. § 36(b) (Count Ten). On appeal, he raises five issues, each of which will be addressed in turn.

## I. DISCUSSION

### A. Entrapment

First, Higdon argues that the evidence at trial demonstrated that he was entrapped as to Counts Two and Three, because his testimony at trial showed that he was not predisposed to sell drugs. Specifically, Higdon testified that he sold "ice" to confidential informant Shane Carlton only after Carlton "badgered" him on a daily basis for several months.

When a jury rejects an entrapment defense, we review <u>de novo</u> whether the government presented sufficient evidence for a reasonable jury to conclude that the defendant was predisposed to take part in the crime, viewing all evidence in favor of the government. <u>United States v. Francis</u>, 131 F.3d 1452, 1456 (11th Cir. 1997). "A valid entrapment defense requires two elements: (1) government inducement of

2

the crime, and (2) defendant's lack of predisposition to commit the crime prior to the inducement. Once the defendant has produced evidence of inducement, the government must prove beyond a reasonable doubt that the defendant was predisposed to commit the crime absent the government's role in assisting such commission." Francis, 131 F.3d at 1455-56. "Predisposition is a fact intensive inquiry into the defendant's readiness and willingness to engage in the crime absent any contact with the government's officers or agents." Id.

The record is replete with evidence that Higdon was predisposed to sell drugs before Carlton, the government's agent, approached him about purchasing ice. Several persons other than Carlton testified that Higdon sold them drugs before the alleged drug transactions in this case took place, and Higdon told Carlton that he had been selling drugs for 20 years. The only evidence at trial that supported Higdon's entrapment defense was his own testimony, which the jury was free to reject. Therefore, the government presented sufficient evidence for a reasonable jury to conclude that Higdon was predisposed to distribute ice methamphetamine.

## B. Sufficiency of the Evidence on Higdon's Intent to Distribute

Second, Higdon asserts that the district court erred in denying his motion for judgment of acquittal as to his conviction for possession with intent to distribute

3

methampetamine because there was insufficient evidence at trial that he intended to distribute, as opposed to merely possess, the 6.9 grams of "ice" seized on December 11, 2002.

The district court's denial of "motions for judgment of acquittal will be upheld if a reasonable trier of fact could conclude that the evidence establishes the defendant's guilt beyond a reasonable doubt." United States v. Rodriguez, 218 F.3d 1243, 1244 (11th Cir. 2000). "Sufficiency of the evidence is a question of law reviewed de novo. We, however, view the evidence in the light most favorable to the government, with all reasonable inferences and credibility choices made in the government's favor." United States v. Martinez, 83 F.3d 371, 373-74 (11th Cir. 1996) (internal citations omitted). To sustain a conviction under 21 U.S.C. § 841, the government must prove, either by direct or circumstantial evidence, three elements: (1) knowledge, (2) possession, and (3) intent to distribute. See United States v. Poole, 878 F.2d 1389, 1391-92 (11th Cir. 1989).

Carlton testified at trial that on December 10, the 7.5 grams of ice methamphetamine he purchased from Higdon were sitting on a lamp in Higdon's home when he arrived. A tape recording of that transaction was played at trial, in which Carlton asked when he could make another purchase and Higdon replied that he could probably do it again tomorrow. The next day, police seized 6.9

4

grams of ice from the same lamp in Higdon's home. The jury could have reasonably concluded from this evidence that Higdon intended to distribute, rather than merely possess for personal consumption, the methamphetamine seized from his home.

## C. Higdon's Motion for New Trial Based on Newly Discovered Evidence

Next, Higdon contends that the district court was required to conduct an evidentiary hearing to determine whether to grant a motion for new trial based on newly discovered evidence. To support this motion, Higdon proffered an affidavit from Christopher Lee Stevens, the cellmate of Higdon's co-defendant, John Gabriel Medley, stating that Medley had admitted to him that he had perjured himself at Higdon's trial. Higdon argues that this evidence was not merely impeachment evidence as the district court concluded, because it supported his allegations that Medley, whose testimony Higdon viewed as the sole basis for his conviction on the drive-by shooting, had committed perjury. At trial, Medley testified that Higdon had ordered the drive-by shooting.

