IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

NORTHERN DIVISION

JERRY JOSEPH HIGDON          §

    Movant,                  §

vs.                          §          Case No: 2:07-CV-310-MEF

UNITED STATES OF AMERICA,    §

    Respondants              §

## MOVANT'S REPLY TO GOVERNMENT'S RESPONSE

Comes now, Jerry Joseph Higdon, movant pro-se, in the above entitled, styled, and numbered action, who would now so reply to wit;

I.

The governments response is in violation of this Court's Order of April 13, 2007, which stated in bold that the government is required to produce <u>all</u> documents and court records relevent to the issues pending in this cause. Yet the government failed to do so, knowing that this movant was relying on memory and handwritten notes from this movants trial.

This Court was also clear that the Rules of Federal  Civil Procedure applied in the instant matter, yet the government fails to ask for a definite statement, when it "assumes" that this movant is relating to Brady materials mentioned in appeal, yet this is not the case, so the government is in contempt of this Court's Order of April 13,2007, for it failed to produce to this movant <u>any</u> Brady materials to rebut his claim, for movant's claim was made,"Petitioner was denied due process rights by virtue of government's following violations: 1). Government failed in their duty to relinquish all known favorable statements, tape recordings, and otherwise complete Brady evidence 2). Government failed to correct known false testimony made by government witnesses.

Had the government followed the Rules of Civil Procedure, and requested a more definite statement, they would have learned the following, and properly produced the required documents, versus their attempt to avoid the Order set forth by this Court, which is a sanctionable offense, and this movant leaves this Court to so determine the sanctions to impose. Fines, denial of rebuttal after the fact, ect...

For had the government simply followed the rules and requested a more definate statement they would have learned that the tapes this movant was referring to were infact of a taped phone conversation, which was placed between Shane Carlton and this movant, found in the governments own direct at Trial Transcript pg. 48., and this taped phone recording was never turned over to the defense. Shane Carlton had already once stated that he had made the initial contact with this movant in order to have this movant make a small purchase of drugs for him. (Trial Trans. pg. 54 Line 1-3). This taped phone conversation when viewed under the cause and prejudice prongs of **Frady 456 US 152 , 164-165,** the "cause" being clear Brady/Giglio material, which is clearly exculpatory in nature, and it was withheld by the government and its agents therein. The "prejudice" prong is met when out of a 10 count indictment taken before a petit jury, movant was only found guilty of 4 counts, and had the petit jury had the oppertunity to hear the taped phone conversation of Shane Carlton persuading this movant to make a purchase of drugs for him, it would show and prove out a entrapment of this movant, which as this action progresses forth in this motion, this movant <u>will</u> show is the truth, for there is a whole lot of Brady materials withheld in order to  obtain this movants conviction.

The aforementioned taped phone recording, the DEA 6 Form of Danny Pitts, the other DEA 6 Forms that were withheld, as the governments own agent stated ,"there were more than one source of confidential informants. Prelim Trans. pg. 55 lines 8-12, testimony of SA Halasz.

Had the government asked for a more definite statement, which is required by the F.R.Civ.P. then they would have learned this movant was speaking of a taped phone conversation which was withheld.

2

Next, the government is required to correct false and inconsistant testimony/
statements, so that the petit jury who are mere laymen of the law are not confused,,or
misled, yet this did not occur in the instant matter before this Court, for Gabe
Medley repeatedly made false statements known by the government to be patently
untrue, such as the amounts of marijuana he purchesed allegedly from this movant,
as the trial transcripts show at page 207 lines 10-12, of a one time purchase of
marijuana to page 263 lines 7-8 to maybe a half dozen times. This is a unchecked
and very confusing statement that was never corrected by the government, left before
the jury in a rather jumbled mess at best, which is confusing to any jurist of
reason.

The next inconsistent statement known to be patently impossible by the government
and its investigative agents is the timeline set forth by Medley, when he states
that he went with this movant to Atlanta, GA. to purchase 2 ounces of "ice" methamphetamine
from one Landon Birch (Trial Trans. pg. 211 lines 17-25), as Medley under oath stated
that he and this movant went to Atlanta in Sept. and met with Birch, which the
government and its investigative agents knew to be patently untrue, for Mr. Birch
was in jail and unable to have provided the drugs to either Medley, or this movant.
Another known misstatement, which the government knew was a impossibility but failed
to correct properly, which would tend to mislead the petit jury or confuse it,
which combined with the aforementioned other times, is beginning to show a distrurbing
pattern of procedural due process violations against this movant. Failing to correct
their key witnesses goes towards a bolstering of witnesses due to this procedural
due process violation.

Gabe Medley went on to respond to the governments questions with repeated misstatements
known to be such by the government, which are found at trial trans. pg. 216 lines
2-7, which clearly shows that this movant never ordered anyone to shoot-up anyones
home, then Medley went on to state that this movant called up and threatened the
parties shot at the Dec. 5 shooting, and that Eric Culpepper was present at this

3

alleged phoning of the threats, and even drove Medley to pick up money owed to this movant right after the shooting of Dec. 5th. SA Halasz stated in his sworn testimony that the phone cal never occurred. (Trial Trans. pg. 364 lines 14-17, and pg. 365 lines 1-4), and Eric Culpepper's own admission on cross from the government shows by the governments own back counting that while Eric Culpepper was at movants house the night of Dec. 5th, it was not the night of the shooting itself, as that occurred on Dec. 4th-5th 11:57pm to on or about 12:00 am respectfively, according to the police reports that were obviously known to exist by the government, which never were turned over to defense. Eric Culpepper stated he was not there, once the government explained exactly when the shooting took place. (trial trans. pg. 472-473.), yet Medley states Eric Culpepper was present. (trial trans. pg. 242-243). Even the party shot admitted there were no phone calls from this movant.