We review a district court's denial of an evidentiary hearing and denial of a motion for new trial for abuse of discretion. United States v. Fernandez, 136 F.3d 1434, 1438 (11th Cir. 1998). "To obtain a new trial based on newly discovered evidence, a movant must demonstrate that the evidence was discovered after trial,

5

that due diligence was shown, and that the evidence was neither cumulative nor impeaching but actually material and likely to produce a new result." Fernandez, 136 F.3d at 1438 (internal citations omitted).

In United States v. Culliver, we held that where a motion for new trial is based on an affidavit by an adverse witness presenting exculpatory post-trial statements, the district court must grant an evidentiary hearing. 17 F.3d 349, 350-51 (11th Cir. 1994). However, we have also determined that an affidavit from a former cellmate of a government witness, calling into question the veracity of that witness's testimony at trial, is not new evidence. United States v. Starrett, 55 F.3d 1525, 1554 (11th Cir. 1995). Additionally, we have held that while "a court of appeals is without authority to rule on a motion for a new trial, we must nevertheless decide whether to remand the case for the limited purpose of having the district court entertain such a motion, and if remanding the case would serve no valid purpose, we will decline to do so." United States v. Bascaro, 742 F.2d 1335, 1344 (11th Cir. 1984) (declining to remand for limited purpose of having the district court conduct an evidentiary hearing on whether probable cause existed for officers to conduct a search, because the new evidence was not such that would probably produce an acquittal).

6

Higdon is not entitled to either an evidentiary hearing or a new trial because the "new evidence" that he proffers is merely impeaching and he has not shown that it would change the outcome of the trial.   Under <u>Culliver</u>, the information was not merely impeaching because it was a recantation by the most important witness for the prosecution.  Here, the evidence is merely impeaching because it is not a recantation but a report that the witness said he lied; it does not have the same reliability as a recantation.  Not only was the evidence that Medley told his cellmate that he had lied about Higdon's involvement in the North Pass shooting merely impeaching, it would have also been cumulative because the jury heard testimony by Higdon and another defense witness that Higdon had nothing to do with the shooting.  In addition, Higdon's conviction on Count Ten was not only supported by Medley's testimony, but also by Higdon's own taped statements to Carlton that he was responsible for the North Pass shooting.  Therefore, the district court properly concluded that the evidence in the cellmate's affidavit would not probably have produced a different result.  Accordingly, remand for an evidentiary hearing would serve no valid purpose.

## D.  Higdon's Motion for New Trial Based on a Brady Violation

Higdon filed a renewed motion for new trial, which the district court denied on the basis that Higdon's appeal was pending, pursuant to Fed.R.Crim.P. 33(b)(1).

Higdon contends that the district court erred in denying this motion, which was based on his allegation that the government withheld exculpatory evidence, in violation of <u>Brady v. Maryland</u>, 373 U.S. 83, 87, 83 S.Ct. 1194, 1196-97 (1963). The exculpatory evidence allegedly withheld was a statement by Daniel Pitts to drug enforcement agents that Medley was the major source for "ice" in the Montgomery area.

We generally review a district court's denial of a motion for a new trial based on a <u>Brady</u> violation for an abuse of discretion. <u>United States v. Kersey</u>, 130 F.3d 1463, 1465 (11th Cir. 1997). Under Fed.R.Crim.P. 33(b)(1), if a motion for new trial based on newly discovered evidence is filed while an appeal is pending, "the court may not grant a motion for a new trial until the appellate court remands the case." The Supreme Court has held that denial of a motion for new trial for lack of jurisdiction because an appeal is pending is error. <u>See</u> <u>United States v. Cronic</u>, 466 U.S. 648, 667 n.42, 104 S.Ct. 2039, 2051 (1984). Rather, a district court has jurisdiction "to entertain the motion and either deny the motion on its merits, or certify its intention to grant the motion to the Court of Appeals, which could then entertain a motion to remand the case." <u>Id.</u>