The government continues to allow these misstatements by Medley, which have been contradicted by the governments own witnesses, yet the government fails to correct these confusing statements that are known misstatements. One would tender the question as to why the government would do this when they so readily attacked this movant when he took the stand in his defense. This severely prejudiced this movant, as his procedural due process rights were violated at that time, which allowance of such patently false statements not corrected did bias the petit jury against this movant after it had been misled. Had the government so corrected its own witnesses, then it is clear that a element of  doubt would have been raised as to the remaining counts this movant was found guilty of. Out of 10 counts, this movant was only found guilty of four.

Taken all of the aforementioned elements into view by a jurist of reason, the governments witnesses do not support any of Medleys allegations he swore to on the stand, and had the government produced the Brady material in the form of the taped phone conversation of movant and Carlton, which obviously showed entrapment.

Movant has met the cause and prejudice prongs of **Frady**, based on the causation of the government failing to correct false statements, and the prejudice it caused

4

this movant is the due process violated, which is a US Constitutional right and a statutory right as well. The petit jury was misled, and that is where the prejudice comes in as well. That answers the government on **B&C.**

In the governments response at **D**, the government states that movants legal claims are without merit, which would be true _if_ this movant cannot overcome the **Frady** hurdles as he has, and as he will continue forth to so do, for the record corroborates every one of this movants claims and sub-claims, which will show that this movant has factual evidence, which makes him factually and actually innocent of the charges set forth by the government in a overzealous prosecution, by a showing that three things occurred at his trial. 1). The government failed to correct its witnesses, 2). Movants counsel was ineffective, 3). The government was misled as to the testimony of its witnesses.

The government responds at **E** that movants ineffective assistance of counsel claim be rejected as they are without factual support, but as this movant goes forth, he prays that this Court review this section under the scope of the interest of justice, as there are several issues herein at this point which are of extreme importance.

1). Trial counsel was ineffective when he failed to preserve the Apprendi/Jones issue for appeal, which is the enhancement portion of the sentencing not found by the jury at trial, when pretty much every attorney in the country was making Apprendi/Jones objections, which is the ultimate reason the 11th Circuit stated they rejected this issue on appeal. By movants counsel failing to preserve these issues is a **Strickland** issue, for it severely prejudiced this movant, by allowing illegal enhancements to be found by the sentencing court.

Counsel went so far as to stating that he had failed to review the proffer of Medley, which was where the PSI had gotten its drug amounts and drug weights. See, Sent. Trans. pg. 37-38 lines 25-2 respectively. This clearly show indifference to this movants right to  procedural due process, which requires a person to have

effective assistance of counsel at <u>all</u> sentencing. (sic) For had movants counsel
simply read the proffer of Medley, then went back to review the trial transcripts
as he should have to have been properly prepared for his client to be facing a
extremely long time in prison, which meets the due process requirement of having
effective assistance of counsel. Movants counsel could not even rebut or properly
make a cross of what was stated in the proffer, having not read it.

Movants counsel reached such ineffectiveness of counsel, that he failed to read
probably one of the most important documents in this movants life, and that failure
caused this movant to be charged with a drive-by shooting he was not even remotely
connected to, due to the fact that no one else was there to uphold the governments
witness, other than another government witness who would obviously do anything
for money. Movants counsel failed to read Medleys proffer, when it was clear and
evident that this very same peice of paper was about to have a severe impact in
his clients life. Next at sentencing transcript pg.79 et al ,the government lays out
the **Watts** case, showing this movants counsels ineffective assistance, for what
attorney in their right mind would not request a **Watts** charge to the jury in a
conspiracy case, when such a definite would benefit his client ? That is enough
of a procedural due process claim in itself to reach the <u>**Strickland**</u> level of ineffective
assistance.

As this Court is well aware, there is no way that a mere layman of the law could
possibly know of  his counsels ineffectiveness during trial, or even on appeal,
for a average citizen who does not know the law will eventually learn that law
once he loses his established freedoms. It is at that point in time that one would
learn that counsel was ineffective assistance, and no attorney in their right frame
of mind is going to actually go on the record as stating I made a mistake, for
he would lose valuable clientale, so it is up to the movants after trials and being
found guilty who ultimately find the ineffectiveness of counsel <u>after</u> the fact,
<u>not</u> before as the government would have us believe.

Movants counsel at sentencing pretty much assured that this movant would be sentenced beyond what the USSG called for at that time, for he failed to ask for a **Watts** jury charge, and while at sentencing the prosecutor overcame the  jury charge, when he stated he was the finder of fact, which is a procedural due process violation, for the jury is and was told that they are the ones who find for the proponderance of the evidence, <u>not</u> that once they find a person guilty, then there will be another party as a factfinder to determine exactly how guilty a person is. <u>That</u> is a procedural due process violation, for it is the <u>jury</u>, not the prosecutor who prosecuted the case who finds by a proponderance of the evidence what can ultimately be charged at sentencing, for the jury found this movant guilty of approx. 28 grams of Ice methamphetamine, a level 28, not the level 44 I was sentenced under.

Trial counsel was ineffective assistance of counsel, when in the Courts Jury Charge Count Ten was a impossibility, for Title 21 USCA §841 (a)(1) is <u>not</u> a conspiracy charge, as charged in the indictment <u>and</u> alluded to by the Court as such in both its initial jury empanelment, (Trial Trans. pg. 16 lines 1-17) and the final Jury Charge on page 611 lines 17-25, pg. 612 lines 1-2 in the trial transcripts. Effectively there is no conspiracy charged, or even alleged properly in the indictment, so there is no way that this movant can be charged with a Title 21 USCA §846 conspiracy charge, when this movant was found guilty of no such charge at all, nor was he charged as such in the indictment in <u>any</u> of the charges he was found guilty of. That is finding the movant guilty of a non-offense, which under **United States v. Peter 310 F3d 709 (11th Cir)**  , which is the precedent in the 11th Circuit for this very same issue to a point. Movants counsel, the judge, and even the prosecutor missed this wording, and it is clearly ineffective assistance for the 5th Circuit case precedent is older than **Peter,** so counsel should have known relevent caselaw.