In a criminal proceeding, the Due Process Clause of the United States Constitution requires the government to produce all evidence that is favorable to

8

the accused upon request. <u>Brady</u>, 373 U.S. at 87, 83 S.Ct. at 1196-97. In order to

establish a <u>Brady</u> claim, a defendant must show that:

1. the government possessed evidence favorable to the defendant, including impeachment evidence;
2. the defendant does not possess the evidence, nor could he obtain it himself with any reasonable diligence;
3. the government suppressed the favorable evidence; and
4. had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

<u>United States v. Hansen</u>, 262 F.3d 1217, 1234 (11th Cir. 2001), <u>cert. denied</u>, 122

S.Ct. 2326 (2002).

Higdon is correct that the district court should have either clearly rejected

his renewed motion for new trial on the merits, or certified to this Court its

intention to grant the motion. <u>See</u> <u>Cronic</u>, 466 U.S. at 667 n.42, 104 S.Ct. at 2051

n.42. However, as Higdon concedes in his reply brief, compelling testimony other

than Medley's supports his convictions on the drug counts. Moreover, rather than

undermining Medley's credibility, Pitts's statement to investigators that Medley

was a major source of "ice" methamphetamine in the Montgomery area was

consistent with Medley's testimony at trial that Higdon fronted "ice" to Medley for

him to sell. Therefore, there is not a reasonable probability that Pitt's statement

would have changed the outcome of the trial. <u>See</u> <u>Hansen</u>, 262 F.3d at 1234;

<u>Bagley</u>, 473 U.S. at 682, 105 S.Ct. at 3383. Since Higdon is unable to establish a

9

<u>Brady</u> claim, remand would serve no valid purpose. <u>See</u> <u>Bascaro</u>, 742 F.2d at 1344.

## F. Drug Quantity Determination at Sentencing

Finally, Higdon argues that the district court erred in accepting the base offense level calculations in the PSI over his objection because the computation was based on a proffer by his co-defendant, John Gabriel Medley.

We review "[t]he trial court's determination of the amount of drugs attributable to a defendant for sentencing purposes" for clear error. <u>United States v. Lee</u>, 68 F.3d 1267, 1274 (11th Cir. 1995). The government has the burden to prove drug quantity by a preponderance of the evidence. <u>United States v. Sepulveda</u>, 115 F.3d 882, 890 (11th Cir. 1997). The government's burden "must be satisfied with reliable and specific evidence." <u>Id.</u> A court may consider trial testimony as well as hearsay evidence that has sufficient indicia of reliability. <u>See</u> <u>Lee</u>, 68 F.3d at 1275-76.

In drug cases, base offense level is usually determined by the amount of drugs attributable to the defendant using the Drug Quantity Table in § 2D1.1(c) of the Sentencing Guidelines. <u>See</u> U.S.S.G. § 2D1.1. In a case involving two or more different types of drugs, the Drug Equivalency Table provides a means for combining differing controlled substances to obtain a single offense level by

10

converting each drug to a marijuana equivalent. § 2D1.1, cmt. n.10. The guidelines assign an offense level of 36 if at least 10,000 kilograms but not more than 30,000 kilograms were involved. § 2D1.1(c)(2).

Higdon contends on appeal that the 34 ounces of "ice" attributed to him based on Medley's trial testimony and proffer did not meet the preponderance standard. Considering all the evidence produced at trial and sentencing, the government sufficiently proved a drug quantity that would trigger a base offense level of 36 because of Medley's testimony at trial and the probation officer's testimony at sentencing that Medley had witnessed Higdon purchase and sell 34 ounces of ice methamphetamine, which is equivalent to 19,278 kilograms of marijuana. See Lee, 68 F.3d at 1275-76; § 2D1.1(c)(2). In fact, this calculation does not even include the amounts of drugs that he sold to other people. Therefore, we conclude that the district court did not commit clear error when it found that the government had met its burden of providing reliable and specific evidence.