Trial Counsel was ineffective assistance of counsel, when he failed to learn about the disclosure of the unredacted audio tape of Dec. 10th, namely the tape played of the events of December 10, 2002 was a redacted version, not so stipulated in Court by the government, nor was this misnomer noticed by defense counsel, however

7

as attested to in this movants **Exhibit "A"**, his sworn affidavit of the fact that he personally told his counsel to object, for the tape was altered. Movant knew of this but his counsel failed him yet again, (having failed to object to a jury charge on count ten to a conspiracy this movant was never found guilty of), for had movants counsel objected to the tapes, he would have learned from this movant that the reason this movant knew the tape was altered on the December 10, 2002 tape was the whirring sound in the background. Movant has attested in his affidavit that it is due to his education and having a bachelors degree in electronics, various US Navy accommodations dealing with electronics, a member of the North American Sound Contractors Assoc., that he was able to detect the whirring sound on the December 10th tape that was not on the November tape, and the difference is that Carlton testified that the tape player was a D/C tape recorder. The whirring sound from the Dec. tape is from using a A/C tape recorder to distort the sound, or mask statements. The whirring sound comes from a A/C recorder because it is belt driven and the belt warps or stretches, and a D/C recorder runs directly from the motor, so there can **exist no whirring sound**, for it is motor driven, <u>not</u> belt driven.

Had movants counsel requested even the smallest prong of **McMillan**, namely the whirring sound that is easily discernible on the December 10th tape does not occur on the November tape, for if it did then it would mean that an A/C recorder was used and <u>not</u> the D/C recorder as attested to at trial by Carlton. See movants **Exhibit B** for a rough overview of exactly what this movant is talking about and see exactly what a expert audio man can detect, which is exactly what this movant detected.

Had movant counselor requested this expert testimony, then the Court and even the government would have learned that somewhere either the government by its agents were duped into believing the Dec. 10 tape to be true, or the government made a redacted version, and did not inform the defense. Either way the tape has been altered, for there is no ceiling fan in this movants home in the area they were speaking at, and a change of "pockets" does not make the whirring sound either.

8

Counsel was ineffective for not properly representing his client in this tape issue, which had the government requested a more definite statement they would have learned what tape this movant was speaking of in this matter.

Movants affidavit further states that SA Halasz misspoke when he stated he was the one who found the shotgun inthis movants home. SA Halasz stated he located the shotgun, but he did not do so, as he was not in the house at that time and he wished to get this movant for a brandishing charge so there would be more pressure on this movant to cooperate and  work for Team USA, which this movant declined to do, for he was seeing firsthand how one could be set up. See page 348 lines 1-25 as to SA Halasz statement in regards to the whereabouts of the shotgun, when he came into the room, <u>after</u> movant was arrested by other officers. Now is SA Halasz misspeaking when he makes the bold statement that no one but him saw the shotgun only 2 ft approx. from where movant had been lying, or is the truth the fact that another officer found the weapon before SA Halasz walked in to the room, which what this movant has stated all along. A commonsensical approach would lead one to think that someone misspoke, and misled as to what actually happened, for if there were several officers in before SA Halasz, he would have us believe that while arresting this movant, **not one of these trained officers located a possible dangerous weapon that was within hands reach in a meth bust ?** That goes beyond description, for we have Halasz' own testimony, that basically a meth bust is not a nice thing, rather it is dangerous, so how can one group of officers who were actually there not see the weapon, when it was at this movants head ? Movant attest that this all occurred as per his sworn affidavit that SA Halasz was not present when the weapon was found. Again counsel was ineffective for pointing this out and objecting to SA Halasz' testimony, which is beyond belief, or misspoken at best.

These last two items are of special interest, for if only one is proven, then there is no way that the movant received a fair trial, rather his due process was

10

trampled upon, and a severe miscarriage of justice has been carried out against
this movant. If this Court would review the tapes in question with the transcripts
for each movant believes that this Court will hear the whirring sound as movant
described it, because these are not the same tapes, nor are they the originals,
because it is electronically impossible for the whirring to be heard from a D/C
recorder.

III.

This movant is relying in part from memory, and in part from notes he had written
to his attorney Michael Petersen, and movant knows there are more discreapancies
in the testimony and discovery, but he has yet to have received  his records from
counsel, after having requested such. See **Exhibit C,** which is the prisons mailing
form approved through June 2007, and as of this writing the 3 boxes of legal records
have not been received by this movant, so at this time, this movant would so move
this Court as to notifying it that movant would like to preserve the right to address
further issues, and amend his complaint once the legal documents have become available.

This Court should also know that this movant is still in the process of obtaining
the telephonic transcripts of this movant having called his counselor Michael Petersen
and as attested to in this movants affidavit Mr. Petersen notified this movant
that the government was willing to knock over 140 years or so off of his sentence,
if this movant would dismiss his appeal and testify in court against others, and
if this movant did do this, then the government would see to it that this movant
only got 10 years approx., and that it was a misunderstanding on Mr. Feagas part
and the DEA, because they believed the movant was someone else. Once BOP transcribes
this phone recorded conversation between this movant and his counsel he will send
it forth to this Court forthwith and due haste, so this Court may determine who
is misspeaking therein, Mr. Petersen, or Mr. Feaga to Mr. Petersen. That is a due
process violation as well, for movant is entitled to an appeal. See **Exhibit D.**

11

IN CONCLUSION

This movant is a mere layman of the law, having made the world of electronics his chosen field of endeavor, but he has read some law, and asked some other people here questions as to the legal system operates, and he does recognize that he received a "poor mans" justice as one of the alleged Duke University rapist stated. This movant did not have the money to make his lawyer get a expert witness to look at those tapes, for if he had, then this movant would have been able to been acquitted of all charges, for a jurist of reason would not possibly believe that if a redacted tape was entered illegally into evidence, regardless of intent by the government, as grave erro would have occurred.

Surely the government cannot deny that if the whirring sound is heard in the Dec. 10 tape and not the Nov. tape, then it would prove out that the A/C recorder would prove the whirring, for it is a known fact that it is the belt that warps and cuases the sound, when a D/C does not do so, then the government should not object to a expert looking over the tapes, and in fact it should gladly join this movant in looking into the tape issue to cure this miscarriage of justice.