Upon review of the record and upon consideration of the parties' briefs, we find no reversible error. Accordingly, we affirm.

**AFFIRMED.**[1]

---

[1] Higdon's "Motion for Leave to File Supplemental Argument," construed as a motion for leave to file a supplemental brief raising a Blakely v. Washington, – U.S. –, 124 S.Ct. 2531

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____
Deputy Clerk
Atlanta, Georgia

(June 24, 2004), issue is denied because he did not raise the issue in his initial brief.  United States v. Curtis, – F.3d – (11th Cir. Aug. 10, 2004); United States v. Levy, – F.3d – (11th Cir. Aug.3, 2004).

12

**[DO NOT PUBLISH]**

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE ELEVENTH CIRCUIT

--------------------------------

**No. 03-14365**
**Non-Argument Calendar**

--------------------------------

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
DECEMBER 13, 2005
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00043-CR-N-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JERRY JOSEPH HIGDON, JR.,

Defendant-Appellant.

--------------------------------

Appeal from the United States District Court
for the Middle District of Alabama

--------------------------------

(December 13, 2005)

### ON REMAND FROM THE
### SUPREME COURT OF THE UNITED STATES

Before ANDERSON, CARNES and HULL, Circuit Judges.

PER CURIAM:

We previously affirmed the conviction and sentence in this case. <u>See</u> <u>United States v. Higdon</u>, 122 Fed. Appx. 985 (11th Cir. 2004). Later, we denied rehearing en banc. <u>See</u> <u>United States v. Higdon</u>, 418 F.3d 1136 (11th Cir. 2005). The Supreme Court has vacated our prior judgment and remanded the case to us for further consideration in light of <u>Booker v. United States</u>, 543 U.S. __, 125 S.Ct. 738 (2005). Having reconsidered our decision pursuant to the Supreme Court's instructions, we reinstate our judgment affirming conviction and sentence.

In our opinion accompanying our denial of rehearing en banc, we noted:

> At no time in the district court or in his initial brief on appeal did Higdon challenge the constitutionality of any extra-verdict sentencing enhancement or assert that the district court lacked the authority to impose the enhancements under a preponderance-of-the-evidence standard. Instead, approximately three months after briefing was completed in the case, Higdon filed a motion to file a supplemental brief raising a <u>Blakely</u> issue.

418 F.3d at 1137. Following the well-established rule in this circuit, <u>see</u> <u>United States v. Levy</u>, 379 F.3d 1241, 1242 (11th Cir. 2004), <u>reh'g en banc denied</u>, 391 F.3d 1327 (11th Cir. 2004), issues that are not timely raised in the briefs are deemed abandoned. In <u>United States v. Ardley</u>, 242 F.3d 989, 990 (11th Cir. 2001), we applied this rule to a case remanded from the Supreme Court in light of <u>Apprendi</u>. Recently, we applied <u>Ardley</u> to a post-<u>Booker</u> remand and found that the defendant had abandoned his <u>Booker</u> claim because he failed to raise it at the

2

district court or in his initial brief.  <u>United States v. Dockery</u>, 401F.3d 1261 (11th Cir. 2005).

Our opinion affirming the conviction and sentence in this case is accordingly **REINSTATED**.[1]

A True Copy - Attested
Clerk U.S. Court of Appeals,
Eleventh Circuit

By: _____

Deputy Clerk
Atlanta, Georgia

---

[1]  The motion to withdraw as appointed counsel for appellant, filed by attorney Michael J. Peterson, is granted.  Attorney Maryanne Melko Prince is hereby appointed to represent appellant.