A jurist of reason can easily see that this movant has serious issues herein at hand, and that a miscarriage of justice did occur, which is clearly visible under the interest of justice scope.

Wherefore premises considered, this movant request that this Court issue its Order for a Evidentiary Hearing in order to clarify the issues herein.

Respectfully submitted on this $3$ day of _____, 2007.

x _____
Jerry Higdon #11167-002
P.O. Box 26030
Beaumont, TX 77720

Certificate of Service

Under penalty of perjury, copies of the foregoing were mailed by placing same in the prison mailing system, prepaid postage to the following parties below on the date below; US Attorney Office, P.O. Box 197, Montgomery, AL. 36101-0197, and the Clerk of the US District Court on this $2$ day of _____, 2007.

x _____
Jerry Higdon

12

Terry Higdon #11167-002

United States Penitentiary

P.O. Box 26030

Beaumont, Tx. 77720

Clerk US District Court

P.O. Box 711

Montgomery, Al.

36101-0711

DATE ___JUN 01 2007___

The enclosed letter was processed through special
mailing procedures for forwarding to you. The letter
has neither been opened nor inspected. If the writer
raises a question or problem over which this facility
has jurisdiction, you may wish to return the material
for further information or clarification. If the writer
encloses correspondence for forwarding to another
addressee, please return the enclosure to the
above address.

FEDERAL CORRECTIONAL COMPLEX
BEAUMONT, TEXAS 77726

****LEGAL MAIL*

****CONFIDENTIAL

EXHIBIT A

Jerry Joseph Higdon §                              State of Texas
                                                 County of Jefferson

### AFFIDAVIT OF JERRY JOSEPH HIGDON

   I hereby attest that I am Jerry Joseph Higdon, the movant in this 2255 proceeding,

and I hereby attest that the following is true and correct to the best of my knowledge;

1). That I received my electronics education at John Patterson State Tech College
    in 1982.

2). I was in the United States Navy in 1985 as a Interior Communications Electrician
    and was awarded two Letters of Accomendation for being in the Top 1% of my
    Company, and the Top 1% of the Battalion.

3). I was a Sound Sales/Engineer for CMI Electonics in Montgomery, AL.

4). I belonged to the North American Sound Contractors Association.

5). That I have designed sound systems for various churches, schools, and auditoriums.

6). That I have received continuing education classes from Dukane Corp. in Illinois,
    and Innovative Electronic Designs in Kentucky.

7). That when I heard the December 10, 2002 tape for the first time in the courtroom,
    I told my counsel Michael Petersen that the tape was altered, due to the whirring
    sound occurring in a D/C recorder, and due to my electronics education I knew
    this to be impossible for a D/C recorder does not whir, a A/C recorder does
    due to a warped belt.

8). In January of 2004, on the prison telephone that is monitored I was told by
    my attorney Michael Petersen that if I would drop my appeal, then Mr. Feaga
    would work out a deal with me for 20 years, and if I testified at trial for
    Mr. Feaga I would have an additional 10 years knocked off of my sentence.
    I asked Mr. Petersen why Mr. Feaga was being so generous, and was told that
    Mr. Feaga had stated that the reason I was sentenced so harshly was because
    they thought that I was someone else. I am a first time offender.

9). I repeatedly requested my attorney Mr. Petersen at trial to stop the trial

1

and request a expert to go over the tape because of the whirring sound I
had heard, and the fact that I knew that myself and Carlton had spoken a
lot more than was on those tapes, but this never occurred, as Mr. Petersen
told me the quality was poor.

10). During the search of my home on December 10, 2002, the deputy who helped
me off of the couch was the one who asked me if there were any weapons, and
I stated that there was a shotgun, but I was not certain. I was led away
from the couch area and it was searched by this deputy, and not Mr. Halasz
as he stated at trial.

11). I did not meet Tom Halasz, until approx. 4 to 5 hours after my home was searched,
when he came to me at the back of a cop car and read me my rights, after
he had asked me to sign the warrant form. I asked what Attachment A was,
and he went to the back of his car and came back with a file stating here,
and gave me a inventory form.

12). That I have asked the Federal Bureau of Prisons to provide me with the transcripts
of my January 2004 phone call with Michael Petersen.

    Affiant further sayeth naught.

 Under the penalty of perjury as required by law for me to so state, the
foregoing is true and correct to the best of my knowledge.

 Signed by my hand on this 3( day of MAY____, 2007.



x _____
   Jerry Joseph Higdon

2

EXHIBIT B

FEATURE

## SOUND RECORDINGS AS EVIDENCE IN COURT PROCEEDINGS

### BY STEVE CAIN

### INTRODUCTION

FEDERAL RULE OF EVIDENCE 901(A) PROVIDES in general terms that the requirement of authentication or identification as a condition precedent to the admissibility of evidence is satisfied by proffered proof sufficient to support a finding that the matter in question is what its proponent claims it to be. A foundation for authentication of sound recordings was established in the federal courts in *United States v. McKeever*,[1] and upheld in cases such as *United States v. McMillan*.[2] In *McMillan* the court ruled that where a government agent testified that he heard the voice of an informant at all times when he was making a recording of a telephone conversation, that this part of the conversation was accurate, and that immediately after the telephone calls were completed, a tape was replayed by the agent in the informant's presence to verify that the conversation had in fact been recorded and that the instruments were operating correctly, it was sufficiently established that the recordings were true and accurate as a basis for their admission in evidence.