3

**IN THE UNITED STATE DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | **Civil Action No. 2: 07-CV-310-MEF** |
| V. | ) | **(CR-99-00043-N-1)** |
| | ) | |
| | ) | |
| JERRY JOSEPH HIGDON, JR. | ) | |

**AFFIDAVIT**

| | |
|---|---|
| **STATE OF ALABAMA** | ) |
| | ) |
| **COUNTY OF MONTGOMERY** | ) |

I, **MICHAEL J. PETERSEN,** being duly sworn, states as follows:

1.      I am currently employed by the office of the Federal Defender for the Middle District of Alabama. During the pendency of the Petitioner's trial, appeal, and Petition for Writ of Certiorari to the Supreme Court of the United States, your affiant was in the private practice of law and as a member of the Criminal Justice Act Panel for the Middle District of Alabama was appointed to represent the Petitioner pursuant to the Criminal Justice Act, 18 U.S.C. § 3006A.

2.      I was appointed as trial counsel for Jerry Joseph Higdon, Jr. in this action.

3.      I subsequently represented the Petitioner in his appeal of his conviction and sentencing before the 11th Circuit and also petitioned the Supreme Court of the United States for

1

a Writ of Certiorari.

4.      On April 6, 2007, pursuant to 28 U.S.C. 2255, Higdon filed a petition to vacate, set aside or correct his sentence in this case. (Doc. # 1-1).  In this petition, Higdon alleged my representation was ineffective for five reasons which he specified in Ground One and Two.  Ground One asserts that Higdon was denied his Sixth Amendment right because trial/appellate counsel failed to properly object to sentencing enhancements, failed to investigate confidential informants and their reliability, failed to argue *Apprendi* for drug amounts introduced at sentencing, and failed to object to the playing of certain tape recordings at the trial.  Ground Two asserts that Higdon was also denied his Sixth Amendment right because trial/appellate counsel failed to raise an *Apprendi* claim on direct appeal.

5.      This affidavit is in response to this Court's Order, entered on April 13, 2007 (Doc. # 2).

6.      Mr. Higdon first alleges "Council (sic) failed to properly object when the District Court was preparing to use enhancements for specific criminal offense level increase to move Defendant from level 28 to level 44, based upon unfounded issues not brought before the Jury which was a clear *Jones/Apprendi* issue." (Doc. # 2, Motion, page 6, second paragraph, "Ground One (1)").

7.      This assertion is incorrect.  Counsel objected to the drug quantity calculation, arguing that the unindicted marijuana should not have been included and that only 23.58 grams of ice was attributable to him by a preponderance of the evidence.  The court overruled these objections and set the base offense level at 36.  Additionally, counsel argued that Mr. Higdon was entitled to a two-level reduction because he played a minor role in the offense.  Counsel also objected to the obstruction-of-justice enhancement and the recommendation that Mr. Higdon not receive a reduction

2

for acceptance of responsibility. The trial court overruled all of counsel's objections and set his total offense level at 44. Counsel objected to this finding and presented these issues on appeal.

8.    The petitioner also alleges that he was denied effective assistance of counsel at trial, because counsel "failed to properly investigate the confidential informants and their reliability." (Doc # 2, Motion, page 6, Ground One, (2)).

9.    Prior to trial, counsel, raised an entrapment defense. Counsel contended both at trial and on appeal that Mr. Higdon had been entrapped by the confidential informant. In preparation for this defense, conducted several interviews with Higdon concerning his co-worker who was known by counsel and Higdon to be the confidential informant. The co-worker, who testified for the government at trial, declined to be interviewed by counsel. Higdon testified at trial that he possessed the methamphetamine represented in Counts Two, Three, and Four for personal use only. Counsel believes these defenses were adequately investigated and presented at trial because the jury acquitted Higdon as to Count One, the conspiracy allegation, as well as Counts Five and Six, distribution allegations, and the firearms allegations of Counts Seven, Eight and Nine. Counsel also raised both entrapment and personal use issues on appeal to the Circuit Court.

10.    Next, petitioner alleges counsel "failed to investigate and properly prepare for argument on drug amounts which were in proffer. Clearly *Jones/Apprendi* issue and Circuit Precedent as defined in *Rogers* 99-15150 9/29/2000 and *Swatzie* 00-1079 9/29/2000." (Doc # 2, Motion, page 6, Ground One, (3)). The petitioner further asserts that because "[d]efendant specifically requested that Counsel raise three cited cases and supporting arguments on Direct Appeal, Counsel failed to raise *Apprendi* argument as requested by Defendant resulting in denial of *Booker/Fanfan* claim on supplemental brief and subsequent affirmation of Defendants 145 year

3

sentence." (Doc # 2, Motion, page 7, Ground Two).