In *United States v. Kandiel*,[3] the court ruled that any question concerning the credibility of a witness who identifies voices on a tape recording admitted into evidence simply goes to the weight which the jury accords the evidence, not its admissibility. Referring to *McMillan* the court said:

Applying [the *McMillan* case], we conclude that the government laid a proper foundation for introduction of the two cassette tapes into evidence. The tapes were found at appellant's home. Ahmed Kandiel [defendant's brother] testified that the tapes were made in Egypt and sent to appellant by their mother and father while Ahmed was living with appellant. The contents of the tape recordings have numerous references to people, places and activities that were corroborative of other testimony in the record. We believe the government has offered sufficient circumstantial evidence to establish the prima facie authenticity and correctness of the tapes. Furthermore we find that the government sufficiently established the identity of the speakers through the testimony of Ahmed Kandiel. Appellant's argument that Ahmed's credibility was suspect, and that therefore his



Steve Cain is president of Applied Forensic Technologies International and a forensic tape examiner as well as an examiner of questioned documents.

testimony was insufficient to establish foundation for the admission of the tapes is without merit. Identification of a voice, whether heard firsthand or through mechanical or electronic transmission or recording, may be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." Fed. R. Evid. 901(b)(5). Any question concerning the credibility of the identifying witness simply goes to the weight the jury accords this evidence, not to its admissibility. *United States v. Kirk*, 534 F.2d 1262, 1277 (8th Cir. 1976), cert. denied, 433 U.S. 907, 97 S. Ct. 2971, 53 L. Ed. 2d 1091 (1977). Our review of the record convinces us that the district court did not abuse its discretion in finding that proper foundation was laid for admitting the tapes. *See United States v. Johnson*, 767 F.2d 1259, 1271 (8th Cir. 1985).[4]

The cases are, therefore, now in general agreement as to what constitutes a proper foundation for the admission of a sound recording and indicate a reasonably strict adherence to the rules prescribed for testing admissibility of recordings, as set forth in *McMillan*.[5] These rules can be summarized as follows:

· The recording device must have been capable of taking the conversation now offered in evidence

· The operator of the device must be competent to operate the device

· The recording must be authentic and correct

· Changes, additions or deletions have not been made in the recording

· The recording must have been preserved in a manner that is shown to the court

· The speakers must be identified

· The conversation elicited was made voluntarily and in good faith, without any kind of inducement.[6]

(continued on page 26)

25

**SOUND RECORDINGS**

*(continued from page 25)*

## THE BASIC PROCESS

OVER THE PAST 35 YEARS, ATTORNEYS HAVE UTILIZED THE basic process set forth in *McMillan* to create cases for admission of tapes or, on the opposition side, to deny admission of tape evidence. This process involves the following elements:

· Capability of the recording device: this first requisite may be fulfilled simply. The very existence of the tape recording proves that the recording device was functioning and capable of duplicating sounds.[1]

· Competency of the operator: today most people know how to operate a tape recorder so this step is almost automatic. In *United States v. McCowan*,[8] the agent merely testified that he learned how to use the recorder on the day he made the tapes. The fact that he successfully made the recordings satisfied the competency requirement.

> "OVER THE PAST 35 YEARS, ATTORNEYS HAVE UTILIZED THE BASIC PROCESS SET FORTH IN *MCMILLAN* TO CREATE CASES FOR ADMISSION OF TAPES, OR ON THE OPPOSITION SIDE, TO DENY ADMISSION OF TAPE EVIDENCE."

· Authenticity and correctness of the recording: authentication is satisfied by evidence sufficient to support a finding that the matter in question is "what its proponent claims,"[9] as decreed in Federal Rule of Evidence 901. The standard for correctness of a recording [is] whether "the possibility of misidentification and adulteration [is] eliminated, not absolutely, but as a matter of reasonable probability."[10]

· Preservation of the recording with no additions, deletions or changes: an aural overview of the tape allows the court to hear signs (*i.e.,* gaps) which might indicate tampering. If there exists signs of tampering, a forensic expert is often consulted. If there are no signs of tampering, a proper chain of custody documentation may suffice.[11]

· Chain of custody: this fifth step has created stumbling blocks for proponents of admissibility. The proponent for the tape's admittance can assure the court that the item offered as evidence is substantially the same as it was originally by documenting its "chain of custody." A proper chain of custody begins with consecutively numbered and dated tapes. Careful logs are then kept which note the time of particular conversations and the locations on the tapes at the time of occurrence. These evidence tapes are sealed and stored in separate envelopes and appropriate chain of custody records are maintained by the evidence custodian.[12]

· Identification of the speakers: Federal Rule of Evidence 901(b)(5) states that: "Voice identification is adequate if made by a witness having sufficient familiarity with the speaker's voice." The rule goes on to clarify that familiarity may be obtained previous to or after listening to the recorded voice. This standard for voice identification has been upheld in cases such as *United States v. Rizzo, United States v. Bonanno*, and *United States v. Hughes*.[13]

—Voluntary elicitation of the recorded conversation: as long as one participant in the conversation is aware that he is being recorded, the tape fulfills this final requirement. This means that a defendant's Fourth Amendment rights are not violated when the conversation is electronically monitored by a government agent with consent of the government informant in the investigation.[14]

## ADMISSIBILITI OF INAUDIBLE SOUND RECORDINGS

IT IS A GENERAL RULE THAT A sound recording is admissible unless the inaudible portions or omissions are so substantial as to render the recording as a whole untrustworthy as evidence.[15] It has further been established that the question of admissibility of audible portions of tape recordings, when certain portions were inaudible, was properly addressed to the discretion of the trial court.[16]

## RECENT COURT RULINGS

THE HISTORICAL PROCESS SET OUT ABOVE, AS FIRST established in *United States v. McMillan*, is widely used today even though several recent court decisions provide more relaxed rulings on admissibility. For example, in *United States v. Traficant*,[17] the court stated that: "Recent cases have developed more flexible standards for the admission of tape recorded conversations. The most important criterion for admission is that the tapes accurately reflect the conversation which they purport to record. . . . This evidence may be circumstantial or direct, real or testimonial, and need not conform to any particular mode." Therefore, according to the more liberal admission rulings, a tape recording may be admitted into evidence if a proper chain of custody is proven. Or, if the chain is not strong enough, the proponent of the tape may submit it to a qualified forensic expert for authentication. In *United States v. King*,[18] the United States Court of Appeals for the Ninth Circuit characterized the elements of the process as "useful, but not dispositive guidelines for determining when a proper foundation for the introduction of sound recordings has been made." The Ninth Circuit said that the trial court, in the exercise of its discretion, must be satisfied that the recording is accurate, authentic and generally trustworthy.