11.    Mr. Higdon's trial (May 5 - 9, 2003) and sentencing hearing (August 8, 2003), were conducted prior to the Supreme Court's opinion in *Blakely v. Washington*, 542 U.S. 296 (2004). Because the Eleventh Circuit and every other circuit had upheld the Guidelines against *Blakely*-type challenges, counsel did not challenge judicial fact-finding of facts that had not been presented to the jury. Within a month of the *Blakely* decision, however, counsel filed a "motion for leave to file supplemental argument" with the Eleventh Circuit in Petitioner's direct appeal and an accompanying brief asserting that Mr. Higdon's sentence was unconstitutional under *Blakely*. The Eleventh Circuit denied the motion. The Eleventh Circuit affirmed Mr. Higdon's convictions and sentences without addressing the merits of his *Blakely* claim. Counsel then raised this issue amongst others in Mr. Higdon's Petition for Writ of Certiorari to the Supreme Court of the United States. On October 25, 2005, the Supreme Court granted Counsel's Petition on Mr. Higdon's behalf, vacated the sentence, and remanded the matter to the Circuit Court for consideration in light of *United States v. Booker*, 543 U.S. 220 (2005). *Higdon v. United States*, 126 S. Ct. 83, 84 (2005). Counsel subsequently filed a Motion to Withdraw as counsel, based on leaving private practice, with the Eleventh Circuit. Attorney Maryanne Prince was appointed as counsel for Mr. Higdon.

12.    Petitioner alleges that he was denied effective assistance of counsel at trial, because counsel "failed to object to the playing of taped evidence at trial that had not been shown to have met the Rules of Evidence § 901(a) or to investigate the authenticity of said tapes prior to the actual trial." (Doc # 2, Motion, page 6, Ground One, (4)).

13.    Pursuant to Fed. Rule Evidence 901(a), the government was allowed to play tapes of the conversations between Higdon and the confidential informant (Higdon's co-worker). As there

was no legal basis for objecting to this evidence, no such objection was raised at trial.

Further Affiant saith not.

_____
**MICHAEL J. PETERSEN**
Affiant

**STATE OF ALABAMA** )
)
**MONTGOMERY COUNTY** )

I, the undersigned authority, a Notary Public in and for said State of Alabama at Large, do hereby certify that **MICHAEL J. PETERSEN**, whose name is signed to the foregoing Affidavit and who is known to me, acknowledged before me, on this day, that being informed of the contents of said instrument, he executed the same voluntarily, on the day the same bears date.

**GIVEN** under my hand and official seal this 1st day of May, 2007.

(SEAL)

_____
Notary Public
My Commission Expires: _12/18/10_

5

IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **Civil Action No. 2: 07-CV-310-MEF** |
| V. | ) | **(CR-99-00043-N-1)** |
| | ) | |
| JERRY JOSEPH HIGDON, JR. | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that I have this 1st day of May, 2007, served a copy of the foregoing upon

the following, by  placing a copy of the same in the U.S. mail, postage prepaid and properly

addressed to:

> Jerry J. Higdon, Jr.
> AIS #11167-002
> USP Beaumont
> U.S. Penitentiary
> P. O. Box 26030
> Beaumont, TX 77720

I hereby also certify that on May 1, 2007, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notification of such filing to the following:

Louis V. Franklin, Sr., Esq.

> Respectfully submitted,
>
> **s/Michael J. Petersen**
> MICHAEL J. PETERSEN
> Assistant Federal Defender
> 201 Monroe Street, Suite 407
> Montgomery, Alabama 36104
> Phone: (334) 834-2099
> Fax: (334) 834-0353
> E-mail: michael_petersen@fd.org
> ASB-5072-E48M

6