## EXAMINATION REQUESTS AND REQUIRED EQUIPMENT

WHEN AN AUDIO TAPE IS SUSPECTED OF HAVING BEEN TAM-
pered with, it may be forwarded to a qualified forensic audio specialist
for authentication. Prosecutors often request investigation of deficiencies
in the previously mentioned process. Examples of such problems are:
· Credibility questions relating to the tape recorder operator

-- Chain-of-custody contradictions

· Differences between the content of the tape and testimony of what was
said.

Most often, however, a forensic expert is contacted when the
tape is believed to have been altered or tampered with. Due to the nature
of the allegations surrounding tampering issues, the examiner will require
specific items from the party.

The Federal Bureau of Investigation, for example, has a
protocol of required information, including:
· The original tape.

· The tape recorders and related components used to pro
    duce the recording

· Written records of any damage or maintenance done to the recorders,
  accessories and other submitted equipment

· A detailed statement from the person or persons who made the
  recording, describing exactly how it was produced and the conditions
  that existed at the time, such as:

1. Power source, including a portable generator or drycell batteries

2. Input, such as telephone, radio frequency transmitter/receiver,
   miniature microphone, etc.

3. Environment, such as telephone transmission line, restaurant,
   apartment, street, etc.

4. Background noises, such as television, radio, unrelated
   conversations, computer games, etc.

5. Foreground information, such as number of individuals involved in
   the conversation, general topics of discussion, closeness to
   microphone, etc.

6. Magnetic tape, such as brand, format, when purchased, whether
   previously used

7. Recorder operation, such as number of times turned on and off in
   the record mode, type of keyboard or

*(continued on page 28)*

September/October 1995

SOUND RECORDINGS

(continued from page 27)

remote operations for all known recorded events, use of voice-activated features, etc.

· A typed transcript of the entire recording or, if that is not available, transcriptions of the portions in question.

The items listed above are examples of what is required by a forensic expert as she begins an examination of questioned audio recordings.

## TECHNICAL DEFINITIONS

CERTAIN TECHNICAL DEFINITIONS SHOULD BE UNDERSTOOD by prosecutors and others in considering the technical process of examining sound recordings. They include the ones listed below.

### FALSIFICATION OF TAPES

A QUALIFIED FORENSIC EXPERT DETERMINES AUTHENTICA-tion by performing a number of scientific tests which detect evidence of tampering or falsification. The four basic types of tampering are these:

· Deletion: the elimination of words or sounds by stopping the tape and over-recording unwanted areas

· Obscuration: the mixing in of sounds of amplitude suffi cient to mask waveform patterns which originally would show stops and starts in inappropriate places

· Transformation: the rearranging of words to change con tent or context

· Synthesis: the adding of words or sounds by artificial means or impersonation

### ELECTROMECHANICAL INDICATIONS OF FALSIFICATION

THESE ARE SOMETIMES REFERRED TO AS "ANOMALIES" AND include the following:

· Gaps: segments in a recording which represent unexplained changes in content or context (a gap can contain buzzing, humming or silence)

· Transients: short, abrupt sounds exemplified by clicks, pops, etc. (transients may indicate tape splicing)

· Fades: gradual loss of volume (fades can cause inaudibility and are considered gaps when the recording becomes fully inaudible)

· Equipment sounds: inconsistencies of context caused by the recording equipment itself (common equipment sounds include hums, static, whistles, and varying pitches)

· Extraneous voices: background voices which at times appear to be as near as the primary voices (these can, at times, even block the primary voices).

## DETECTING FALSIFICATIONS

·A FORENSIC EXPERT IS TRAINED to detect falsifications and to authenticate – sound recordings. The expert correlates his observations of anomalies with machine functions to interpret events in the following ways.

· Critical listening: this involves the use of human analytical capabilities to locate anomalies. The forensic expert listens with proper headphones to the original tape using high-quality analytical equipment. He first performs a preliminary overview of the original tape and notes events, including starts, stops, speed fluctuations, and other variations requiring further investigation. He then examines recorded events and categorizes them as environmental or non-environmental. After examining recorded events, the expert analyzes background sounds. He listens for abnormal changes, absences or the presence of environmental sound. The final phase of critical listening is an extensive audit of the foreground information. He concentrates on voices, conversations and other audible sounds. Here anomalies include sudden changes in a person's voice, abrupt unexplained topic change or strong foreground interruptions indicative of obscuration. The initial forensic process of critical listening provides foundation and direction for later intensive instrumental tests.

· Physical inspection: the forensic expert next inspects for tampering with thorough visual inspection of the tape itself. She inspects the housing for pry marks, welding, size, label and date, consistent with the alleged recording date. She also measures the tape and assures that the splicing of the magnetic tape to the leader is consistent with a normal manufacturing process. Any other splices are noted as possible alterations.

· Magnetic development: direct visual observation of the "developed" tape is conducted to find track widths, the type of recorder used and the presence or absence of residual speech signals.

· Spectrum analysis: specialized computer equipment and programs to produce a visual interpretation of a frequency-versus-amplitude and frequency-versus-amplitude-versus-time displays. This allows the expert to view the entire spectrum or to zoom in on an area of particular interest thereby helping to characterize the acoustic quality of anomalies and identify their source.

· Waveform analysis: a computer generated display representing time-versus-amplitude of recorded sounds in graphic form. With such analysis the expert can often

"THE HISTORICAL PROCESS . . . IS WIDELY USED TODAY EVEN THOUGH SEVERAL RECENT COURT DECISIONS PROVIDE MORE RELAXED RULINGS ON ADMISSIBILITY. "

The Prosecutor

measure signal return time, which reveals how long a recorder had been turned off. He can identify recordmode events, including the measurement of record-toerase-head distance, determination of the spacing between gaps in multiple-gap erase heads and inspection of the signature shape and spacing of various record event signals.

· Recorder performance: various electrical and mechanical measurements of standard and modified recorders for use in finding possible origins of buzz sounds, hum, etc.

## CONCLUSION

IN ORDER TO SUBMIT SOUND RECORDINGS AS EVIDENCE IN court, a prosecutor or other attorney must establish that the tape is an authentic representation of the conversation it is said to record. A traditional method of establishing authenticity involves maintaining a chain of custody which logs all
persons, times and locations concerned in the creation of the tape. Then, the tape must be officially sealed and stored to complete a proper chain of custody. However, even if this procedure is strictly observed, there may still be challenges to the tape's authenticity.

The recording may contain inconsistencies suggestive of tampering. In such cases, a prosecutor may consult a qualified forensic examiner to inspect the tape. The examiner would initially listen critically for signs such as gaps, transients, fades, equipment sounds or extraneous voices which indicate tampering. Then she would utilize other methods like physical inspection, magnetic development, spectrum analysis and waveform analysis to discover anomalies.

It is relatively easy to change the content of a recording by deleting words or sections, by obscuring meaning with over-recorded sounds, or by transforming context through rearrangement of selected phrases or by adding additional words through synthesis. Nevertheless, falsifications normally leave detectable magnetic and waveform acoustic signatures which can lead to forensic individualization of the evidential recorders and tapes.

## ENDNOTES

1 United States v. McKeever, 169 E Supp. 426, 430 (S.D.N.Y. 1958), rev'd on other grounds, 271 E2d 669 (2d Cir. 1959).
2 United States v. McMillan, 508 E2d 101, 104 (8th Cir. 1974), cen. denied, 421 U.S. 916 (1975); see also United States v. Kandiel, 865 E2d 967, 973-974 (8th Cir. 1988), cen. denied, 487 U.S. 1210 (1988); Todisco v. United States, 298 E2d 208 (9th Cir. 1962).
3 United States v. Kandiel, 865 E2d 967, 973-974 (8th Cir. 1988), cen. denied, 487 U.S. 1210 (1988).
4 Kondiel, 865 E2d at 974.
5 McMillan, 508 E2d at 104.
6 Id. at 104.
7 United States v. Moss, 591 E2d 428, 433 (8th Cir. 1979); United States v. McCowan, 706 E2d 863 (8th Cir. 1983).
8 McCowan, 706 E2d at 863.
9 Zenith Radio Corp. v. Matsushita Electrical Industries Co., 505 E Supp. 1190 (E.D. Pa. 1980), and Finance Co. of America v. Bankamerica Corp., 493 E Supp. 895 (D.C. Md. 1980).
10 Gass v. United States, 416 E2d 767, 770 (D.C. Cir. 1969); United States v. Haldeman, 559 E2d 31 (D.c. Cir. 1976).
11 United States v. Faurote, 749 E2d 40 (7th Cir. 1984).
12 United States v. Craig, 573 E2d 455 (7th Cir. 1977), cen. denied, 439 U.S. 820 (1978).
13 United States v. Rizzo, 492 E2d 443 (2d Cir. 1974), cen. denied, 417 U.S. 944 (1974); United States v. Bonanno, 487 E2d 654 (2d Cir. 1973); United States v. Hughes, 658 E2d 317 (5th Cir. 1981).
14 United States v. White, 401 U.S. 745 (1971); United States v. Bonanno, 487 E2d 654 (2d Cir. 1973); United States v. Bishton, 463 E2d 887 (D.C. Cir. 1972); United States v. Quintana, 457 E2d 874 (10th Cir. 1972), cen. denied, 409 U.S. 877 (1972); United States v. Holmes, 452 E2d 249 (7th Cir. 1971), cen. denied, 405 U.S. 1016 (1972).
15 United States v. West, 948 E2d 1042 (6th Cir. 1991); People v. Rogers, 543 N.E.2d 300 (Ill. 1989); State v. Rodriguez, 583 N.E.2d 795 (Ind. 1972).
16 United States v. Enright, 579 E2d 980 (6th Cir. 1978); United States v. Gordon, 688 E2d 42 (8th Cir. 1982).
17 United States v. Traficant, 558 E Supp. 996, 1002 (N.D. Ohio, 1983).
18 United States v. King, 587 E2d 956, 961 (9th Cir. 1978).

September/October 1995

EXHIBIT C

U.S. DEPARTMENT OF JUSTICE
Federal Bureau of Prisons

## AUTHORIZATION TO RECEIVE PACKAGE OR PROPERTY

Name and Address of Person Sending Package

**Michael J. Petersen ESQ.**
(Name)

**201 Monroe Street**
(Address)

**Suite 407**

| **Montgomery** | **Alabama** | **36104** |
| (City) | (State) | (Zip Code) |

**EXPIRATION DATE**

6-24-07

This Authorization Is Not Valid After The Date Shown.

Enter Inmate Name, Register No., and Institution Address Here:

**Jerry J. Higdon, Jr.**
**11167-002**
**United States Penitentiary**
**P.O. Box 26030**
**Beaumont, Texas 77720-6030**

THE NAMED INMATE IS AUTHORIZED TO RECEIVE (specify below):

You are authorized to send the following personal property. PLEASE NOTE: Including unauthorized materials in the package will result in the entire package being returned undelivered.

| QUANTITY | ITEM AND DESCRIPTION (INCLUDED STATED VALUE) | DISPOSITION |
|---|---|---|
| 3 boxes | Inmates Jury Trial Case File      (LEGAL MAIL) | M,K |
| | | |
| | | |
| | | |
| | | |
| | | |

SPECIAL INSTRUCTIONS: The inmate will mail the pink and goldenrod copy to addressee. The addressee may retain the pink copy but must include the GOLDENROD IN THE PACKAGE. The material must also be received prior to the Expiration Date shown above.

DISPOSITION: S = Storage; D = Donated; K = Keep in Possession; M = Mail; C = Contraband

ENTER SIGNATURE, TITLE AND DATE OF APPROVING OFFICIAL – APPROVING OFFICIAL ALSO ENTERS EXPIRATION DATE, above.

_for Michael Nalley Coll Commander_                    6/24/07
(Signature and Title)                                   (Date Approved)

## INSPECTION AND RECEIPT

Completed by Inspecting Staff

Status/Condition of Property Received:

Inspected and cleared for issue: _____
                                      (Staff Signature)        (Date)

_____
(Inmate Signature Upon Receipt)                              (Date)

The white, green and canary copy remain together until fully completed.
The pink and goldenrod are forwarded to the addressee by the inmate.

Final Filing: White – Central File
              Green – R&D Property File
              Canary – Inmate
              Pink – Addressee to keep
              Goldenrod – Addressee place in package



EXHIBIT D

## FREEDOM OF INFORMATION ACT REQUEST

APRIL 23, 2007

Regional Office Bureau of Prisons
4211 Cedar Springs Road
Suite 300
Dallas, Texas  75219

Records Officer,

This is a request under the Freedom of Information Act (U.S.C. 5 § 552) in conjunction with the Privacy Act (U.S.C. 5 §552a).

I am writing to request a copy of the following information:  I need to receive the transcripts of my personal telephonic conversations under the name Jerry Joseph Higdon, Jr. inmate register #11167-002, PAC # 738720177, to the following phone numbers, 334-269-1506, from January 01, 2004 to March 31, 2004, and phone number 334-262-1006 from April 01, 2006 to July 31, 2006 all from the telephones here in USP Beaumont, Building One Unit A/B phone ID's 4138, 4139, 4140 and 4141.

Please contact me with the approximate cost of the transcripts as soon as possible. I thank you for your prompt response in this matter.

The FOIA also provides that if only a portion of a file are exempted from release, the remainder must be released.  I therefore request that I be provided with all nonexempt portions which are reasonably segregate.  I, of course, reserve the right to appeal the withholding or deletion of any information.

If you have any questions regarding this request, please write me at the below captioned address.

As provided in the Freedom of Information Act, I will expect to receive a reply within the twenty working days prescribed by law.

Regards,

Jerry Joseph Higdon, Jr.

Jerry J Higdon 11167-002
P.O. Box 26030
United States Penitentiary
Beaumont, Texas 77720-6030





**U.S. Department of Justice**

Federal Bureau of Prisons

*South Central Regional Office*

---

*4211 Cedar Springs Road, Suite 300*
*Dallas, Texas 75219*

MAY  7  2007

Jerry J. Higdon
Register Number 11167-002
Federal Correctional Complex (USP)
Post Office Box 26030
Beaumont, Texas 77720

RE: Correspondence

Dear Mr. Higdon:

This is in response to your letter dated April 23, 2007, in which
you request a copy of transcripts for specific telephone
conversations for calls you made from the United States
Penitentiary at the Federal Correctional Complex at Beaumont,
Texas.

In accordance with Title 28, Code of Federal Regulations,
Sections 16.3, please direct your correspondence to:

        Director
        Federal Bureau of Prisons
        320 First Street, N.W.
        Room 841
        Washington, D.C.  20534

Please ensure your correspondence and the envelope are clearly
marked "FREEDOM OF INFORMATION REQUEST."  Additional information
is provided at Title 28, Code of Federal Regulations, Section
513.50, et. seq.

Sincerely,

Jason A. Sickler
Regional Counsel

lc

**SENSITIVE BUT UNCLASSIFIED**

U.S. Department of Justice                    **Certification of Identity**                    

Privacy Act Statement. In accordance with 28 CFR Section 16.41(d) personal data sufficient to identify the individuals submitting requests by mail under the Privacy Act of 1974, 5 U.S.C. Section 552a, is required. The purpose of this solicitation is to ensure that the records of individuals who are the subject of U.S. Department of Justice systems of records are not wrongfully disclosed by the Department. Failure to furnish this information will result in no action being taken on the request. False information on this form may subject the requester to criminal penalties under 18 U.S.C. Section 1001 and/or 5 U.S.C. Section 552a(i)(3).

Public reporting burden for this collection of information is estimated to average 0.50 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Suggestions for reducing this burden may be submitted to Director, Facilities and Administrative Services Staff, Justice Management Division, U.S. Department of Justice, Washington, DC 20530 and the Office of Information and Regulatory Affairs, Office of Management and Budget, Public Use Reports Project (1103-0016), Washington, DC 20503.

Full Name of Requester [1]  **Jerry Joseph Higdon Jr.**

Citizenship Status [2]  **USA**                    Social Security Number [3]  **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**

Current Address :**Jerry Higdon 11167-002; P.O. Box 26030;Beaumont, TX. 77720-6030**

Date of Birth  **February 15, 1963**            Place of Birth  **Biloxi, Mississippi**

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I am the person named above, and I understand that any falsification of this statement is punishable under the provisions of 18 U.S.C. Section 1001 by a fine of not more than $10,000 or by imprisonment of not more than five years or both, and that requesting or obtaining any record(s) under false pretenses is punishable under the provisions of 5 U.S.C. 552a(i)(3) by a fine of not more than $5,000.

Signature [4] x _____    Date  **April 23, 2007**

---

OPTIONAL: Authorization to Release Information to Another Person

This form is also to be completed by a requester who is authorizing information relating to himself or herself to be released to another person.

Further, pursuant to 5 U.S.C. Section 552a(b), I authorize the U.S. Department of Justice to release any and all information relating to me to:

_____

**Print or Type Name**

[1] Name of individual who is the subject of the record sought.
[2] Individual submitting a request under the Privacy Act of 1974 must be either "a citizen of the United States or an Alien lawfully admitted for permanent residence," pursuant to 5 U.S.C. Section 552a(a)(2). Requests will be processed as Freedom of Information Act requests pursuant to 5 U.S.C. Section 552, rather than Privacy Act requests, for individuals who are not United States citizens or aliens lawfully admitted for permanent residence.
[3] Providing your social security number is voluntary. You are asked to provide your social security number only to facilitate the identification of records relating to you. Without your social security number, the Department may be unable to locate any or all records pertaining to you.
[4] Signature of individual who is the subject of the record sought.